# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BLACKBIRD TECH LLC d/b/a BLACKBIRD
TECHNOLOGIES,

        Plaintiff,

v.

No. 16-cv-140 (RGA)

LENOVO (UNITED STATES) INC.,
        Defendant.

## MEMORANDUM OPINION

Stamatios Stamoulis, Richard C. Weinblatt, STAMOULIS & WEINBLATT LLC,
Wilmington, Del.; Wendy Verlander, Christopher Freeman, David Gerasimow
(argued), BLACKBIRD TECHNOLOGIES, Boston, Mass., attorneys for Plaintiff.

Frederick L. Cottrell, III, RICHARDS, LAYTON, & FINGER, PA, Wilmington, Del.; Fred
I. Williams, Michael Simons, VINSON & ELKINS LLP, Austin, Tex.; Eric J. Klein,
Todd E. Landis (argued), VINSON & ELKINS LLP, Dallas, Tex., attorneys for
Defendant.

June 19, 2017

ANDREWS, U.S. DISTRICT JUDGE:

Plaintiff Blackbird Technologies brings suit against Defendant Lenovo claiming infringement of U.S. Patent No. 7,129,931 by the Lenovo ThinkPad S230u Twist. The '931 Patent, "Multipurpose Computer Display System," relates to a laptop computer with a dual-axis hinge for the monitor and a front-facing port. The named inventor of the '931 Patent is Nicholas Pappas.

## I.    LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324) (alteration in original). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted).

2

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (internal quotation marks omitted). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention

3

works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GMBH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

## II. CLAIM CONSTRUCTION

The dispute in this claim construction center on a term in claim 1 of the '931 Patent. Claim 1 reads:

1. A computer system comprising:

a) a keyboard unit including a computer keyboard and a keyboard base that includes a front wall and a back wall;

b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;

c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and

d) a *port* positioned proximate said front wall of said keyboard base, said *port* adapted to receive a signal from an ancillary computer system;

4

wherein a signal from said ancillary computer system delivered to said *port* is effective to generate a computer-generated image on said display screen; and

wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen.

('931 Patent, col. 13, ll. 10–40 (disputed terms italicized)).

In the briefing, the parties disputed multiple terms. After the *Markman* hearing and post-hearing briefing, the only dispute remaining is whether "port" includes a PC card slot.

## 1. no construction for "two spaced slots"

In its sur-reply, Defendant stipulated to Plaintiff's proposal that "two spaced slots" be given its plain and ordinary meaning. (D.I. 48 at 68). Plaintiff argued, and I agree, that the jury is capable of understanding "two spaced slots" without additional construction. Thus, I decline to construe the term.

## 2. "directly" means "passing through the mounting assembly, but no other structure"

In the briefing, the parties vigorously disputed the meaning of "directly" in the term "directly into said intermediate region." Plaintiff argued "directly" meant "passing through the mounting assembly, but no other structure." At oral argument, Defendant agreed to Plaintiff's construction of "directly." Thus, I adopt it.

For the first time at the hearing,[1] Defendant raised the argument that "intermediate region" needed to be construed. As this term was not addressed in the briefs, I decline to address it at this time.

### 3. "proximate" means "next to, very near, or close to"

After shifting claim constructions on the part of Defendant, the parties have agreed that "proximate" as used in "a mounting assembly proximate said back wall of said keyboard base" and "a port positioned proximate said front wall of said keyboard base...." means ""next to, very near, or close to." (D.I. 53 at 4; D.I. 51 at 21). This construction is consistent with the plain meaning of the term. *See, e.g., American Heritage Dictionary of the English Language* (4th ed. 2000) (defining "proximate" as "[v]ery near or next, as in space, time, or order").

### 4. "port" means "interface not including a PC card slot"

At the hearing, the parties narrowed their disagreement on the term "port" to whether "port" includes PC card slots, or whether PC card slots were disclaimed during the prosecution of the patent. Plaintiff argues that PC card slots were disclaimed because, in prosecuting the patent, Pappas explicitly said that PC card slots were not "ports" as claimed. Defendant argues that they were not disclaimed

---

[1] It is the Court's understanding that Defendant changed counsel between filing its answering brief and its sur-reply brief.

because of a later statement by Pappas that prior arguments were moot. After a review of all cited portions of the prosecution history, I agree with Plaintiff. The patentee clearly disclaimed PC card slots.

