## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BLACKBIRD TECH LLC d/b/a BLACKBIRD TECHNOLOGIES, | ) ) ) | |
| Plaintiff, | ) | C.A. No. 16-140-RGA |
| v. | ) ) ) | REDACTED PUBLIC VERSION |
| LENOVO (UNITED STATES) INC., | ) ) | |
| Defendant. | ) | |

## DECLARATION OF T. KIM PARNELL, PhD IN SUPPORT OF DEFENDANT LENOVO (UNITED STATES) INC.'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF NO INVALIDITY

*Of Counsel:*

Jennifer Salinas (*pro hac vice*)
Anup Shah (*pro hac* vice)
Jenny Kim (*pro hac vice*)
TROUTMAN SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, CA  92614-2545
Telephone:     (949) 622-2700
Jennifer.Salinas@troutman.com
Anup.Shah@troutman.com
Jenny.Kim@troutman.com

Frederick L. Cottrell, III (#2555)
Renée M. Mosley (#6442)
RICHARDS, LAYTON & FINGER, PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
cottrell@rlf.com
mosley@rlf.com

*Attorneys for Defendant Lenovo (United States) Inc.*

Dated: May 11, 2018

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BLACKBIRD TECH LLC d/b/a<br>BLACKBIRD TECHNOLOGIES, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 16-140-RGA |
| | ) | **CONFIDENTIAL-** |
| v. | ) | **FILED UNDER SEAL** |
| | ) | |
| LENOVO (UNITED STATES) INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF T. KIM PARNELL, Ph.D., IN SUPPORT OF DEFENDANT
LENOVO (UNITED STATES) INC.'S ANSWERING BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF NO INVALIDITY**

I, T. Kim Parnell, declare as follows:

1.      I make this declaration in support of Defendant Lenovo (United States) Inc.'s

("Lenovo") Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment of No

Invalidity.  I submit this declaration based on my personal knowledge, my experience, and my

investigation into this case, including my review of the materials cited herein.  If called as a

witness, I could and would competently testify to the truth of each statement herein.

**I.      INTRODUCTION**

2.      In 1978, I received a BES in Engineering Science & Mechanics from the Georgia

Institute of Technology (Georgia Tech).  In 1979, I received an MSME degree in Mechanical

Engineering from Stanford University.  In 1984, I received a Ph.D. in Mechanical Engineering

also from Stanford University.

3.      I am a licensed professional Mechanical Engineer (PE License M25550) in the

State of California.  I have over 30 years' experience as a professional engineering consultant

including 1986-1999 as a Senior Managing Engineer at Exponent and 2000 to present as

Principal & Founder of Parnell Engineering & Consulting (PEC).  My practice encompasses

design, failure analysis, and reliability for a variety of industrial, medical, electronic, and

34919144v1

2

consumer products. My professional career started at Bell Telephone Laboratories (Bell Labs) in 1978 where I was involved with the physical design of telephone sets, components, and evaluation of new technology.

4. I have performed inspections and consulted on several types of consumer electronic equipment (computers, cell phones, portable entertainment devices, etc.) during my career. I also have direct experience with manufacturing in multiple industries during my consulting career. These applications include consumer electronics, biomedical, medical device, automotive, petrochemical, paper, metal forming, metalworking, specialty materials and others. Equipment at issue often involves injection molding, metal forming and machining, semiconductor packaging, pipelines and piping components, pressure vessels, sensors and control systems.

5. I am a Fellow of the American Society of Mechanical Engineers (ASME) and a Senior Member of the Institute of Electrical and Electronic Engineers (IEEE). I am also a member of several IEEE Societies including Consumer Electronics (CE), Electronics Packaging Society (EPS), Vehicular Technology Society (VTS), Sensors Council, and the Nanotechnology Council. I was elected as Chair of the IEEE Santa Clara Valley Section in 2011 (the SCV Section is the largest IEEE Section in the world with over 12,000 members in Silicon Valley). I was elected as Chair of the IEEE Consultants' Network of Silicon Valley (IEEE-CNSV) in 2008-2009 and remain as a Member of the Board of Directors for this organization. I am also a Member of ASM (ASM International), the ASM Electronic Device Failure Analysis Society (EDFAS), the ASM Shape Memory & Superelastic Technology (SMST), and SAE (Society of Automotive Engineers).

6. I was a full-time member of the Mechanical Engineering faculty at Santa Clara University from 2010-2012 and taught classes in Manufacturing, Material Science, Mechanical Design, Finite Element Analysis (FEA), Composite Materials, and Mechanisms. During this time, I served as the Faculty Advisor for several Senior Design Projects. These "real world" Capstone Design Projects encompassed design, system integration, and manufacturing aspects

34919144v1

3

and provided the students with a full product development experience.  I also taught graduate courses in Mechanical Engineering at Stanford University from 1995-1996.  I have delivered numerous invited presentations, short-courses, and seminars on a range of technical topics to professional organizations.  Some topics include Mechanical Design for Reliability (MDfR) courses tailored to specific types of products and industries, and Medical Device Technology.  I taught several courses involving the application of simulation and analysis tools and how to better utilize simulation in the design cycle to reduce design time and to improve product reliability.

7.      A more comprehensive record of my professional background and technical qualifications is reflected in my *curriculum vitae*, Exhibit A to the Expert Report of T. Kim Parnell, Ph.D Regarding Invalidity of U.S. Patent No. 7,129,931, attached hereto as Exhibit 1.  I have been retained as an expert in over 30 cases and have testified at trial and in depositions.  A list of my expert engagements is included in my *curriculum vitae*.

8.      I am being compensated at my usual rate of $450 per hour for my work related to this dispute.  My compensation is not contingent on the conclusions I reached in my analysis, the testimony or opinions that I give, or the outcome of this dispute.

9.      I have been retained as an expert in this case by Lenovo to provide expert opinions and testimony regarding claims 1, 2, 3, 6, 8, 9, and 10 (the "Asserted Claims") of U.S. Patent No. 7,129,931 (the "'931 patent"), which have all been asserted against Lenovo.  In particular, I have been tasked to review and offer my opinions regarding statements made by Plaintiff Blackbird Tech LLC d/b/a Blackbird Technologies ("Blackbird") in its Motion for Summary Judgment of No Invalidity ("Motion" or "Mot.").  I understand that Blackbird's expert, James L. Glancey, has not submitted a declaration in support of Blackbird's Motion.

10.     In connection with my analysis, I have reviewed Blackbird's Motion, the '931 patent, relevant prior art, the Court's Markman Order and Memorandum Opinion, relevant documents and deposition transcripts from the case, and other materials cited herein.  In forming

my opinions, I have also relied on my education, experience, and knowledge of basic engineering principles, consumer electronics, and manufacturing techniques.

## II.    LEVEL OF ORDINARY SKILL IN THE ART

11.    The subject matter of the '931 patent, discussed in further detail below, is directed to a design for a portable computer display system and to provide added convenience in terms of positioning of the display system.  I understand that September 14, 2001 is the effective filing date of the patent application that issued as the '931 patent.

12.    It is my opinion that a POSITA of the '931 patent technology at the time of the invention would have at least 18 months of hands-on computer physical design work or mentorship from a computer physical designer, and an undergraduate degree in mechanical engineering, manufacturing design, or an equivalent engineering degree.  The POSITA at the time of the invention of the '931 patent would be familiar with the physical design of computers and laptop computers as well as consumer electronics devices in general.  A POSITA's knowledge of laptops would include, among other things, a familiarity with hinge mechanisms used to connect a base to a display and other components found in laptop computers.

13.    I utilized my professional and personal experience on the state of the relevant art at the time of the '931 patent invention, and also prior to the invention of the '931 patent.  In addition, I am aware of information generally available to, and relied upon, by a POSITA during the relevant time period.  Such information includes familiarity with the wide variety of laptop systems available from the relevant time period.  My personal and professional experience comes into play here as I began using personal computers in 1984 beginning with the initial IBM PC and "portable" (luggable!) computers such as Compaq systems as they became available in the market.  I also have direct experience with a wide variety of laptop and handheld computers starting with the first commercial models and coming up to present day systems.

14.    I am a person of at least ordinary skill in the art with respect to the subject matter of the '931 patent at the time of the effective filing date.

15.     A POSITA would also have had a basic understanding of personal computer components, hardware, and computer programs.  Specifically, a POSITA would have known that portable computers have hinge assemblies as part of the housing, processors (CPUs), memory (RAM), storage devices, display screens, keyboards, and ports to interface with peripheral devices.  A POSITA could have gained this basic knowledge by using computers on a regular basis, designing computers, or it could also have been obtained by training about computers, service or repair of computers, or through more formal education and training.  By September 14, 2001, I had gained this knowledge and familiarity as detailed above.

### III.     INVALIDITY OF THE '931 PATENT

#### A.     The Asserted Claims of the '931 Patent are Invalid

16.     It is my opinion that claims 1, 2, 3, 6, 8, 9, and 10 of the '931 patent (that is, all of the Asserted Claims) are invalid.  Specifically, all Asserted Claims are obvious in view of (1) Kim[1] alone or in combination with Sach,[2] Kumar,[3] or Satoshi[4]; (2) Ioka[5] in combination with Sach, Kumar, or Satoshi; (3) Wu[6] in combination with Sach, Kumar, or Satoshi; and (4) Masaru[7] in combination with Sach, Kumar, or Satoshi.  The bases for my opinion are set forth below.

17.     I understand that Blackbird's Motion identifies three elements that it contends are not disclosed by the prior art: "two spaced slots," "two spaced mounting brackets," and "communication conduit."  Mot. 1-2.  I understand that Blackbird contends that the elements "two spaced slots" and "two spaced mounting brackets" are not disclosed in Kim and Ioka, and therefore, the prior art combinations relying on Kim or Ioka do not invalidate claim 1 of the '931 patent.  Mot. 8-15.  Likewise, I understand that Blackbird contends that a "communication conduit" is not disclosed in Wu and Masaru, and therefore, the prior art combinations relying on Wu or Masaru do not invalidate claim 1 of the '931 patent.  Mot. 15-19.

---

[1] U.S. Patent No. 6,498,721.
[2] U.S. Patent No. 5,774,331.
[3] U.S. Patent No. 5,632,373.
[4] Japanese Published Patent Application No. H7-261,905.
[5] Japanese Published Patent Application No. H11-161,367.
[6] U.S. Patent No. 5,016,849.
[7] Japanese Published Patent Application No. H8-191,420.

34919144v1

18.     On November 9, 2017, I submitted an expert report regarding the invalidity of the '931 patent (the "Opening Report"). My Opening Report describes in detail my opinion that all of the Asserted Claims are invalid for obviousness. I considered each limitation of each claim under the Court's constructions in arriving at my opinions. My Opening Report includes and accurately reflects, among other things, my opinions regarding the invalidity of the Asserted Claims. Attached as Exhibit 1 is a true and correct copy of the Opening Report.

19.     On January 25, 2018, I submitted a reply expert report regarding the invalidity of the '931 patent (the "Reply Report"). My Reply Report addresses, among other things, the opinions expressed in the Rebuttal Expert Report of James L. Glancey, dated December 14, 2017. My Reply Report includes and accurately reflects my opinions regarding the invalidity of the Asserted Claims. Attached as Exhibit 2 is a true and correct copy of my Reply Report.

20.     I collectively refer to my Opening Report and my Reply Report as my "Invalidity Opinions."

21.     On February 9, 2018, I was deposed in this action regarding my Invalidity Opinions. During my deposition, I confirmed that my Opening Report and Reply Report included the invalidity opinions that I have developed in this case.

**B.     Kim**

22.     It is my opinion that Kim alone or in combination with Sach, Kumar, or Satoshi renders claims 1-3, 6, 8, and 10 of the '931 patent obvious. It is also my opinion that Kim with Masaru, Anderson, or Ioka alone or in further combination with Sach, Kumar, or Satoshi renders claim 9 obvious.

23.     I understand that Blackbird argues in its Motion that Kim does not render claim 1 of the '931 patent obvious because "[r]ather than disclose 'two spaced slots' and 'two spaced mounting brackets'. . . Kim [] disclose[s] a **single** bracket that fits into a **single** slot." Mot. 8.

24.     As discussed below, I disagree. It is my opinion, as discussed in my Invalidity Opinions, that it would have been obvious for a POSITA to modify Kim in view of the knowledge of a POSITA and/or in combination with the teachings of Sach, Kumar, or Satoshi.

A POSITA would also have had a reasonable expectation of success because each reference is in the field of portable computer systems and is compatible with the system disclosed by Kim.

### 1.     Claim 1 is Obvious Over Kim Alone or in Combination With Sach, Kumar, or Satoshi

> *1[b] b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;*

25.     Kim discloses that the cover 12 includes a flat screen display (display screen) overlying the keyboard that an operator views as he performs various tasks commanded by the keyboard and cursor control.  Kim at 1:17-22; 2:30-31.  The operator views computer-generated images displayed on the display screen.  The display screen includes two side walls and a bottom edge that extends between the side walls.  Kim at Fig. 2.  The display has two slots 34 (two spaced slots) in the bottom edge to receive the ends 32 of hinge 13.  Kim at 3:4-9, Fig. 6.  Accordingly, it is my opinion that Kim teaches this limitation.

26.     Dr. Glancey disputed that Kim discloses "two spaced slots formed in said bottom edge."  Glancey Rebuttal Report[8] ¶ 181.  Dr. Glancey did not dispute that Kim's display includes two side walls and a bottom edge that extends between the side walls.  For the "two spaced slots" element, Dr. Glancey argued that the receptors 34 do not satisfy this element because "cylindrical holes are not 'slots.'"  Glancey Rebuttal Report ¶ 181.  He also argued that receptors 34 "are formed near, but not in, the bottom edge."  Glancey Rebuttal Report ¶ 181.  I disagree with this characterization by Dr. Glancey.  It is my understanding that the claim language in 1[b] does not require the slots to have a particular shape.  As a result, it is my opinion that Kim's display screen has two slots (receptors 34) in the bottom edge that receive the ends 32 of the hinge assembly.  In my opinion, Kim indeed discloses limitation 1[b].

---

[8] *See* Declaration of Jenny Kim Ex. 3.

27.    I understand that Blackbird suggests that the "bottom edge" can only refer to the portions of the edge that are horizontal, such that the receptors 34 that are located in the indentation cannot be considered as being formed in the bottom edge.  Mot. 10.  I disagree with this position and confirmed in my deposition that "if the bottom edge of the display screen follows the border of the lower portion of the display screen," then elements 34 are located on the bottom edge of the display screen.  Parnell Dep. 205:4-11.



1[c] c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is

*perpendicular to said first axis*

28.     Kim discloses a hinge and rotatable joint (collectively, mounting assembly) that allows the monitor to rotate about a vertical axis (rotational motion . . . relative to a first axis) and a horizontal axis (pivotal motion . . . relative to a second axis).  Kim at 3:1-12.  The vertical and horizontal axes are perpendicular to each other.  Kim at 1:52-56, 2:42-57, 3:1-12.  Kim's hinge and rotatable joint (mounting assembly) connects the monitor to the base proximate the back wall of the keyboard base.  *See* Kim, Fig. 4 ("a rear perspective view of the notebook computer showing the hinge 13 and rotatable joint 23").  Kim discloses that the "hinge 13 is integral with rotatable joint 23" and extends upwardly from the rotatable joint (rotatable element).  Kim at 3:1-2, Fig. 6.  Thus, the two ends 32 (two spaced mounting brackets) of the hinge also extend upwardly and are received in the two slots 34 (two spaced slots) of the display.  Kim at 3:7-9, Fig. 6.  The hinge and rotatable joint (mounting assembly), thereby join the monitor (display screen) to the keyboard unit.  Given these features, it is my opinion that Kim discloses this limitation.

29.     Dr. Glancey disputed that Kim disclosed "two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots."  Glancey Rebuttal Report ¶ 182.  Dr. Glancey did not dispute that Kim teaches the other elements of this limitation.  Glancey Rebuttal Report ¶ 182. Dr. Glancey argued that the "mounting brackets" element is not satisfied by Kim because the ends 32 "do not serve to mount the display in any meaningful sense."  Glancey Rebuttal Report ¶ 182.  He also argued that the ends 32 do not extend upward.  Glancey Rebuttal Report ¶ 182. 93.

30.     I also understand that Blackbird argues in its Motion that Kim does not disclose the "two spaced mounting brackets" in claim 1[c] because "ends 32 in Kim protrude sideways remains true no matter how the display is rotated."  Mot. 10.  I disagree with both of these points by Blackbird and Dr. Glancey with regard to Kim and its disclosure of limitation 1[c].  As set forth in my Opening Report, the hinge and rotatable joint connect the monitor to Kim's keyboard

base.  Opening Report, ¶ 226.  The ends 32 are configured and dimensioned to fit inside the receptors 34 and provide the sole mounting mechanism between the monitor and the hinge.  As a result, it is my opinion that the receptors 32 are indeed "mounting brackets."  In addition, Kim discloses that the hinge 13, which includes the receptors 32, extends upwardly from the rotatable joint.  Kim at 3:1-2, Fig. 6.  Given these features, it is my opinion that Kim fully discloses limitation 1[c].



FIGURE 4

*1[f] wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen*

31.    Kim discloses that the bottom edge of the display screen has an intermediate region between the pair of slots 34.  Kim at Figs. 2, 3.  Kim also discloses that power and data lines 30 (communication conduit) pass from the body 11 (keyboard base) through hinge 13 and rotatable joint 23 (collectively, mounting assembly) and through a slot 34 (slot).  Kim at 3:3-5, Fig. 6; *see* Pl. Final Infringement Contentions, Ex. A at A-11 (July 24, 2017) ("As its name implies, the LCD cable is a conduit through which display information is communicated from the processing elements on the laptop top to the LCD display, and constitutes a 'communication conduit,' as claimed.").  Accordingly, the route of the power and data lines 30 (communication

conduit) pass directly into the intermediate region. Accordingly, it is my opinion that Kim discloses limitation 1[f] of claim 1.

32.     As set forth in my Opening Report, Kim discloses limitation 1[f]. Opening Report, ¶ 236. Dr. Glancey did not dispute that Kim disclosed a communication conduit. Dr. Glancey disputed that Kim discloses an "intermediate region" because "[w]ithout 'two spaced slots,' there is no 'intermediate region.'" Glancey Rebuttal Report ¶ 190. He also argued that the "communication conduit" limitation is not disclosed by Kim because there is no intermediate region and because Kim "does not disclose the alleged communication conduit entering into the area between the receptors 34." Glancey Rebuttal Report ¶ 191.

33.     I disagree with Dr. Glancey on both points. As set forth above, the two receptors 34 satisfy the "two slots" limitation. Accordingly, the intermediate region is the bottom edge of the display between the pair of slots. *See* Opening Report, ¶ 236. Kim discloses that power and data lines 30 (communication conduit) pass directly from the laptop's body 11 through hinge 13 in the intermediate region before entering the display through receptor 34. Kim at 3:3-5, Fig. 6. In my opinion, Kim discloses limitation 1[f].

### C.     Ioka

34.     It is my opinion that Ioka in combination with Sach, Kumar, or Satoshi renders claims 1-3, 6, and 8-10 of the '931 patent obvious. It would have been obvious to a POSITA to modify Ioka in view of the knowledge of a POSITA and/or in combination with the teachings of Sach, Kumar, or Satoshi.

35.     I understand that Blackbird makes the same argument with respect to Ioka as with Kim, that "Ioka discloses a single mounting bracket (green) extending upwardly from a rotatable element, with the bracket being received into a single slot (blue)[.]" Mot. 11.



[Figure 1]

36.    As discussed below, I disagree.  It is my opinion, as discussed in my Invalidity Opinions, that it would have been obvious for a POSITA to modify Ioka in view of the knowledge of a POSITA and/or in combination with the teachings of Sach, Kumar, or Satoshi. My Invalidity Opinions show that laptop computers commonly had one or more input/output ports at the time of the invention.

### 1.    Claim 1 is Obvious Over Ioka in View of Sach, Kumar, or Satoshi

*[1b] b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;*

37.    It would have been obvious to a POSITA to modify the display part 20 in Ioka to have two slots because the center portion of the indented part 160 in Ioka's display is not functional.  Ioka's hinge mechanism is covered by a separate cover, as shown in Figures 1, 4 and 5. Figure 3 shows the hinge without the cover.  The hinge cover is a separate piece and there is not a functional reason why the hinge cover could not be at least partially integrated into the display.  As a result, a cover integrated into the display would be an obvious modification to a POSITA.  The opening of the indented part 160 could be partially covered with an integrated hinge cover that include two slots for the two support plates.  For this reason, it is my opinion that it would have been obvious to a POSITA to modify the display part 20 to include an integrated cover that partially covered the opening of the indented part 160 to include two slots.

In that circumstance, the display part 20 would include two slots where the horizontal member enters the sides of the indented part 160 and an opening in the center for vertical member 50. It is my opinion therefore, that, to the extent that Blackbird argues that Ioka does not disclose two spaced slots, this feature would have been obvious to a POSITA in view of his knowledge and common sense.



[Figure 1]

[Figure 4]

Raised portion

Vertical member

38.    Dr. Glancey disputed that Ioka disclosed "two spaced slots formed in said bottom edge." Glancey Rebuttal Report ¶¶ 212-213. Dr. Glancey did not dispute that Ioka's display includes two side walls and a bottom edge that extends between the side walls. For the "two spaced slots" element, Dr. Glancey argued that the elements identified in my Opening Report were not necessarily slots because "a variety of mechanisms besides slots could have been used

to connect the support plates of the hinging mechanism to the display." Glancey Rebuttal Report ¶ 212. He also argued that "any such openings are not 'formed in said bottom edge' of the display screen," but "are formed near, not in, the bottom edge." Glancey Rebuttal Report ¶ 212.

39.     I disagree with the characterization of the "two spaced slots" element by Dr. Glancey. Ioka discloses a connection part 30 that has two "display part support plates 130." Ioka, ¶ [0008], Fig. 2. Those display part support plates 130 are internal to the display part 20 and "an indented part [160] is provided for one part of the display 20 in order the connection part 30 enters it." Ioka, ¶ [0009], Fig. 3. As shown in Figures 1 and 3, the connection part 30 enters the display part at the sides of the indented part 160 and the display must accommodate both support plates 130 and, thus, in my opinion are "slots." In addition, the support plates 130 when connected to the display screen extend from the bottom of the display screen and therefore the indented part 160 that receives these support plates 130 must also extend from the bottom of the display screen and be formed therein. As a result, it is my opinion that Ioka discloses two spaced slots formed in the bottom edge to accommodate connection part 30 and support plates 130 and therefore Ioka discloses limitation 1[b].



40.     Dr. Glancey also argued that it would not have been obvious to modify the display part 20 to have two slots because "the center portion of the indented part 160 in Ioka's display is functional insofar as it reflects the underlying design and configuration of the hinging mechanism." Glancey Rebuttal Report ¶ 213. He then argued that there is no motivation to

modify Ioka and that my proposed modification "would actually impact the function of the hinging mechanism, given that a single horizontal member 60 extends laterally from side to side, and would impact at least the pivot action of the hinging mechanism." Glancey Rebuttal Report ¶ 213.

41.     Contrary to Dr. Glancey's suggestion, my opinion was not based on changing the design or functionality of Ioka's hinge mechanism. Instead, as explained in my Opening Report, it would have been obvious to a POSITA to modify the display part 20 in Ioka to partially cover the hinge mechanism and provide two openings or slots in the bottom edge of the display screen. Ioka's hinge mechanism is covered by a separate cover, as shown in Figures 1, 4 and 5, and this cover is not functional and thus using the display screen to partially cover the hinge would not alter the functionality of the disclosed hinge mechanism. As a result, a cover integrated into the display would be an obvious and predictable modification to a POSITA. For this reason, it is my opinion that it would have been obvious to a POSITA to modify the display part 20 to include an integrated cover that partially covered the opening of the indented part 160 to include two slots. In that circumstance, the display part 20 would include two slots where the horizontal member enters the sides of the indented part 160 and an opening in the center for vertical member 50. It is my opinion that Ioka discloses limitation 1[b] in this manner also.



[1c] c) a mounting assembly proximate said back wall of

*said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis;*

42.     Ioka discloses a "connection part 30" (mounting assembly).  Ioka, ¶ [0006], Fig. 2.  "[T]he connection part 30 is fixed by a screw 200 at the surface to the rear of the main unit, and in addition it is also fixed by a screw to the reverse surface of the main unit" (proximate said back wall of said keyboard base).  Ioka, ¶ [0010], Fig. 3-5.  Connection part 30 has two display part support plates 130 (two spaced mounting brackets).  Ioka, ¶ [0008], Fig. 2.  "A linking part 120 is connected to the vertical member 50, and vertical member 50 in the vertical direction and the horizontal member 60 in the horizontal direction are fixed" (rotatable element). Ioka, ¶ [0008], Fig. 2.  "[D]isplay part support plates 130 are disposed at a position where they can rotate around the shaft of the horizontal member 60."  Ioka, ¶ [0008], Fig. 2.  Each display part support plate 130 extends upwardly from the rotatable element when the display is opened. Furthermore, the two display part support plates 130 are configured and dimensioned to be received within said two spaced slots in order to attach the display part 20 to connection part 30. (Ioka, Figs. 1, 2.  Ioka discloses that the device includes "a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10" (said mounting assembly joining said display screen to said keyboard unit).  Ioka, ¶ [0006], Fig. 1. Ioka discloses that the connection part and display part are connected "rotatably in the perpendicular direction relative to the main unit 10 [first axis] and the direction that is orthogonal to the perpendicular direction [second axis]" (permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis).  Ioka, ¶ [0006], Fig. 1.  Given these features in Ioka, it is my opinion that Ioka teaches this limitation.



43.     Dr. Glancey disputed that Ioka disclosed "two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots." Glancey Rebuttal Report ¶ 214. Dr. Glancey did not dispute that Ioka teaches the other elements of this limitation. Glancey Rebuttal Report ¶ 214. Dr. Glancey again argued that the "mounting brackets" element was not satisfied by Ioka because the support plates "do not serve to mount the display in any meaningful sense." Glancey Rebuttal Report ¶ 214. He also argues that the support plates do not extend upward. Glancey Rebuttal Report ¶ 214.

44.     I disagree with Dr. Glancey. When connected to the display screen, the support plates obviously extend upward into the display screen. Ioka discloses that the hinge mechanism includes two display part support plates 130, which include two holes that a POSITA would understand to be used to attach the display screen to the support plates. As a result, it is my opinion that the display support plates extending upwardly from the hinge mechanism and serve to mount the display to the hinge mechanism. As a result, it is my opinion that Ioka discloses limitation 1[c].

> *[1f] wherein said bottom edge of said display screen*
> *defines an intermediate region between said pair of slots*

> *and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen.*

45.    Ioka discloses an "indented part 160" intermediate region in the bottom edge of the display between the pair of slots as seen in Figure 1 and 3. (Ioka, ¶ [0009], [Key], Figs. 1, 3.) Ioka discloses wiring between the main unit and the display part. For example, Ioka discloses that "since the connection part 30 prevents the severing of the wire between the main unit 10 and the display part 20, the angle of rotation is restricted in a range from +180° to -180°." (Ioka, ¶ [0007].) Similarly, "owing to the impelling part and the angle restriction part, it is possible to prevent the display part from rotating unintentionally when it is being carried, and to prevent the wire between the main unit and the display part from being severed." (Ioka, ¶ [0007].) Elsewhere, Ioka states "[s]ince the two sides of the indented part do not require a connection part, the wiring for sending and receiving the signals and coordinate input can be done easily." (Ioka, ¶ [0009].)

46.    Ioka discloses that "an indented part is provided for one part of the display 20 in order the connection part 30 enters it."  Ioka, ¶ [0009].  Ioka also discloses that "when the display part 20 is opened or closed, the connection part 30 has a round shape in cross section such that it does not strike against the display part 20."  Ioka, ¶ [0009].  Finally, Ioka states that "[s]ince the two sides of the indented part do not require a connection part, the wiring for sending and receiving signals for display and coordinate input can be done easily."  Given this disclosure, the wiring described by Ioka utilizes the indented part.  Ioka discloses, for example, that the device prevents unintentional rotation and avoids severing the cable.  A cable placed in the center can rotate as the display rotates, so that movement of the display places the least rotational stress on the cable.  A POSITA would have known that a cable located elsewhere would have been disadvantageous.  For example, a cable entering into the back of the display, or to the bottom edge at one side, would have to extend or retract as the display rotates, which would place unnecessary stress on the communication cable and increase the rate of failure.  This would also conflict with Ioka's goal of preventing severing of the cable.  In my opinion, the

location and description of the indented part would have suggested to a POSITA that a communication conduit extends from the main unit 10 directly into the intermediate region of the display part 20 to connect the display screen with the processing and graphics components of the laptop. Thus, a POSITA would have found it obvious for the communication conduit to travel through the laptop's display holding structure to keep it internal to the laptop computer system. Accordingly, it is my opinion that Ioka in view of the knowledge and common sense of a POSITA renders this limitation obvious.

47. Dr. Glancey did not dispute that Ioka discloses a communication conduit. Dr. Glancey disputed that Ioka discloses a "bottom edge of said display screen [that] defines an intermediate region between said pair of slots" because "there is no 'intermediate region.'" Glancey Rebuttal Report ¶ 222. He also argued that this element was not satisfied because "the empty space" between the two independent parts is not part of the display screen, of which the intermediate region is part. Glancey Rebuttal Report ¶ 222.

48. I disagree with these points by Dr. Glancey. As set forth in my Opening Report, the intermediate region is the bottom edge of the display between the pair of slots. I further pointed out that it would be obvious that Ioka's disclosed cable would travel through the center of the indented part (i.e., directly into the intermediate region) to avoid severing the cable and minimize the rotation stress on as the display rotates.

### D.  Wu

49. In my opinion, Wu in combination with Sach, Kumar, or Satoshi renders obvious claims 1-3, 8, and 10. It is also my opinion that Wu in combination with Sach, Kumar, or Satoshi and in further combination with Ioka, Kim, Masaru, or Anderson renders claims 2, 3, 6, 9, and 10 obvious.

50. I understand that Blackbird argues in its motion that Wu does not disclose a "communication conduit" in part because the drawings do not show the path by which a "communication conduit" may pass from the keyboard base, through the mounting assembly, and into the display. Mot. 17.

1.    **<u>Claim 1 is Obvious Over the Combination of Wu with Sach, Kumar or Satoshi</u>**

*[1b] b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;*

51.    Wu discloses a monitor (display screen) for displaying computer-generated images.  Wu at 1:21-22, 1:28-30.  The monitor includes two side walls and a bottom edge that extends between the side walls.  Wu at Fig. 2.  The monitor has two spaced slots in the bottom edge where inner sides 51 and 52 are the inner side walls to the spaced slots.  Wu at 2:26-29, Figs. 2, 3.  Accordingly, it is my opinion that Wu teaches this limitation.

52.    Dr. Glancey did not dispute that Wu discloses a display screen for displaying computer-generated images or that Wu's display includes two side walls and a bottom edge that extends between the side walls.  Glancey Rebuttal Report ¶¶ 124-33.  Dr. Glancey disputed whether Wu discloses "two spaced slots."  Glancey Rebuttal Report ¶ 127.

53.    For the "two spaced slots" element, Dr. Glancey argues that Figure 1 does not show spaced slots.  Glancey Rebuttal Report ¶¶ 127.  Dr. Glancey apparently bases his opinion only on a single embodiment represented by Figure 1.  Figures 2 and 3 show embodiments with two spaced slots (Compare Wu at Fig. 1 with Wu at Figs. 2, 3).  *See also* Opening Report, ¶ 166.  The two spaced slots are formed in the bottom edge of Wu's monitor where inner sides 51 and 52 are the inner side walls to the spaced slots.  Wu at 2:26-29, Figs. 2, 3.  Accordingly, it is my opinion that Wu teaches this limitation.



Fig.1

21



Fig. 2                    Fig. 3

54.    Contrary to Wu's express disclosure, Dr. Glancey argued that the display screen in Wu "is not even capable of rotational motion." Glancey Rebuttal Report ¶¶ 128-33. Dr. Glancey then conceded that Wu (1) claims an invention capable of rotational and pivotal motion and (2) shows an embodiment with a display screen rotated. Glancey Rebuttal Report ¶ 128. I disagree that Wu's disclosure of a swivel mechanism that allows the screen to rotate/swivel relative to a keyboard around a horizontal and vertical axis is rendered inoperable by Wu's Figure 1.

> *[1c] c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and*

55.    Wu discloses a swivel mechanism (mounting assembly) that allows the monitor (display screen) to rotate about a horizontal axle (rotational motion . . . relative to a first axis), and rotate about a vertical axle (pivotal motion . . . relative to a second axis). Wu at 1:15-18, Fig. 5. The vertical and horizontal axles are perpendicular to each other. Wu at 1:15-18, 1:23-27, 1:59-63. The horizontal axle 2 is mainly constituted by four longitudinal axles 21, 22, 23 and 24 in the same direction, four springs 25, 26, 27 and 28, two positioning plates 31 and 32, two

side covers 41 and 42, and a protective cover 6.  Wu's swivel mechanism (mounting assembly) connects the monitor (display screen) to the base proximate the back wall of the keyboard base. Wu at Figs. 2-3.  The swivel mechanism (mounting assembly) includes a fixed seat 11 or platform (rotatable element) that rotates relative to the fixed base.  Wu at 1:63-64, 2:2-7, Fig. 3. The longitudinal axles 22 and 24 (spaced mounting brackets) along with the fixed blocks protrude upward from the fixed seat. The axles and fixed blocks are arranged to fit inside the two spaced slots on the bottom edge of the monitor.  Wu at 2:10-16, 2:26-29, Fig. 3.  The axles are kept in position by two positioning plates and two side covers.  Wu at 2:29-41.  Wu's swivel mechanism allows the monitor to rotate with respect to the horizontal axles.  Wu at 2:41-43.  It is my opinion that Wu teaches this limitation.

56.     Dr. Glancey did not dispute that Wu discloses a mounting assembly proximate the back wall of the keyboard base or that the mounting assembly in Wu contains a rotatable element and joins the display screen to the keyboard unit and permits both rotational and pivotal motion of the display screen.  *See* Glancey Rebuttal Report ¶¶ 134-38.  Dr. Glancey, however, disagreed that Wu's mounting assembly satisfied each element of the claim.  *See* Glancey Rebuttal Report ¶¶ 134-38.  In particular, Dr. Glancey argued that Wu did not disclose (1) mounting brackets or (2) mounting brackets "configured and dimensioned to be received within said two spaced slots." Glancey Rebuttal Report ¶¶ 137-38.  In support, Dr. Glancey stated that axles 22 and 24 are not mounting brackets because they "function more like rods 128 in the '931 Patent" and "do not extend upwardly from anything."  Glancey Rebuttal Report ¶ 137.  Further, it is my understanding that Dr. Glancey contends that "the mere engagement of axles 22 and 24 with the monitor" does not satisfy the "configured and dimensioned to be received within said two spaced slots" limitation.  Glancey Rebuttal Report ¶ 138.

57.     As explained in my Opening Report, Wu discloses a swivel mechanism (mounting assembly) that allows the monitor to rotate and pivot.  Opening Report, ¶ 168.  The longitudinal axles 22 and 24 (spaced mounting brackets) along with the fixed blocks protrude upward from the fixed seat and are arranged to fit inside the two spaced slots on the bottom edge

of the monitor.  Opening Report, ¶ 168; *see also* Wu at 2:10-16, 2:26-29, Fig. 2.  Accordingly, it is my opinion that Wu's swivel mechanism satisfies this limitation.



*[1f] wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen*

58.    Wu discloses that the bottom edge of the monitor has an intermediate region (framed by the inner sides 51 and 52) between the pair of slots.  Wu, Figs. 2-3, 2:26-29.  Wu also discloses that the swivel mechanism includes a hole and sits on top of a vertical hole in the positioning block.  The positioning block is attached to a fixed frame of the main body (keyboard base).  Wu at 1:64-68, Fig. 3.  While Wu does not expressly disclose a communication conduit, it would have been obvious to a POSITA that cabling (or a communication conduit) extends directly from the main body 10 through the vertical hole 131 and the hole in the fixed seat 11 directly into the intermediate region of the display to connect the laptop display monitor disclosed in Wu with the processing and graphics components of the laptop.  A POSITA would have known that a communication conduit was required in laptop computer systems in order for the monitor to communicate with the processing and graphics components located in the base.  *See* Pl. Final Infringement Contentions, Ex. A at A-11 (July 24, 2017) ("As its name implies, the LCD cable is a conduit through which display information is communicated form the processing elements on the laptop to the LCD display, and constitutes a 'communication conduit,' as

claimed."). Wu's invention relates to "a swivel mechanism for a monitor of a laptop computer." Wu at 1:21-22. A POSITA would have known that a laptop computer requires communication between the processor in the base and the laptop. And a POSITA would have found it obvious for the communication conduit to travel through the laptop's swivel hinge mechanism to keep it internal to the laptop computer system. Accordingly, it is my opinion that Wu in view of the knowledge and common sense of a POSITA renders this limitation obvious.

59.     Dr. Glancey did not dispute (1) that Wu discloses a "bottom edge of said display screen [that] defines an intermediate region between said pair of slots" and (2) that a POSITA would have known that a communication conduit was required in a laptop computer system in order for the monitor to communicate with the processing and graphics components located in the base. *See* Glancey Rebuttal Report ¶ 139-43. Dr. Glancey disagreed that it would have been obvious for cabling to extend directly from the main body 10 through the vertical hole 131 and the hole in the fixed seat 11 directly into the intermediate region of the display.

60.     Dr. Glancey appeared to argue that a POSITA would not have wanted to keep the communication conduit internal to the laptop computer system and that "other routes are possible." Glancey Rebuttal Report ¶¶ 142-43. I disagree due to my understanding that obviousness does not require a single solution to a problem, but rather that an element may be obvious if a POSITA would have chosen the claimed solution from a number of identified, predictable solutions with a reasonable expectation of success. As I explained in my Opening Report, it would have been obvious to and logical for a POSITA to arrange the communication conduit to travel through the laptop's swivel hinge mechanism to keep it internal to the laptop computer system. Accordingly, it is my opinion that Wu in view of the knowledge and common sense of a POSITA renders this limitation obvious.



Fig. 3

### E.    Masaru

61.    It is my opinion that Masaru in combination with Sach, Kumar, or Satoshi renders claims 1-3, 6, and 8-10 of the '931 patent obvious.  It is also my opinion that Masaru in combination with Sach, Kumar, or Satoshi, and in further combination with Ioka or Kim renders claims 2, 3, and 6 obvious.

62.    I understand that Blackbird argues in its Motion that Masaru does not disclose a communication conduit primarily because the fastener I identified in my Opening Report as suggesting a hole "appears to be some sort of screw head."  Mot. 18.  Dr. Glancey also disagreed in his Rebuttal Report.

63.    I disagree with both Blackbird and Dr. Glancey.  The bases for my opinion are further explained below.

#### 1.    Claim 1 is Obvious Over Masaru in View of Sach, Kumar, or Satoshi

> *[1b] b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;*

64.     Masaru discloses a flat display device 13 (display screen) for displaying computer-generated images.  Masaru, ¶ [0008], Figs. 7, 8, 9.  The display includes two side walls and a bottom edge that extends between the side walls.  Masaru, Figs. 7-9.  The display has two spaced slots in the bottom edge to receive two "holding devices P, with the flat display device 13 being pivotally supported by the holding devices P."  Masaru, ¶ [0008], Figs. 1, 7-9.  All these features are shown in annotated Figure 8, below.  Accordingly, it is my opinion that Masaru teaches this limitation.



65.     Dr. Glancey disputed that Masaru discloses "two spaced slots formed in said bottom edge."  Glancey Rebuttal Report ¶ 79.  Dr. Glancey did not dispute that Masaru's display includes two side walls and a bottom edge that extends between the side walls.  Glancey Rebuttal Report ¶ 79; *see also* Masaru, Figs. 7-9.  For the "spaced slots" element, Dr. Glancey argued that the elements identified in my Opening Report "are not openings of any kind" and that Masaru did not describe "what, if anything, these components are attached to or what purpose they serve."  Glancey Rebuttal Report ¶ 79.

66.     As disclosed by Figures 8 and 9, Masaru's display includes two spaced slots in the bottom edge that extend from the front side of the display screen (see Fig. 8) to the back side of the display screen (see Fig. 9).  Masaru also discloses that these two slots receive two "holding devices P" and that "the flat display device 13 being pivotally supported by the holding

devices P."  Masaru, ¶ [0008], Figs. 1, 7-9.  Accordingly, it is my opinion that Masaru teaches and fully discloses limitation 1[b].

> *[1c] c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and*

67.     Masaru discloses a "semicircular rotating member 9" and "a pair of holding devices P" (collectively, mounting assembly) located proximate the back wall of the keyboard base.  Masaru, ¶ [0008], Figs. 1, 8, 9.  The "rotating member 9 is attached to the fixed member 11 by a fastener 12."  Masaru, ¶ [0008], Figs. 1, 8, 9.  The holding devices P (two spaced mounting brackets) extend upward from the semicircular rotating member (rotatable element) and pivotally support the flat display.  Masaru, ¶ [0008], Figs. 1, 8, 9.  The flat display is joined to the main body unit by the pair of holding devices P such that the holding devices are positioned and sized to be received within the two spaced slots in the bottom edge of the display screen.  The rotating member 9 allows the display to rotate about a vertical axis (first axis).  Masaru, ¶¶ [0008], [0012], see Fig. 8 (illustrating vertical axis rotation by direction arrow D).  And the holding devices P allow the display to pivot about a horizontal axis (second axis).  Masaru, ¶¶ [0009], [0012], see Fig. 8 (illustrating horizontal axis rotation by direction arrow E).  The vertical and horizontal axes are perpendicular to each other.  Given these features in Masaru, it is my opinion that Masaru teaches this limitation.

68.     Dr. Glancey disputed that Masaru discloses "two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots."  Glancey Rebuttal Report ¶ 80.  Dr. Glancey did not dispute that Masaru teaches the other elements of this limitation.  Glancey Rebuttal Report ¶ 80.  Dr. Glancey

argued that the "mounting brackets" element is not satisfied by Masaru because the holding devices, P, are "irregularly-shaped" and "possess a substantially different geometry" than the "rectangular" slots.  Glancey Rebuttal Report ¶ 80.

69.     Masaru discloses a "semicircular rotating member 9" and "a pair of holding devices P" (collectively, mounting assembly).  Masaru, ¶ [0008], Figs. 1, 8, 9.  The holding devices P (two spaced mounting brackets) extend upward from the semicircular rotating member (rotatable element) and pivotally support the flat display.  Masaru, ¶ [0008], Figs. 1, 8, 9.  The display is attached to the horizontal rotating shafts (element 1 in Figs. 1 and 2).  Masaru, Claim 1.  Annotated Figure 8 below illustrates that holding devices P are covered by rectangular caps and that each cap is configured and dimensioned to be received within the rectangular slots.  It is my opinion that Masaru satisfies the "mounting brackets" element.



> *[1f] wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen.*

70.     Masaru discloses an intermediate region in the bottom edge of the display between the pair of slots as seen in Figure 8.  While Masaru does not expressly disclose a communication conduit, it would have been obvious to a POSITA that cabling (or a communication conduit) extends directly from the fixed member 11 directly into the intermediate region of the display.  A POSITA would have known that a cable was required in laptop computer systems for the monitor to communicate with the processing and graphics components located in the base.  *See* Pl. Final Infringement Contentions, Ex. A at A-11 (July 24, 2017) ("As its name implies, the LCD cable is a conduit through which display information is communicated form the processing elements on the laptop top the LCD display, and constitutes a 'communication conduit,' as claimed.").  Masaru's device is a "personal computer, word processor, or an information communication terminal device" (Masaru at [0001]) and a POSITA would have known that such a device requires communication between the processor and the display.

71.     Masura discloses a fastener 12 that attaches the mounting assembly to the base.  Masura, ¶ [0008].  Fastener 12 is depicted in Figure 1 as a circular shape directly underneath the intermediate region that appears to be an open circle, forming a hole through the rotating member 9 and the top surface of fixed member 11.  In my opinion, the shape and location of fastener 12 would have suggested to a POSITA that a communication conduit obviously extends from the keyboard base directly into the intermediate region of the display screen to connect the display screen with the processing and graphics components of the laptop.

72.     In contrast, display 13 of Masaru is fixed to the two horizontal rotating shafts (elements P and 1) (Masaru ¶ [0005]) and Masaru does not disclose through holes at, near, or through these rotations shafts (see Masaru at Fig. 1), so a POSITA would understand that a communication conduit could not be placed in the pair of slots occupied by the brackets.  Thus, a

POSITA would have found it obvious for the communication conduit to travel through the laptop's display holding structure and, specifically, through the fastener 12 to keep it internal to the laptop computer system.  Accordingly, it is my opinion that Masaru in view of the knowledge and common sense of a POSITA renders this limitation obvious.

73.    A POSITA would have known that a communication cable between a base and a rotatable display (like that disclosed by Masaru) should be inherently located in the center of the base between the two side walls, which is where Masaru illustrates that the hole formed by fastener 12 is located.  A cable placed in the center can rotate within the hole unimpeded as the display rotates, so that movement of the display places the least stress on the cable.  A POSITA would have known that a cable located elsewhere would have been disadvantageous.  For example, a cable entering into the back of the display, or to the bottom edge at a non-centered location, would have to extend or retract as the display rotates, which would place unnecessary stress on the communication cable and increase the rate of failure.

74.    Dr. Glancey disputed that Masaru discloses a "bottom edge of said display screen [that] defines an intermediate region between said pair of slots" because "a centrally-located" slot "disrupts the continuity of the bottom edge, such that the bottom edge does not define an intermediate region."  Glancey Rebuttal Report ¶ 87.  I disagree with this characterization by Dr. Glancey.  I note that claim 1 does not require the bottom edge to have "continuity," as Dr. Glancey suggests.  As a result, it is my opinion that Masaru discloses an intermediate region in the bottom edge of the display between the pair of slots as seen in Figure 8 of Masaru.

75.    Dr. Glancey also disagreed that it would have been obvious for cabling to extend directly from the fixed member 11 into the intermediate region of the display.  Glancey Rebuttal Report ¶¶ 88-90.  Dr. Glancey argued that the cabling could be routed to the display screen "any number of ways."  Glancey Rebuttal Report ¶¶ 88-89.  It is my understanding that obviousness does not require a single solution to a problem, but that an element may be obvious if a POSITA would have chosen the claimed solution from a number of identified, predictable solutions with a reasonable expectation of success.  As I explained in my Opening Report, it would have been

obvious to a POSITA that cabling in Masaru's laptop would extend through fastener 12 that forms a hole through the rotating member and the top surface of the fixed member. Opening Report, ¶¶ 120-121. I also explained that it would have been disadvantageous to route the cabling through the pair of outer slots because there was no apparent opening in the top surface to route the cabling at these locations and because cabling routed away from the vertical axis. This would have been disadvantageous due to the increased twisting and pulling that the cable would have to endure if positioned further outward from the center. Opening Report, ¶¶ 122-123.

76.     Dr. Glancey also argued that the "centrally-located component" above the fastener 12 "constitutes some extra component (or components) between the laptop base and laptop display" and, thus, does not pass "directly" into an intermediate region. Glancey Rebuttal Report ¶ 88. I disagree. The Court construed "directly" as used in "wherein a communication conduit extends from said keyboard base directly into said intermediate region" as "passing through the mounting assembly, but no other structure." The centrally-located component above the fastener 12 is part of the rotating member 9 and part of the mounting assembly. Thus, it is my opinion that it would have been obvious for the cabling in Masaru's disclosed laptop to extend from the fixed member 11 (keyboard base) through the rotating member 9 into the intermediate region.

I declare under penalty of perjury under the laws of the United States of America that the foregoing Declaration is true and correct.

Executed on May 11, 2018 at Sunnyvale, CA

By: _____

T. Kim Parnell, PhD, PE