Before reaching the prosecution history, the specification supports construing PC card slots as something distinct from "ports." At column 5, line 52, the specification describes PC card slots as one possible component in a laptop base. In the next paragraph, the specification transitions to discussing ports. ('931 Patent, col. 5, l. 59–col. 6, l. 10). This discussion suggests the patentee considers PC card slots and "ports" to be different. While not conclusive, the treatment of ports and PC card slots as distinct supports construing "ports" not to include PC card slots.

The prosecution history is conclusive. "[A] prosecution disclaimer requires 'clear and unambiguous disavowal of claim scope...." *Safran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013). It does not, however, require an explicit statement, "I hereby disclaim the following...." *Id.* Disclaimer can occur where a patentee argued that "a prior art reference is distinguishable on a particular ground... even if the applicant distinguishes the reference on other grounds as well." *Id.*

The parties talk past each other on which standard should apply to determining whether a disavowal occurred in this case. Plaintiff urges application of the standard developed in cases where a patentee disclaimed claim scope in a parent application and sought to reclaim it in a child application. (D.I. 53 at 1). In

7

those cases, the prior disclaimer can be rescinded if the prosecution history is "sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited." *Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1319 (Fed. Cir. 2007). Defendant urges me to consider whether a disclaimer occurred in light of the prosecution history as a whole. (D.I. 54 at 1–2 (citing *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009))). Applying either standard, a clear disclaimer occurred here.

In a June 30, 2003 Office Action, Pappas's application was rejected, in part, because "Kikinis teaches the port (105) positioned proximate the side wall of the keyboard base." (A342–43).[2] "Kikinis" refers to U.S. Patent No. 5,708,840.

In a December 30, 2003 response to the rejection, Pappas made two statements that disavowed PC card slots. First, in summarizing the benefits of his invention, Pappas stated, "Applicant's recited 'port' is to be distinguished from card slots, e.g., PC card slot. Card slots are structurally distinct from ports and perform different functions relative to port(s). See, e.g., specification at page 11, lines 11-16." (A28 n. 1). Pappas also argued, among other things, that the "port" in the Kikinis patent "is analogous to the PC card slots disclosed in applicant's specification, and

---

[2] The appendix is available at D.I. 49 (A1–338) and D.I. 56 (A339–80).

is altogether different from the ports for receiving a signal from an ancillary computer system, as disclosed and claimed by applicant (see, e.g., port 112 in Fig. 1)." (A30) (footnote omitted).

These statements clearly disavow PC card slots. The first statement is as close to saying, "I hereby disclaim PC card slots," as is possible without using those exact words. The second statement builds off the initial statement by placing PC card slots in a category "altogether different from" the "port" claimed in the patent.

In a February 18, 2004 Office Action, the examiner again rejected Pappas's application. In this rejection, the examiner put forward mostly new grounds for rejection, combining the Kikinis patent with a new prior art reference. The examiner stated, "Applicant's arguments with respect to claims 1-17 have been considered but are moot in view of the new ground(s) of rejection." (A360). The new prior art reference was not cited in relation to the "port" term. The examiner again stated that the Kikinis patent teaches a "port." (A357).

In his August 18, 2004 response, Pappas stated, "Applicant submits this [Request for Continued Examination] in response to a Final Office Action dated February 18, 2004, in which new grounds of rejection were advanced by the Examiner, thereby rendering moot applicant's previous arguments distinguishing the rejections initially advanced by the Examiner." (A112). Defendant seizes on this statement, arguing that it unwinds the prior disclaimer. (D.I. 54 at 2). It does not.

9

Reading Pappas's "moot" comment in context, he is merely acknowledging the examiner's own prior statement that the earlier arguments were moot. Deeming an argument moot generally denotes that the argument is no longer relevant, not that it is withdrawn. Defendant does not point to anywhere in the prosecution history that Pappas takes a contrary position on the meaning of "port."

In light of the clear statements by the inventor that the term "port" did not include PC card slots, I am construing "port" as an "interface not including a PC card slot."

III. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion.