# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BLACKBIRD TECH LLC d/b/a/ BLACKBIRD TECHNOLOGIES, <br><br> *Plaintiff,* <br><br> v. <br><br> LENOVO (UNITED STATES) INC., <br><br> *Defendant.* | Civil Action No. 16-140-RGA |

<u>**EXPERT REPORT OF T. KIM PARNELL, PhD
REGARDING INVALIDITY OF U.S. PATENT NO. 7,129,931**</u>

**TABLE OF CONTENTS**

**Page**

I.    GENERAL MATTERS ....................................................................................................1

    A.    Summary ...........................................................................................................1

    B.    Qualifications and Professional Experience .....................................................2

        1.    Educational background............................................................................2

        2.    Career History.........................................................................................2

        3.    Compensation .........................................................................................4

II.   BASIS OF OPINIONS FORMED...................................................................................4

    A.    Summary of Materials Reviewed......................................................................4

    B.    Review and Analysis.........................................................................................5

    C.    Understanding of the Law.................................................................................5

        1.    Claim construction...................................................................................5

        2.    Legal Standards Relating to Invalidity ...................................................6

        3.    Level of Ordinary Skill in the Art...........................................................12

III.  THE '931 PATENT ........................................................................................................14

    A.    Specification of the '931 Patent........................................................................15

    B.    The Claims of the '931 Patent ..........................................................................17

    C.    The Invention Date of the '931 Patent..............................................................19

IV.   TECHNOLOGY BACKGROUND ................................................................................19

V.    OVERVIEW OF PRIOR ART REFERENCES .............................................................23

    A.    Japanese Published Patent Application No. H8-191,420 ("Masaru")....................23

    B.    U.S. Patent No. 5,016,849 ("Wu")...................................................................25

    C.    U.S. Patent No. 6,498,721 ("Kim") .................................................................27

    D.    Japanese Published Patent Application No. H11-161,367 ("Ioka") .......................30

    E.    U.S. Patent No. 5,335,142 ("Anderson")..........................................................31

    F.    U.S. Patent No. 5,632,373 ("Kumar") .............................................................34

    G.    Japanese Published Patent Application No. H7-261,905 ("Satoshi")....................35

    H.    U.S. Patent No. 5,774,331 ("Sach")................................................................37

VI.   THE PRIOR ART RENDERS OBVIOUS CLAIMS 1-3, 6, AND 8-10 OF THE '931 PATENT.................................................................................................................38

    A.    Masaru Renders the Asserted Claims Obvious..................................................38

1.      A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Masaru with Sach, Kumar, or Satoshi. .................................. 39

2.      A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Masaru with Ioka or Kim. ..................................................... 42

3.      Claim 1 is obvious over Masaru in view of Sach, Kumar, or Satoshi. ................................................................................................. 44

4.      Claim 2 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi alone or in further combination with Ioka. ................. 61

5.      Claim 3 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi alone or in further combination with Ioka or Kim. ................................................................................................... 64

6.      Claim 6 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi alone or in further combination with Ioka or Kim. ................................................................................................... 68

7.      Claim 8 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi. ................................................................................ 73

8.      Claim 9 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi. ................................................................................ 77

9.      Claim 10 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi. ................................................................................ 79

B.      Wu Renders the Asserted Claims Obvious. ........................................................... 83

1.      A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Wu with Sach, Kumar, or Satoshi. ........................................ 83

2.      A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Wu with Ioka, Masaru, or Kim. .............................................. 87

3.      A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Wu with Anderson. ................................................................. 88

4.      Claim 1 is obvious over the combination of Wu with Sach, Kumar, or Satoshi. ................................................................................................ 89

5.      Claim 2 is obvious over the combination of Wu with Sach, Kumar, or Satoshi alone or in further combination with Ioka. ............................. 105

6.      Claim 3 is obvious over the combination of Wu with Sach, Kumar, or Satoshi alone or in further combination with Ioka, Kim, or Anderson. ............................................................................................ 108

7.      Claim 6 is obvious over the combination of Wu with Sach, Kumar, or Satoshi and in further combination with Ioka or Kim. ........................ 113

8.      Claim 8 is obvious over the combination of Wu with Sach, Kumar, or Satoshi. ................................................................................................ 116

9.      Claim 9 is obvious over the combination of Wu with Sach, Kumar, or Satoshi and in further combination with Anderson, Masaru, or Ioka .................................................................................120

10.     Claim 10 is obvious over the combination of Wu with Sach, Kumar, or Satoshi alone or in further combination with Masaru, Anderson, or Kim...........................................................125

C.  Kim Renders the Asserted Claims Obvious.........................................133

1.      A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Kim with Sach, Kumar, or Satoshi......................................134

2.      A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Kim with Masaru or Ioka. ...................................................138

3.      A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Kim with Anderson. ...........................................................139

4.      Claim 1 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi. ................................................................................140

5.      Claim 2 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi. ................................................................................157

6.      Claim 3 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi. ................................................................................159

7.      Claim 6 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi. ................................................................................160

8.      Claim 8 is obvious over Kim alone or in combination Sach, Kumar, or Satoshi. ................................................................................162

9.      Claim 9 is obvious over Kim in combination with Anderson, Masaru, or Ioka alone or in further combination with Sach, Kumar, or Satoshi. ...............................................................................167

10.     Claim 10 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi. ................................................................................172

D.  Ioka Renders the Asserted Claims Obvious.........................................174

1.      A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Ioka with Sach, Kumar, or Satoshi......................................174

2.      Claim 1 is obvious over Ioka in view of Sach, Kumar, or Satoshi. .........178

3.      Claim 2 is obvious over Ioka in combination with Sach, Kumar, or Satoshi............................................................................................196

4.      Claim 3 is obvious over Ioka in combination with Sach, Kumar, or Satoshi alone or in further combination with Kim.................................198

5.      Claim 6 is obvious over Ioka in combination with Sach, Kumar, or Satoshi............................................................................................201

iii

6.      Claim 8 is obvious over Ioka in combination with Sach, Kumar, or Satoshi................................................................................................204

7.      Claim 9 is obvious over Ioka in combination with Sach, Kumar, or Satoshi................................................................................................208

8.      Claim 10 is obvious over Ioka in combination with Sach, Kumar, or Satoshi. ...........................................................................................209

VII.    SECONDARY CONSIDERATIONS ............................................................................211

VIII.   SUMMARY OF CONCLUSIONS ...............................................................................212

IX.     RESERVATIONS OF RIGHTS ...................................................................................212

**LIST OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Curriculum Vitae of Dr. T. Kim Parnell |
| B | Materials Reviewed |

## I.    GENERAL MATTERS

### A.    Summary

1.      I have been retained as an expert in this case by the Defendant Lenovo (United States) Inc. ("Lenovo") to provide expert opinions and testimony regarding the technology involved in this case and what a person of ordinary skill in the art ("POSITA"), at the relevant time, would understand some of the technical terms in the claims to mean.  It is my opinion that the prior art discussed in my report renders obvious the asserted claims.  I expect to testify at trial regarding the matters set forth in this report ("Report"), if asked about these matters by the Court or by the parties' attorneys.  Exhibits are attached to this Report which I incorporate by reference.

2.      I understand that the Plaintiff Blackbird Tech LLC d/b/a Blackbird Technologies ("Blackbird") has asserted that Lenovo infringes U.S. Patent No. 7,129,931 ("the '931 patent").  I have been informed that Blackbird has asserted claims 1, 2, 3, 6, 8, 9, and 10 of the '931 patent (the "Asserted Claims") against Lenovo.

3.      I have been asked to provide my expert opinion as to the validity of the Asserted Claims.  In my opinion, each and every one of the Asserted Claims is rendered obvious by the prior art analyzed in my Report.

4.      At trial in this case, I may provide and rely on visual aids and demonstrative exhibits to explain my opinions, the technology described in the '931 patent, the Asserted Claims, the state of the art at the time the '931 patent was filed, and the prior art.  My testimony may include relevant background materials including materials related to the design of portable computer systems, the relevant operation of computers and operating systems, and standardized interface protocols (e.g., the USB standards).

1

5.    I am also prepared to testify, if appropriate, on matters raised in cross-examination; to rebut, as necessary, matters raised (in reports, depositions, and/or court testimony) by Blackbird's experts; and to address other related matters raised at trial.

## II.    Qualifications and Professional Experience

### 1.    Educational background

6.    In 1978, I received a BES in Engineering Science & Mechanics from the Georgia Institute of Technology (Georgia Tech).  In 1979, I received an MSME degree in Mechanical Engineering from Stanford University.  In 1984, I received a Ph.D. in Mechanical Engineering also from Stanford University.

### 2.    Career History

7.    I am a licensed professional Mechanical Engineer (PE license M25550) in the State of California.  I have over 30 years of experience as a professional engineering consultant including 1986-1999 as a Senior Managing Engineer at Exponent and 2000 to Present as Principal & Founder of Parnell Engineering & Consulting (PEC).  My practice encompasses design, failure analysis, and reliability for a variety of industrial, medical, electronic, and consumer products.  My professional career started at Bell Telephone Laboratories (Bell Labs) in 1978 where I was involved with the physical design of telephone sets, components, and evaluation of new technology.

8.    I have performed inspections and consulted on several types of consumer electronic equipment (computers, cell phones, portable entertainment devices, etc.) during my career.  I also have direct experience with manufacturing in multiple industries during my consulting career.  These applications include consumer electronics, biomedical, medical device, automotive, petrochemical, paper, metal forming, metalworking, specialty materials and others. Equipment at issue often involves injection molding, metal forming and machining,

2

semiconductor packaging, pipelines and piping components, pressure vessels, sensors and control systems.

9. I am a Fellow of the American Society of Mechanical Engineers (ASME) and a Senior Member of the Institute of Electrical and Electronic Engineers (IEEE). I am also a member of several IEEE Societies including Consumer Electronics (CE), Components, Packaging, and Manufacturing Technology (CPMT), Vehicular Technology Society (VTS), Sensors Council, and the Nanotechnology Council. I was elected as Chair of the IEEE Santa Clara Valley Section in 2011 (the SCV Section is the largest IEEE Section in the world with over 12,000 members in Silicon Valley). I was elected as Chair of the IEEE Consultants' Network of Silicon Valley (IEEE-CNSV) in 2008-2009 and remain as a Member of the Board of Directors for this organization. I am also a Member of ASM (ASM International), the ASM Electronic Device Failure Analysis Society (EDFAS), the ASM Shape Memory & Superelastic Technology (SMST), and SAE (Society of Automotive Engineers).

10. I was a full-time member of the Mechanical Engineering faculty at Santa Clara University from 2010-2012 and taught classes in Manufacturing, Material Science, Mechanical Design, Finite Element Analysis (FEA), Composite Materials, and Mechanisms. During this time, I served as the Faculty Advisor for several Senior Design Projects. These "real world" Capstone Design Projects encompassed design, system integration, and manufacturing aspects and provided the students with a full product development experience. I also taught graduate courses in Mechanical Engineering at Stanford University from 1995-1996. I have delivered numerous invited presentations, short-courses, and seminars on a range of technical topics to professional organizations. Some topics include Mechanical Design for Reliability (MDfR) courses tailored to specific types of products and industries, and Medical Device Technology. I

3

also taught several courses involving the application of simulation and analysis tools and how to better utilize simulation in the design cycle to reduce design time and to improve product reliability.

11.    A more comprehensive record of my professional background and technical qualifications is reflected in my *curriculum vitae*, which is attached hereto as Exhibit A.  I have been retained as an expert in over 30 cases and have testified at trial and in depositions.  A list of my expert engagements is included in my *curriculum vitae*.

### 3.    Compensation

12.    I am being compensated at my usual consulting rate of $450 per hour for my work related to this dispute.  My compensation is not contingent on the conclusions I reach in my analysis, the testimony or opinions that I give, or the outcome of this dispute.

## III.    BASIS OF OPINIONS FORMED

### A.    Summary of Materials Reviewed

13.    Among the materials I reviewed in forming my opinions are the '931 patent and the prosecution history for this patent.  I also reviewed this Court's order construing the claims.

14.    I have also reviewed Blackbird's initial infringement contentions in this case, served October 20, 2016, as well as the final infringement contentions Blackbird served on July 24, 2017.

15.    I have reviewed all of the documents and materials cited in my Report.  I have also relied on my professional and academic experience.  A full list of materials that I have reviewed and considered relating to this Report is attached as Exhibit B.  I reserve the right to rely upon additional materials as I become aware of them, and to revise my analysis and opinions to the extent necessary based on any such new materials.

**B.      Review and Analysis**

16.      My opinions are based in part on my review and analysis of the above mentioned documents and materials.  I have also relied on my education, experience, and knowledge of basic engineering principles, consumer electronics, and manufacturing techniques.

17.      I have also relied on my review of Blackbird's infringement contentions.  Some of my opinions regarding invalidity are based on claim scope as applied by Blackbird in its infringement contentions.  These opinions should not be construed as an agreement or admission with regard to claim scope.

18.      I reserve the right to revise my opinions as my investigation continues and to supplement my opinions, if required, in response to further discovery, new information and opinions provided by Blackbird's expert(s), or decisions made by this Court or other courts.

**C.      Understanding of the Law**

19.      I am not an attorney.  For the purposes of this Report, I have been informed about certain aspects of the law that are relevant to my analysis and opinion.

20.      Lenovo's counsel has informed me of certain legal principles relevant to my invalidity analysis and opinions.  I have used my understanding of those principles in forming the opinions set forth in this Report.  My understanding of those principles is summarized below.

21.      I understand that invalidity analysis is a two-step process.  First, the Asserted Claims are construed to ascertain their proper scope.  Second, the construed claims are compared to the prior art.

**1.      Claim construction**

22.      I understand that the district court in the District of Delaware has construed certain claim terms in the '931 patent as set forth in the table below:

5

| Claim Term | D. Del. Construction |
|---|---|
| "directly" | "passing through the mounting assembly, but no other structure" |
| "proximate" | "next to, very near, or close to" |
| "port" | "interface not including a PC card slot" |

23.    I have reviewed the Court's claim construction order and the claim constructions set forth above and my opinions in this Report as to the validity of the Asserted Claims are based on and use the Court's claim constructions.  For ease of reference, I have endeavored to include the relevant claim constructions within the claim by claim analysis provided in this Report.  To the extent any claim section omits a recitation of the claim constructions, it is inadvertent (or intentional to avoid duplication) and my opinions are still based on the Court's claim constructions.

24.    With regard to claim language not construed by the Court, I viewed that language from the perspective of one of ordinary skill in the art at the effective filing date of the '931 patent.  I understand that the POSITA would have reviewed the intrinsic evidence, including the claim language, the patent specification, and the prosecution history.  I further understand that the POSITA would be familiar with other materials (such as contemporaneous dictionaries) not in the written record of the patent.

**2.    Legal Standards Relating to Invalidity**

*a.    Presumption of Validity and Burden of Proof*

25.    I have been informed and understand that a patent claim is presumed valid, and that a challenger must establish invalidity by "clear and convincing evidence."

26.    I have been informed and understand that invalidity must be demonstrated on a claim-by-claim basis.  I understand that a claim is invalid in light of prior art if the prior art

6

discloses or teaches, alone or in combination, each limitation recited in the claim clearly and convincingly. I have also been informed and understand that to prove invalidity of a dependent claim, the prior art must clearly and convincingly disclose or teach, alone or in combination, each limitation of the dependent claim, as well as each limitation of each other claim from which the claim depends.

### b.    Invention Date

27.    I have been informed and understand that the invention date is the date of conception. I have further been informed and understand that conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention. It is also my understanding that conception must include every feature or limitation of the claimed invention.

### c.    Anticipation

28.    I have been informed and understand that a patent claim is invalid if it is "anticipated" by prior art. I have been informed and understand that proof of anticipation requires a finding that a single prior art reference, device, or method discloses each limitation of the claim at issue, either expressly or inherently. I have been informed and understand that a limitation is inherently disclosed by a prior art reference if the reference must necessarily function in accordance with, or include, the limitation in the context of patented technology.

29.    I have been informed and understand that a patent claim is anticipated if there is clear and convincing evidence that, before the date of the claimed invention, the invention set forth in the claim was known or used by others in the United States; described in a patent published anywhere in the world; described in a printed publication anywhere in the world; or described in a patent application filed in the United States, as long as the USPTO ultimately published the application and/or granted it as a U.S. patent.

7

30.    I have been informed and understand that a patent claim is anticipated if there is clear and convincing evidence that, more than one year before the filing date of the patent, the claimed invention was in public use or on sale in the United States; patented anywhere in the world; or described in a printed publication anywhere in the world.

31.    I have been informed and understand that a patent claim is anticipated if there is clear and convincing evidence that the application for a patent filed by another was filed in the United States (or certain foreign applications having such effect) before the invention by the patent applicant and subsequently the application was published or issued as a patent.

32.    I have been informed and understand that material not explicitly contained in a single prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document.

### d.    Obviousness

33.    I have been informed and understand that a patent claim is invalid if it would have been obvious to a POSITA at the time of the claimed invention.  I have been further informed and understand that a claimed invention is not patentable if differences between it and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the pertinent art at the time the invention was made.  I have been informed and understand that factors relevant to the determination of obviousness include the scope and content of the prior art, differences between the claimed invention and the prior art, the level of ordinary skill in the art at the time of the invention, differences between the claimed invention and the prior art, and "secondary considerations" or objective indicia of non-obviousness.

34.    I have been informed and understand that a prior art reference must be analogous to the claimed invention to be considered in the obviousness analysis.  I understand that a prior art reference is analogous if the art is from the same field of endeavor, regardless of the problem

8

addressed. I also understand that a prior art reference that is not within the field of the inventor's endeavor is analogous if the reference still is reasonably pertinent to the particular problem with which the inventor is involved. A prior art reference is reasonably pertinent if it logically would have commended itself to an inventor's attention in considering his problem.

35. I have been informed and understand that a single reference alone can render a patent claim obvious, if any differences between the reference and the claim would have been known or obvious to a POSITA at the time of the alleged invention. That is if the POSITA could have adapted the reference to meet the claims of the patent by applying known concepts to achieve expected results, then the patent claims are rendered obvious by that reference.

36. I have been informed and understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. I have also been informed and understand that when a patent claim simply arranges old elements with each performing the same function it had been known to perform, and yields no more than one of ordinary skill would expect from such an arrangement, the combination is obvious.

37. I have been further informed and understand that there are several rationales for combining prior art references or modifying prior art references to show obviousness of claimed subject matter. These rationales include: simple substitution of one known element for another to obtain predictable results; use of a known technique to improve similar devices in the same way; applying a known technique to a known device ready for improvement to yield predictable results; choosing from a finite number of identified, predictable solutions with a reasonable expectation of success; known work in one field of endeavor may prompt variations of it for use in either the same field or a different field based on design incentives or other market forces if

9

the variations are predictable to one of ordinary skill in the art; and some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill in the art to modify a prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

38. I have been informed and understand that a patent claim composed of several limitations is not obvious merely because each limitation was independently known in the prior art. Hindsight reasoning is not an appropriate basis for combining references to form an obviousness combination. I have been further informed and understand that it can be important to identify a reason that would have prompted a POSITA to combine multiple prior art references. I have been informed and understand that factors to consider when assessing whether there was a reason that would have prompted a POSITA to combine the known elements in a way the claimed invention does, include: (1) whether the claimed invention was merely the predictable result of using or substituting prior art elements according to their known methods or functions; (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, with a reasonable expectation of success; and (6) whether the prior art teaches, suggests, or would otherwise motivate one of ordinary skill to modify or combine the prior art to arrive at the claimed invention or predicable results.

39. I have been informed and understand that the obviousness analysis requires consideration of common knowledge, common sense, and the perspective of a POSITA. The

10

Supreme Court of the United States has said that a POSITA is also a person of ordinary creativity, not an automaton, and that, in many cases, a POSITA will be able to fit the teachings of multiple patents together like pieces of a puzzle.

> *e.     Secondary Considerations*

40.    I have been informed that various "secondary considerations" (sometimes referred to as objective indicia of non-obviousness) may support a determination of non-obviousness and that such secondary considerations must be considered as part of an obviousness analysis.  I have been informed that even strong evidence of secondary considerations may not be sufficient to rebut a strong showing of obviousness.  I have been informed that evidence of secondary considerations must be relevant to the subject matter as claimed and therefore must demonstrate a nexus between the merits of the claimed invention and the evidence of secondary considerations.  I am informed and understand that a nexus may not exist where, for example, the merits of the claimed invention were readily available in the prior art and, additionally, there is no nexus unless the evidence presented is reasonably commensurate with the scope of the claims. I have been informed that the patentee bears the burden of showing the existence and effect of secondary considerations of non-obviousness, after which the burden of coming forward with rebuttal evidence shifts to the party arguing obviousness.

41.    I have been informed and understand that the following secondary considerations may indicate non-obviousness:

  1.    Commercial success:  a showing of commercial success for products that practice the patent.

  2.    Copying: evidence that others, including the accused infringer, copied the patented invention.

  3.    Long-standing problem or need:  evidence of a persistent problem or need in the art that was resolved by the patented invention.

11

4.      Prior failure: evidence that others have tried and failed to solve the problem or failed to provide the need resolved by the claimed invention.

5.      Commercial acquiescence of competitors: the willingness of industry to license the patent at issue.

6.      Skepticism: evidence that those of ordinary skill in the art were skeptical as to the merits of the invention, or even taught away.

7.      Praise: evidence of praise directed to an invention by others in the field.

8.      Unexpected results: evidence that those of ordinary skill in the art were surprised by the capabilities of the claimed invention.

42.    I have been informed and understand that the near-simultaneous invention by others can be evidence that a claimed invention is obvious.  I have further been informed and understand that the patentee bears the burden of showing a "nexus" between the claimed invention and the evidence proffered on secondary considerations (*e.g.*, proof of commercial success of a product that practices the claimed invention is not enough; there must be evidence that the commercial success resulted, at least in part, from the claimed invention).

### 3.      Level of Ordinary Skill in the Art

43.    I have been informed and understand that the level of ordinary skill in the relevant art at the time of the invention is relevant to inquiries such as the meaning of claim terms, the meaning of disclosures found in the prior art, and the reasons one of ordinary skill in the art may have for combining references.  I understand that September 14, 2001 is the effective filing date of the patent application that issued as the '931 patent.

44.    I have been informed and understand that factors that may be considered in determining the level of ordinary skill include: (1) the education of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active

12

workers in the relevant field. I have been further informed and understand that a POSITA is also a person of ordinary creativity.

45. Considering these factors, it is my opinion that a POSITA of the '931 patent technology at the time of the invention would have at least 18 months of hands-on computer physical design work or mentorship from a computer physical designer, and an undergraduate degree in mechanical engineering, manufacturing design, or an equivalent engineering degree. The POSITA at the time of the invention of the '931 patent would be familiar with the physical design of computers and laptop computers as well as consumer electronics devices in general. A POSITA's knowledge of laptops would include, among other things, a familiarity with hinge mechanisms used to connect a base to a display and other components found in laptop computers.

46. I utilized my professional and personal experience on the state of the relevant art at the time of the '931 patent invention, and also prior to the invention of the '931 patent. In addition, I am aware of information generally available to, and relied upon, by a POSITA during the relevant time period. Such information includes familiarity with the wide variety of laptop systems available from the relevant time period. My personal and professional experience comes into play here as I began using personal computers in 1984 beginning with the initial IBM PC and "portable" (luggable!) computers such as the Compaq systems as they became available in the market. I also have direct experience with a wide variety of laptop and handheld computers starting with the first commercial models and coming up to present day systems. Some early examples of relevant laptop computers include those Toshiba models shown below that were available commercially between 1985 to 1996:

13



47.    I am a person of at least ordinary skill in the art with respect to the subject matter of the '931 patent at the time of the effective filing date as detailed in Part I.B, which discusses my background and experience with the physical design of laptop computers and other relevant devices that utilize similar technology.

48.    A POSITA would also have had a basic understanding of personal computer components, hardware, and computer programs.  Specifically, a POSITA would have known that laptop or portable computers have hinge assemblies as part of the housing, processors (CPUs), memory (RAM), storage devices, display screens, keyboards, and ports to interface with peripheral devices.  A POSITA could have gained this basic knowledge by using computers on a regular basis, designing computers, or it could also have been obtained by training about computers, service or repair of computers, or through more formal education and training.  By September 14, 2001, I had gained this knowledge and familiarity as detailed above.

## III.    THE '931 PATENT

49.    Blackbird has asserted the '931 patent in this case.  The '931 patent issued on October 31, 2006 from U.S. Patent Application No. 09/952,138, which was filed on September

14, 2001.  The '931 patent is titled "Multipurpose computer display system."  The '931 patent identifies Nicholas Pappas as the sole inventor.

50.    I have reviewed the '931 patent and its file history in developing an understanding of the Asserted Claims and the opinions set forth in this Report.  While I set forth some general observations about the '931 patent in this section, I may rely on any aspect of the specification or file history as additional support for the opinions set forth herein.

### A.        Specification of the '931 Patent

51.    The technology of the '931 patent is not sophisticated.  This is especially true in view of the state of the art at the time of the invention.  The '931 patent is directed to a design for a portable computer display system and to provide added convenience in terms of positioning of the display system.  A stated objective of the '931 patent invention was to provide a device that "allows a computer user to easily and effectively maximize the value and utility of the laptop's flat panel display."  ('931 patent at 2:60-63.)  The '931 patent provides a rotatable flat panel display that works in combination with the supposed advantageous positioning of a port on the front face of the laptop computer housing.  ('931 patent at 3:63-67.)  The '931 patent addresses this objective by having the structure identified in Figures 1 and 5—each respectively showing the portable computer, having a port (112), yet depicting the flat panel display in a traditional arrangement  ('931 patent, Fig. 1 (left)) and an alternative position facing away from the user ('931 patent, Fig. 5 (right)).

15



52.    Figure 3, partially depicted below, is a close up of the mounting assembly (114) that facilitates the dual axis operability of the flat panel display relative to the keyboard base. ('931 patent at Fig. 3, 3:3-13.) The device generally includes a rotating turret (130) that has two vertically extending posts (120). ('931 patent at 7:13-15.) The '931 patent states that "[l]aptop computers generally employ flat-panel monitors for reasons of necessity, given space/weight constraints and the desire to pivotally mount the monitor relative to the base/keyboard for system protection and portability." ('931 patent at 1:60-63.) The display (104) has two recesses (124) within it that couple to the posts (120), allowing for the opening and closing, or pivoting, of the display onto the keyboard base. ('931 patent at 7:15-17.) The rotating turret is mounted onto the keyboard unit to facilitate rotational movement of the display relative to the keyboard base along a second or vertical axis. ('931 patent at 7:28-39.) The communication conduit (140), shown as a ribbon cable, is disclosed as extending from the keyboard unit (not shown) and into the display (104). ('931 patent at 7:30-36.)



Fig. 3

53.    In addition to the mounting assembly described above, the '931 patent places an "input receiver" or "port" on the front part of the laptop computer housing, or close thereto, to "permit efficient and non-encumbered coupling of the laptop computer to an ancillary computer system, *e.g.,* a separate desktop computer and/or a PDA." ('931 patent at 3:50-53.) The '931 patent describes that the port configuration "generally constitutes a 15 pin D-sub video connector, serial port, parallel port and/or universal serial bus ("USB"), and may communicate with peripheral devices by wired communication or wireless communication (e.g., via infrared signals)." ('931 patent at 5:65-6:3.) This port appears to be configured to facilitate the use of the laptop display as an external or secondary monitor for the ancillary computer system.

**B.    The Claims of the '931 Patent**

54.    The '931 patent has 17 total claims including two independent system claims: claims 1 and 13. I have been asked to provide opinions in this case regarding claims 1, 2, 3, 6, 8, 9, and 10 (the "Asserted Claims") of the '931 patent. Claim 1 is the only independent claim asserted by Blackbird and states:

> 1. *A computer system comprising:*
>
> [1a] *a) a keyboard unit including a computer keyboard and a keyboard base that includes a front wall and a back wall;*

17

[1b] *b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;*

[1c] *c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and*

[1d] *d) a port positioned proximate said front wall of said keyboard base, said port adapted to receive a signal from an ancillary computer system;*

[1e] *wherein a signal from said ancillary computer system delivered to said port is effective to generate a computer-generated image on said display screen; and*

[1f] *wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen.*

('931 patent at 13:11-40).  Claims 2-3, 6, and 8-10 depend directly from claim 1 and further require:

*2. A computer system according to claim 1, further comprising a central processing unit mounted within said keyboard unit. (Id. at 13:41-43).*

*3. A computer system according to claim 1, wherein said display screen is a flat screen unit. (Id. at 13:44-45).*

*6. A computer system according to claim 1, wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees. (Id. at 13:53-56).*

*8. A computer system according to claim 1, wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer. (Id. at 13:61-14:3).*

18

9. *A computer system according to claim 1, further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base.* (*Id.* at 14:4-6 (claim 9)).

10. *A computer system according to claim 1, wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.* (*Id.* at 14:7-10).

### C.    The Invention Date of the '931 Patent

55.    I have been informed and understand that the parties dispute the invention date of the '931 patent.  Blackbird does not provide an exact invention date (i.e. date of conception), but contends that "the inventions recited in the asserted claims of the '931 patent were conceived of between March 1998, and October 20, 1998."[1]  The prior art that I rely on in my Report, with the exception of the Kim reference, is unaffected by Blackbird's conception date assertion because each reference was published and/or issued more than one year before the filing date of the '931 patent.

56.    It is my understanding that Lenovo challenges Blackbird's assertion that the '931 patent is entitled to a conception date between March 1998 and October 20, 1998.  It is also my understanding that Lenovo contends that the '931 patent is entitled to a conception date no earlier than January 2001.  I have been asked to render opinions for certain prior art combinations based on a conception date of January 2001.

### IV.    TECHNOLOGY BACKGROUND

57.    The laptop industry at the time of the invention was evolving rapidly.  Flat panel displays were in widespread use due to their thin form-factor.  LCD screens were typically used in these flat panel displays.  (*See, e.g.*, '931 patent at 6:44-47 ("Display monitor 104 typically employs a liquid crystal display ("LCD") for the screen, eliminating the bulkiness of

---

[1] Pl.'s Suppl. Resp. & Objs. to Def's First Set of Interrogs., First Suppl. Resp. to Interrog. No. 1 at 4 (Aug. 17, 2017).

conventional desktop cathode ray tube monitors.")).  Laptops had multiple processors, including a CPU (central processing unit), that served as the core computing component and RAM (random access memory) for temporary storage while running software, which were generally located in the base along with a computer keyboard.  Permanent storage was primarily on floppy drives in the early days of the laptop industry but rapidly began moving to hard disk drives (HDD) for greater storage capacity and faster access.  A variety of ports were commonly found including serial, parallel, printer, keyboard/mouse, and others.  Some had display ports for connecting to an external display or monitor.

58.    Laptops also included cables that connected the flat panel displays to the computing components in the base, with the cables being routed internally to the laptop system. This is illustrated by U.S. Patent No. 6,275,376 to Joung-Nam Moon ("Moon") (LEN-BLKBRD00372-390).  Moon shows a personal computer with a rotatable display and a cable 80 connecting the base and the display.  (Moon at 8:37-40 ("[A] representative cable 80 from the base 20 communicates with the display cover 40 and display screen 50.  The cable 80 is a flat-type cable well known to one skilled in the art."), Fig. 2.)  In Moon, the cable runs from the base through the center of the of the bottom edge of the display at the point of rotation.  (Moon at Fig. 2.).  These cables were typically routed internally within the laptop system to avoid exposing the cable to being damaged and/or pulled, which could result in a system failure.  In a laptop with a display screen that swiveled about a vertical axis it would have been obvious to a POSITA to place the cable in the center of the swivel point(s) to minimize stress placed on the cable as the display swiveled.  (*See, e.g.*, Kim at 3:3-5; Anderson at 6:38-55.)  Similarly, it would have been obvious to include a rotational stop or limit on the hinge mechanism that allowed the display

20

screen to swivel in order to minimize the stress placed on the cable by preventing the cable from being twisted repeatedly in the same direction.

59.    I also have direct experience with a wide variety of laptop and handheld computers starting with the first commercial models and coming up to present day systems.  Some early examples of relevant laptop computers include those Toshiba models shown below that were available commercially between 1985 to 1996:



60.    Laptops were commercially available in the early 1990s with displays that could both tilt and swivel.  For example, the Zeos Freestyle had a display with both tilt and swivel capability.  The figure below is from a PC Magazine advertisement in May 1994 for the Zeos Freestyle.    (PCMag   (Vol.   13,   No.   10,   May   31,   1994)   p.   34,   available   at https://books.google.com/books/about/PC_Mag.html?id=MfbDrFwiARgC)    Similar advertisements showing this display feature also circulated in 1992 and 1993.   Ads for the Zeos Freestyle ran in publications such as the ABA Journal in September 1992, BYTE in September 1992, PC Magazine in August 1992, and InfoWorld in July 1992.  (LEN-BLKBRD006897, LEN-BLKBRD6899-6901, LEN-BLKBRD006902-6908, LEN-BLKBRD006909).  Also shown below is a portion of the BYTE ad from September 1992 for the Zeos Freestyle.



PCMag (Vol. 13, No. 10, May 31, 1994) p. 34



BYTE (Sept. 1992) (LEN-BLKBRD006901)

61.    The Thomas patent, U.S. Patent No. 5,206,790, titled "Pivot and Swivel Mechanism for Lap Top Display," was assigned to Zeos, issued April 27, 1993, and was filed July 11, 1991.  (LEN_BLKBRD006767-6777).  The patent discloses a swivel capability and some additional capability in the pivot mechanism.  In addition to this early patent disclosing the swivel feature, this mechanism was utilized in the Zeos Freestyle laptop which was commercially offered and marketed between at least 1992-1994.

22

## V.    OVERVIEW OF PRIOR ART REFERENCES

### A.    Japanese Published Patent Application No. H8-191,420 ("Masaru")

62.    Japanese Published Patent Application No. H8-191,420 ("Masaru"),[2] titled "Display Holding Structure," was filed on January 9, 1995, and published on July 23, 1996. Masaru lists Masaru Furujiku as the sole inventor.  It is my understanding that Masaru is prior art under at least 35 U.S.C. § 102(b).

63.    Masaru discloses a portable computer system with "a display holding structure that provides sufficient degrees of freedom in the range of rotation of a display device 13, and can also prevent interference between the display device 13 and fixed member 11."  (Masaru, ¶ [Objective].)  In other words, Masaru teaches a portable computer system with a display screen that can rotate about two perpendicular axes:  "A rotating member 9 is rotatably provided on a fixed member 11, and a display device 13 is pivotally supported by a pair of holding devices P that are provided standing on two sides of the rotating member 9."  (Masaru, ¶ [Configuration]; *see also* Masaru, Figs. 8, 9.)



---

[2] LEN-BLKBRD006688-95 (certified translation of Masaru); LEN-BLKBRD048271-76 (Japanese copy); LEN-BLKBRD006696 (certificate of translation accuracy).

64.    Masaru teaches that the portable computer system includes "a personal computer, a word processor, or an information communication terminal device equipped with a flat display device." (Masaru, ¶ [0001].)  Masaru discloses that generally laptops included a main body unit with a flat display device that could rotate in the open-close direction.  (Masaru, ¶ [0002].)  Masaru teaches that "due to demand for additional degrees of freedom in the range of rotation of the display device, proposals have been made for electronic apparatus having a main body unit and a flat display device, known as a biaxial flat display device, that permits left-right rotation in addition to the rotation in the open-close direction."  (Masaru, ¶ [0002].)

65.    As illustrated in Fig. 1 reproduced below, Masaru discloses a main body unit or fixed member 11 with "a semicircular rotating member [9] provided in a recessed area of an upper surface 11a of the fixed member 11."  (Masaru, ¶ [0008].)  The rotating member 9 is "rotatable around a vertical axis."  (Masaru, ¶ [0008].)  On both sides of the rotating member 9 are a pair of holding devices P, "with the flat display device 13 being pivotally supported by the holding devices P."  (Masaru, ¶ [0008].)  The holding devices P include a fixed bracket 2 that is fixed to the rotating member 9 and a horizontal rotating shaft 1 that is rotatably attached to fixed bracket 2.  (Masaru, ¶ [0009].)



[FIG. 1]

24

66.     A POSITA would understand that Masaru discloses a swivel hinge mechanism for a laptop computer that could be used with laptop systems available at the relevant time.  Laptop computers at the relevant time were predominately constructed with a base portion (which included the keyboard, as illustrated in Figs. 1, 8 and 9 of Masaru) and a display cover in a clam-shell arrangement.   The display cover and base were attached using a variety of hinge mechanisms and it would have been obvious to a POSITA to use Masaru's hinge mechanism with available clam-shell laptop systems.

### E.     U.S. Patent No. 5,016,849 ("Wu")

67.     U.S. Patent No. 5,016,849 ("Wu"),[3] titled "Swivel Mechanism for a Monitor of a Laptop Computer," was filed on November 17, 1989, and issued on May 21, 1991, to Sunny Wu. It is my understanding that Wu is prior art under at least 35 U.S.C. § 102(b).

68.     Wu discloses a system that allows for rotating the display screen of laptop computers.  Specifically, Wu teaches a system with a keyboard base and an attached, moveable display screen (*i.e.*, monitor).  (Wu, Fig. 2, Abstract.)



Fig.1

69.     Wu describes a laptop computer that includes a base, keyboard, and monitor.  The system in Wu allows the screen to rotate/swivel relative to a keyboard around a horizontal and a

---

[3] LEN-BLKBRD006697-704.

vertical axle.  (Wu at 1:59-63, Fig 2.)  The vertical axle includes a fixed seat 11 and a positioning

block 13 (as shown in Figs. 2 and 3).  (Wu at 1:63-2:7.)



Fig. 2



Fig. 3

70.     The vertical axle facilitates rotation between the laptop display and the fixed seat

11 that is attached to the laptop base as shown in Fig. 5.  (Wu at 2:2-7.)



Fig. 5

71.     The horizontal axle facilitates rotation between the fixed seat 11 and the display

screen.  (Wu at 2:10-43.)  In this manner, the display screen is able to rotate about the horizontal

axle to close over the laptop keyboard and base.  (Wu, Fig. 1.)

26

72.    A POSITA would understand that Wu discusses a swivel hinge mechanism for a laptop computer and that the swivel hinge mechanism of Wu could be used with laptop systems available at the relevant time.  Laptop computers at the relevant time were predominately constructed with a base portion (which included the keyboard) and a display cover in a clam-shell arrangement.  The display cover and base were attached using a variety of hinge mechanisms and it would have been obvious to a POSITA to use Wu's swivel hinge mechanism with the clam-shell laptop systems available.

### C.    U.S. Patent No. 6,498,721 ("Kim")

73.    U.S. Patent No. 6,498,721 ("Kim"),[4] titled "Two-way display notebook computer," was filed on August 25, 2000, and issued on December 24, 2002 to Young S. Kim.  It is my understanding that Kim is prior art under at least 35 U.S.C. § 102(e).[5]

74.    Kim discloses a laptop with a "two-way or dial display" that is "hinged to a support rotatably carried by the body."  (Kim at Abstract, 1:8-10.)  "The cover has a main display which in a closed position overlies the body and in an open position pivots and rotates the main display away from the body."  (Kim at Abstract.)



FIGURE 2



FIGURE 4

---

[4] LEN-BLKBRD006627-35.

[5] As discussed in Part III.C, I have assumed that Kim is prior art to the '931 patent.

27

75.    Kim discloses that "[n]otebook computers generally have a main body which houses the processor and associated electronic components, disk drives, cursor control and switches." (Kim at 1:13-15.)  Kim also teaches that notebook computers include a keyboard in the upper surface of the main body and a cover that includes a flat screen display. (Kim at 1:15-19.)

76.    Kim describes that "[o]ne advantage of having a notebook computer is that it can be easily carried by the user for making presentations." (Kim at 1:23-24.)  Kim further describes that "[i]n many applications, the user wishes to display data, drawings, pictures, graphs or other information to others. Presently, the information can be viewed by others if they sit on the same side of the computer as the user observes the selected information, data, etc." (Kim at 1:25-29.)  Kim also describes that the information can be shared with other by presenting the information via a video projector, but requires carrying a projector or having one available for each presentation. (Kim at 1:29-35.)  Kim teaches that "[i]t would be advantageous to be able to make a presentation, display information, etc. to individuals sitting on the opposite side of a table or desk." (Kim at 1:36-38.)

77.    Kim teaches that one object of his invention is "to provide a notebook or laptop computer in which the cover can be opened and positioned to present the main display to individuals sitting opposite the operator." (Kim at 1:46-49.)  Kim discloses that the cover can rotate through an angle from 1 to 180 degrees "to face an observer across from operator, as shown in Fig. 4." (Kim at 2:49-51, 4:15-16.)  "This enables the operator to make a presentation to others without the aid of a projector or the inconvenience of having the others crowd around the operator to view the display from the same side as the operator." (Kim at 2:53-57.)

28

78.     Kim teaches one embodiment in which "hinge 13 is integral with rotatable joint 23,"[6] as shown in Fig. 6 reproduced below.  (Kim at 3:1-2.)  Kim discloses that "[p]ower and data lines 30 connect cover 12 with body 11 through hinge 13 and rotatable joint 23."  (Kim at 3:3-5.)   Kim further describes the hinge mechanism:  "Receptors[7] 34 of cover 12 slidably receive the ends 32 of hinge 13 and enable cover 12 to pivot about hinge 13. Rotatable joint 23 fits into socket 36 and is secured with screw 38 and cap 40 from the underside of socket 36, within body 11."  (Kim at 3:7-11.)



FIGURE 6

_____

[6] Kim generally refers to the element labelled 23 as a "rotatable joint."  On one occasion Kim refers to element 23 as a "rotatable hinge."  (Kim at 3:5-7.)

[7] Kim refers to the element labelled 34 as a "slot" and as a "receptor."  (Kim at 3:3-9.)

**D.** **Japanese Published Patent Application No. H11-161,367 ("Ioka")**

79.    Japanese Published Patent Application No. H11-161,367 ("Ioka"),[8] titled "Portable Information Processor," published on June 18, 1999 to Ioka Tsunejiro.  It is my understanding that Ioka is prior art under at least 35 U.S.C. § 102(b).  The application that led to Ioka was filed on November 27, 1997.  Like Wu, Ioka discloses a notebook computer with a display screen that can tilt relative to its base around a horizontal axis and can swivel around a vertical axis.  (Ioka, ¶¶ [0005], [0007], [0008], Fig. 1.)  The screen can be closed like a typical notebook computer with the screen down.  (Ioka, Fig. 4.)



80.    When the display screen is raised, a user can swivel the screen around a vertical axis.  (Ioka, Fig. 1.)

---

[8] LEN-BLKBRD048264-70 (certified translation of Ioka); LEN-BLKBRD000303-06 (Japanese copy); LEN-BLKBRD048277 (certificate of translation accuracy).



81.     The screen can also be folded down such that the screen is face up.  (Ioka, Fig. 5.) Ioka discloses that the display screen that can be rotated around a vertical axis at least 180 degrees and closed again.  (Ioka, ¶ [0008].)



### E.     U.S. Patent No. 5,335,142 ("Anderson")

82.     U.S. Patent No. 5,335,142 ("Anderson"),[9] titled "Portable Computer Display Tilt/Swivel Mechanism," issued on August 2, 1994, to William J. Anderson.   It is my understanding that Anderson is prior art under at least 35 U.S.C. § 102(b).  The application that

---

[9] LEN-BLKBRD006778-86.

led to Anderson was filed on December 21, 1992. Like Wu, Anderson discloses a portable computer with a hinge assembly that allows the display screen to be tilted from the base about a horizontal axis and swiveled about a vertical axis. (Anderson at Abstract.) The hinge assembly provides tilt and swivel stops, preventing the screen from tilting more than 115 degrees from the closed position or swiveling more than 30 degrees from the straight-forward position. (Anderson at Abstract, 1:59-65.) The swivel functionality of the portable computer is illustrated in Fig. 2.



Fig. 2

83.    An exploded view of the hinge assembly is illustrated in Figure 9.



Fig. 9

84.    Anderson combines a swivel disk 46 with mounting ring 54 to provide swiveling of the display.  (Anderson at 4:63-5:2.)  The swivel disk fits within a grooved ring and rotates relative to the circular mounting ring attached to the base of the laptop computer.  (Anderson at 4:63-5:2.)  Within the mounting ring are stops that are labeled as 70.  (Anderson at 5:7-18.)  Stop tabs 72 are oriented on the swivel disk such that the swivel disk is stopped from rotating beyond a total of 60 degrees.  (Anderson at 5:7-18.)

85.    Anderson achieves the tilting action by using a tilt-tube 84 extending through tilt base walls and through the pivot arms 88 of the attachment yoke 42.  (Anderson at 5:40-45.)  The tilt base is attached to the swivel disk.  The attachment yoke is attached to the display screen.

E.    **U.S. Patent No. 5,632,373 ("Kumar")**

86.    U.S. Patent No. 5,632,373 ("Kumar"),[10] titled "Protective Case for Portable Computer," issued on May 27, 1997, to Rajendra Kumar and Steven E. Brooks.    It is my understanding that Kumar is prior art under at least 35 U.S.C. § 102(b).    The application that led to Kumar was filed on April 3, 1995.    Kumar discloses a protective case for portable computers. Kumar discusses that portable computers "may be all purpose computing machines capable of running a variety of types of software programs."    (Kumar at 1:20-22.)    In addition, "[t]hese portable personal computer may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc."    (Kumar at 1:22-25.)



FIG-4

87.    Kumar describes a protective case that is adapted to hold a portable computer. (Kumar at 3:60-62.)    Kumar describes that the "[p]ortable computer 2 is of the general clam shell

---

[10] LEN-BLKBRD006914-25.

type having a base housing 4 with a standard keyboard 5 mounted thereon. A top housing 6 houses a display screen 7, and is pivotally attached to base housing 4 via a hinge pin 3 and may be moved between a closed position whereby the display screen covers keyboard 5 and an open position (Fig. 4)." (Kumar at 3:64-4:3.) Kumar additionally describes that "portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8," both of which indicate possible locations for various typical laptop ports. (Kumar at 4:21-24.)

### G.    Japanese Published Patent Application No. H7-261,905 ("Satoshi")

88.    Japanese Published Patent Application No. H7-261,905 ("Satoshi"),[11] titled "Personal Computer," was filed on March 18, 1994, and published on October 13, 1996. Satoshi lists Satoshi Wakasugi as the sole inventor. It is my understanding that Satoshi is prior art under at least 35 U.S.C. § 102(b).

89.    One of the objectives in Satoshi is to create a portable pointing device for a personal computer with improved operability. (Satoshi, ¶ [Objective].) Accordingly, Satoshi discloses a tablet-integrated personal computer that "uses a tablet as the pointing device." (Satoshi, ¶ [0005].) The tablet is connected to the personal computer or, when not in use, stowed in the body of the personal computer. (Satoshi, ¶ [0005], Fig. 1.) Satoshi teaches that the tablet functions as a pointing device and allows a user to (1) move a cursor on screen, and (2) input "handwritten information such as graphics and text information." (Satoshi, ¶ [0007].) That is, the tablet enables a user to control the on-screen functionality of the personal computer and generate graphical images for display.

---

[11] LEN-BLKBRD006685-87 (certified translation of Satoshi); LEN-BLKBRD048261-63 (Japanese copy); LEN-BLKBRD006696 (certificate of translation accuracy).



[FIG. 1]

90.　Satoshi also teaches that the tablet is to be connected to the personal computer at a location that would allow users of the personal computer to operate the tablet without having to take their hands off of the keyboard.  (Satoshi, ¶ [Configuration].)  For example, Satoshi discloses that the "tablet connection portion" for the tablet could be located on the front side portion of the personal computer keyboard.  (Satoshi, ¶ [0010].  With this location, a user can operate the tablet "even when typing."  (Satoshi, ¶ [0010].)

91.　Another objective of Satoshi is to allow the tablet to be stowed in the personal computer so the user doesn't forget to bring it along.  (Satoshi, ¶ [Objective].)  Satoshi notes that prior art systems included an integrated pointing device.  (Satoshi, ¶ [0003].)  By creating a "tablet stowing portion," the invention of Satoshi maintains the benefit of having an integrated pointing device, but also allows the user to select from different tablets suitable to a particular usage.  (Satoshi, ¶ [0009].)

III.    **U.S. Patent No. 5,774,331 ("Sach")**

92.    U.S. Patent No. 5,774,331 ("Sach"),[12] titled "Portable Workstation Having Environmentally Sealed Components," was filed on October 6, 1997, and issued on June 30, 1998, to Gary M. Sach. Sach is a continuation of an application filed on May 1, 1996, that was later abandoned. It is my understanding that Sach is prior art under at least 35 U.S.C. § 102(b).

93.    Sach discloses a portable computer workstation that can be easily carried by an operator. (Sach at Abstract.) The workstation has a rotatable top cover that houses a display panel. (Sach at 1:54-56.) The display panel can be a "liquid crystal display, a field emission display panel, a plasma display panel . . . [or other] types of display screens" (Sach at 2:42-49.) The workstation also includes a two-slot VME[13] processor box that receives up to two VME processor cards from one side of the workstation. (Sach at 1:59-62; 2:57-60.) A keyboard and touch panel display are exposed to a user when the top cover of the workstation is opened. (Sach at 2:3-6.)

94.    Sach also discloses that "[t]he VME processor card 17 has a plurality of input and output ports." (Sach at 3:4-7.) These ports include:

- 19a – a LAN port such as an AUI port,

- 19b – a SCSI port that is internally terminated by a terminator 28,

- 19c – a parallel port for connection to a printer for example,

- 19d – an RS-232 port for connection to a printer or modem,

- 19e – a keyboard and trackball port for connection to the keyboard 24 and the trackball 25, and

---

[12] LEN-BLKBRD006926-32.

[13] "VME stands for VersaModule Europa, which is a commercial bus/crate standard for modular computer systems, which is defined in ANSI/IEEE Standard 1014-1987." (Sach at 1:62-65.)

37

- 19f – an RS-343 port for connection to the display panel 13.

(Sach at 3:34-40, Fig. 2.) The specification in Sach includes three drawings: Figure 1, a perspective view; Figure 2, an exploded view; and Figure 3, a block diagram. (Sach at 2:24-32.) As can be seen from Figure 2, ports 19a-19d are located on the side of the workstation.



## VI. THE PRIOR ART RENDERS OBVIOUS CLAIMS 1-3, 6, AND 8-10 OF THE '931 PATENT

95. I will now explain how the prior art references render the Asserted Claims of the '931 patent obvious.

### A. Masaru Renders the Asserted Claims Obvious.

96. In my opinion, Masaru in combination with Sach, Kumar, or Satoshi renders claims 1-3, 6, and 8-10 of the '931 patent obvious. It is also my opinion that Masaru in combination with Sach, Kumar, or Satoshi, and in further combination with Ioka or Kim renders claims 2, 3, and 6 obvious.

1.    **A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Masaru with Sach, Kumar, or Satoshi.**

97.    It is my opinion that it would have been obvious to a POSITA to modify Masaru in view of the knowledge of a POSITA and/or in combination with the teachings of Sach, Kumar, or Satoshi.  At the time of the invention, laptop computers commonly had one or more input/output ports.  Sach, Kumar, and Satoshi each discloses exemplary locations and use of input/output ports.  Each reference provides additional functionality and a specific benefit to the computer system described by Masaru, which provides a motivation to combine these references.  A POSITA would also have had a reasonable expectation of success because each reference is in the field of portable computer systems and is compatible with the system disclosed by Masaru.

98.    Masaru teaches a rotatable display holding structure for a personal computer that is equipped with a flat display device (e.g. a laptop computer).  (Masaru,  ¶ [0001], Fig. 9.)  Masaru discusses how that, in the prior art, laptop computers were generally mounted on a single shaft that rotated only in an open-close direction.  (Masaru, ¶ [0002].)  The invention of Masaru discloses a "biaxial flat display device, that permits left-right rotation in addition to the rotation in the open-close direction."  (Masaru, ¶ [0002].)  In particular, the invention of Masaru addresses the need to provide a configuration where the rotatable display and the main body of the laptop do not "interfere with and damage each other or prevent smooth rotation of the flat display device."  (Masaru, ¶ [0003].)

39



99.   It would have been obvious to a POSITA that the laptop disclosed by Masaru would also include other hardware and components typically found in laptop computers. A POSITA would also have understood that Masaru discloses a display holding structure and does not expressly address other features or aspects of a laptop computer. For example, Masaru does not address the location or use of input/output ports commonly found on laptop computers. To add input/output ports and similar components, a POSITA would have looked at pre-existing, available, and known laptop computers systems to address the same optimal design configuration goals addressed by Masaru. The POSITA would have considered other laptop and electronic systems that improved the working efficiency and practicality of standard laptop computer systems consistent with the design considerations disclosed by Masaru. Each of Sach, Kumar, and Satoshi describes additional functionality intended to be integrated into laptop computer systems. The combination of Masaru with Sach, Kumar, or Satoshi provides additional functionality, efficiency, and practicality to the Masaru laptop computer system.

100.   For example, a POSITA would have been motivated to look at the laptop computer disclosed by Sach with a plurality of input and output ports. Sach discloses multiple input/output

40

ports including "a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 19e for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19f for connection to the display panel 13." (Sach at 3:35-42.) It would have been obvious to incorporate the types of input/output ports from Sach with the portable computer of Masaru to provide the functionality of these ports.

101. As another example, a POSITA would have been motivated to look at the laptop computer disclosed by Kumar with ports on the front wall and side wall of the laptop base. Kumar discloses multiple input/output ports on the front and side walls of the base. (Kumar at 4:21-24.) Kumar also discusses that laptop computers interact with a wide variety of input/output devices that have various functions. (Kumar at 1:22-25 ("These portable personal computer may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc.").) It would have been obvious to incorporate the input/output ports from Kumar with the portable computer of Masaru. A POSITA would have recognized that input/output ports on or proximate the front wall would have been an obvious location selection (although not the only desirable location) because it would allow the user to connect ancillary devices while displaying content or images from the ancillary devices on the laptop flat-panel display and to nearby persons.

102. As another example, a POSITA looking in this area would have found Satoshi's tablet-integrated personal computer. Satoshi discloses a tablet and "a tablet connection portion for connecting the tablet at a predetermined position on the personal computer body." (Satoshi, ¶ [0005].) Satoshi also discloses that the "tablet connection portion 4 is provided with a connector

41

that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard," thereby maximizing the keyboarding efficiency of the user. (Satoshi, ¶¶ [0007], [0010].) Similarly, a POSITA would have considered where the user would be located when determining an efficient placement of input/output ports in Masaru's laptop with a rotatable display holding structure. A POSITA would have been motivated to locate the tablet connection portion of Satoshi or similar ports proximate the front wall of the base to allow convenient connection of ancillary devices to provide various features and functionalities, including displaying images to the laptop users or other people viewing the laptop's display from nearby.

103.    Masaru, Sach, Kumar, and Satoshi each describes portable computers. Because these references deal with portable computers, a POSITA would have had a reasonable expectation of success combining the features of Masaru with Sach, Kumar, or Satoshi to produce a laptop computer system having the combined features. Design incentives would have motivated a person of skill in the art to combine Masaru with Sach, Kumar, or Satoshi. For example, Sach, Kumar, and Satoshi each provides an added functionality that is not expressly disclosed by Masaru, and each provides a benefit derived from that added functionality. Furthermore, the combination of these references produces a predictable product in the form of a portable computer having the features of Masaru plus the features added from Sach, Kumar, and/or Satoshi. As a result, it is my opinion that a POSITA would have been motivated to combine Masaru with Kumar, Satoshi and/or Sach.

## 2.    A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Masaru with Ioka or Kim.

104.    It is my opinion that it would have been obvious to a POSITA to modify Masaru in view of the knowledge of a POSITA and/or in combination with the teachings of Ioka or Kim.

42

Masaru, Ioka, and Kim each disclose a display for a laptop computer that can be rotated about two perpendicular axes. Each reference uses a swivel hinge assembly to provide rotation of a laptop display screen about two perpendicular axes. Each reference also uses the swivel hinge assembly for similar objectives to improve the convenience, functionality, and usability of laptop computers. For example, the references teach a rotatable display screen improves accessibility and viewing angles relative to the laptop display screen. (Masaru, ¶ [0002]; Ioka, ¶ [0003]; Kim at 1:23-29, 36-38.) Because Ioka and Kim solve the same issue in a similar way as Masaru, a POSITA would have been motivated to consider these references for other beneficial features.

105. A POSITA would have had a reasonable expectation of success combining Masaru with Ioka and/or Kim because they provided similar solutions and there are a finite number of ways to improve upon the convenience and versatility of the laptop display swivel mechanism. For example, Ioka and Kim disclose at least 180 degrees of rotation of the display about the vertical axes to allow someone sitting across from the laptop user to view the screen. (Ioka, ¶ [0003]; Kim at 2:49-51, 4:15-16). A POSITA would have found it obvious and would have been motivated to combine the disclosure of Masaru with the disclosure(s) in Ioka and/or Kim to provide at least 180 degrees of rotation about the vertical axes because this would have furthered the common goal of improving the convenience and functionality of a laptop system. Based on the teachings of Ioka and Kim, a POSITA would have recognized the value of modifying the swivel mechanism of Masaru to allow for at least 180 degrees of rotation about a vertical axis so that display could be rotated to share with nearby persons. A POSITA would have similarly been motivated to consider the teachings of Ioka and Kim to modify the swivel mechanism of Masaru to provide additional beneficial features and functionality.

### 3.    Claim 1 is obvious over Masaru in view of Sach, Kumar, or Satoshi.

**1.** *A computer system comprising:*

[1a]  *a) a keyboard unit including a computer keyboard and a
        keyboard base that includes a front wall and a back wall;*

106.    Masaru teaches a computer system with a "fixed member formed by the main body

unit" 11 (*keyboard unit*). (Masaru, ¶ [0008], Figs. 1, 8, 9.)   The *keyboard unit* of Masaru is

depicted, for example, in Figure 8 and includes a *computer keyboard*.  (Masaru, Figs. 8, 9.)  The

*keyboard unit* includes a *keyboard base* with a *front wall* and a *back wall*.  (Masaru, Figs. 8, 9.)

The elements of the preamble and limitation 1[a] are identified in the annotated Fig. 8 below.

Based on these features, it is my opinion that Masaru teaches these limitations.



[FIG. 8]

44

 

[1b]  *b)  a  display  screen  for  displaying  computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;*

107.   Masaru discloses a flat display device 13 (*display screen*) for displaying computer-generated images.  (Masaru, ¶ [0008], Figs. 7, 8, 9)  The display includes two *side walls* and a *bottom edge* that extends between the *side walls*.  (Masaru, Figs. 7-9)  The display has *two spaced slots* in the bottom edge to receive two "holding devices P, with the flat display device 13 being pivotally supported by the holding devices P."  (Masaru, ¶ [0008], Figs. 1, 7-9.)  All these features are shown in annotated Figure 8, below.  Accordingly, it is my opinion that Masaru teaches this limitation.

45

[FIG. 8]



side wall

display screen

side wall

two spaced slots

bottom edge



[FIG. 9]

[1c] *c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and*

108.   It is my understanding that the term "proximate" has been construed as being "next to, very near, or close to." (*See supra* ¶ 22.)

109.   Masaru discloses a "semicircular rotating member 9" and "a pair of holding devices P" (collectively, *mounting assembly*) located proximate the *back wall* of the *keyboard base*. (Masaru, ¶ [0008], Figs. 1, 8, 9.) The "rotating member 9 is attached to the fixed member 11 by a fastener 12." (Masaru, ¶ [0008], Figs. 1, 8, 9.) The holding devices P (*two spaced mounting brackets*) extend upward from the semicircular rotating member (*rotatable element*) and pivotally support the flat display. (Masaru, ¶ [0008], Figs. 1, 8, 9.) The flat display is joined to the main body unit by the pair of holding devices P such that the holding devices are positioned and sized to be received within the two spaced slots in the bottom edge of the display screen. The rotating member 9 allows the display to rotate about a vertical axis (*first axis*). (Masaru, ¶¶ [0008], [0012], *see* Fig. 8 (illustrating vertical axis rotation by direction arrow D).) And the holding devices P allow the display to pivot about a horizontal axis (*second axis*). (Masaru, ¶¶ [0009], [0012], *see* Fig. 8 (illustrating horizontal axis rotation by direction arrow E).) The vertical and horizontal axes are perpendicular to each other. Given these features in Masaru, it is my opinion that Masaru teaches this limitation.

47



Pivotal Motion

Rotational Motion

Mounting Assembly

[FIG. 8]

[FIG. 1]

(a)



[FIG. 9]

48

[1d]  *d) a port positioned proximate said front wall of said keyboard base, said port adapted to receive a signal from an ancillary computer system;*

[1e]  *wherein a signal from said ancillary computer system delivered to said port is effective to generate a computer-generated image on said display screen; and*

110.  It is my understanding that the term "port" has been construed as an "interface not including a PC card slot." (*See supra* ¶ 22.) It is also my understanding that the term "proximate" has been construed as being "next to, very near, or close to." (*See supra* ¶ 22.)

111.  Masaru, being directed to a rotatable display holding structure, does not expressly disclose ports. This limitation, however, would have been obvious in view of Sach, Kumar, and/or Satoshi because laptop computers commonly included at least one input/output port and a flat screen display. A POSITA would have known that a flat screen display inherently displays computer-generated images regardless of whether the images are generated from internal signals or from external signals.

112.  It is my opinion that limitations 1[d] and 1[e] are disclosed by the combination of Masaru with Sach. Although Sach is primarily directed to a self-contained tactical workstation, Sach discloses features of portable computers that were common at the time of the invention of the '931 patent, particularly the types of connections to other devices that computers had and the port arrangements that were commonly used for communicating with these devices. Sach discloses various types of *ports* including "a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d." (Sach at 3:4-7.) More specifically, Sach discloses "a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 19e for connection to the keyboard 24 and the trackball 25, and an RS-343 port

49

19f for connection to the display panel 13." (Sach at 3:35-42.) Sach describes these *ports* as being accessible from one side of the workstation. (Sach at 1:59-61; 2:57-60; 3:4-7, Fig. 1.) Under plaintiff's infringement theory, the location of the parallel port 19c or the serial port 19d would satisfy the court's construction of being proximate the front wall. Further, under plaintiff's infringement theory, the LAN, AUI, SCSI, parallel, and serial ports can be used to interface with a variety of devices including an *ancillary computer system* through which a *computer-generated image* could be received and displayed on the display screen.

113. Input/output ports, such as those disclosed in Sach, could be placed on other portable computer systems, like the portable computer system described by Masaru. Given the specific arrangement of the ports in Sach, a POSITA combining Masaru and Sach would have been motivated to arrange the ports in the same or a similar manner. Masaru does not show any obstructions that would prevent placement of the ports in the arrangement shown by Sach. As a result, a POSITA would have had a reasonable expectation of success when combining the teachings of Masaru and Sach. Under plaintiff's infringement theory, a POSITA would have known that the input/output ports in Sach, particularly the disclosed LAN port 19a, SCSI port 19b, parallel port 19c and serial port 19d, could be used by Masaru's laptop to communicate with ancillary computer systems and generate an image on the laptop's display from a signal received from the ancillary computer system. (*See* '931 patent at 5:65-6:14 ("Port 112 generally constitutes a 15 pin D-sub video connector, serial port, parallel port and/or universal serial bus ("USB"), . . . or an IEEE 1394 port.").) Accordingly, it is my opinion that Masaru in view of Sach discloses limitations 1[d] and 1[e] of the '931 patent.



114.    It is my opinion that limitations 1[d] and 1[e] are also disclosed by the combination of Masaru with Kumar.  Although Kumar is primarily directed to a carrying case for a portable computer, Kumar discloses features of portable computers that were common at the time of the invention of the '931 patent.  Kumar discloses that a "portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8."  (Kumar at 4:21-24; Fig. 4.)  Kumar also discusses that laptop computers interact with a variety of types of input/output devices with a variety of functions and features, including "printers, light pens, image scanners, video scanners, etc."  (Kumar at 1:22-25.)  Kumar discloses ports on the front wall and side wall that, according to Blackbird's interpretation of the claim, satisfies the proximate limitation.  The disclosed input/output ports could be used under plaintiff's infringement theory to interface with a variety of devices and are capable of receiving a signal from an ancillary computer input device and generating a computer-generated image on the display screen from the received signal.

51

115. Input/output ports, such as those disclosed in Kumar, could be combined with other laptop computers and positioned proximate the front wall of the laptop base. Given the express disclosure of a port in the front wall or side wall of a portable computer, a POSITA combining Masaru and Kumar would have been motivated to arrange the ports in the same or a similar manner. Masaru describes a generic portable computer having a particular type of display, and does not show any obstructions that would prevent placement of a port proximate the front wall. A POSITA would have had a reasonable expectation of success when combining the teachings of Masaru and Kumar. Under plaintiff's infringement theory, a POSITA would have known that the input/output ports on the front and side walls of the base in Kumar could be used by Masaru's laptop to communicate with ancillary computer systems and generate an image on the laptop's display from a signal received from the ancillary computer system. This is particularly true given Kumar's mention of light pens, image scanners, and video scanners, which would each create or modify an image on the display, though many other devices were known at the time of the invention of the '931 patent. Further, a POSITA would have been familiar at the time of the invention of the '931 patent with display ports that would have allowed the laptop computer system to project computer-generated images from connected computer systems. (*See* '931 patent at 5:65-6:14 ("Port 112 generally constitutes a 15 pin D-sub video connector, serial port, parallel port and/or universal serial bus ("USB"), . . . or an IEEE 1394 port.").) Accordingly, it is my opinion that a POSITA would have been motivated to combine Masaru with Kumar, which combination discloses limitations 1[d] and 1[e] of the '931 patent.

52



FIG−4

116.   It is my opinion that limitations 1[d] and 1[e] are disclosed by the combination of Masaru with Satoshi.  For example, a POSITA looking to add common features to Masaru's laptop, including generating a computer generated image on the laptop's display screen from external components such as an ancillary computer system, would have found Satoshi's tablet-integrated computer that discloses connecting a tablet (*ancillary computer system*) to a connector (*port*) "that allows pointing/movement of a cursor . . .  displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information." (Satoshi, ¶ [0007]; Fig. 1.)  A POSITA would have understood that Satoshi's tablet was an ancillary computer system that sent signals to the disclosed laptop that were effective to generate computer-generated images on the laptop's display screen.  It would have been obvious for a POSITA to modify the laptop of Masaru with the type of *port* disclosed in Satoshi.  Specifically, by using a tablet as an input device, the functionality of Masaru would be augmented with the advantages of Satoshi by allowing a user to input and display "handwritten information such as graphics and text information."  Alternatively, a POSITA may have chosen to use the "tablet connector portion" for the display of other types of *computer generated images*.

117.    Satoshi also discloses that the "tablet connection portion" is located on "a front side portion of the personal computer keyboard, that allows the user to use the tablet without removing their hands from the keyboard." (Satoshi, ¶ [0010]). Accordingly, the user is able "to use the tablet . . . even when typing." (Satoshi, ¶ [0010]). In order for a user to maintain control of both the laptop and the ancillary computer system, placement of the port proximate the front wall of the laptop, as shown by Satoshi under Blackbird's interpretation of the proximate limitation, would have been obvious to a POSITA. Masaru discloses no feature next to the front wall of the device that would conflict or hinder the port or tablet disclosed by Satoshi. A POSITA, therefore, would have had a reasonable likelihood of success at augmenting the computer system described by Masaru with the additional functionality described by Satoshi because both devices are portable computer systems. Accordingly, it is my opinion that the combination of Masaru with Satoshi is obvious, and that Masaru in view of Satoshi discloses limitations 1[d] and 1[e] of the '931 patent.



54

118.    For these reasons, it is my opinion that a POSITA would have been motivated to combine Masaru with Sach, Kumar, or Satoshi, which combination discloses limitations 1[d] and 1[e] of the '931 patent.

> [1f] *wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen.*

119.    It is my understanding that the Court has construed "directly" as used in "wherein a communication conduit extends from said keyboard base directly into said intermediate region" as "passing through the mounting assembly, but no other structure."

120.    Masaru discloses an *intermediate region* in the bottom edge of the display between the *pair of slots* as seen in Figure 8.  While Masaru does not expressly disclose a *communication conduit*, it would have been obvious to a POSITA that cabling (or *a communication conduit*) extends directly from the fixed member 11 directly into the intermediate region of the display.  A POSITA would have known that a cable was required in laptop computer systems for the monitor to communicate with the processing and graphics components located in the base.  (*See* Pl. Final Infringement Contentions, Ex. A at A-11 (July 24, 2017) ("As its name implies, the LCD cable is a conduit through which display information is communicated form the processing elements on the laptop top the LCD display, and constitutes a 'communication conduit,' as claimed.").)  Masaru's device is a "personal computer, word processor, or an information communication terminal device" (Masaru at [0001]) and a POSITA would have known that such a device requires communication between the processor and the display.

121.    Masura discloses a fastener 12 that attaches the mounting assembly to the base. (Masura, ¶ [0008].)  Fastener 12 is depicted in Figure 1 as a circular shape directly underneath the *intermediate region* that appears to be an open circle, forming a hole through the rotating

55

member 9 and the top surface of fixed member 11.  In my opinion, the shape and location of fastener 12 would have suggested to a POSITA that a *communication conduit* obviously extends from the keyboard base directly into the *intermediate region* of the display screen to connect the display screen with the processing and graphics components of the laptop.

122.  In contrast, display 13 of Masaru is fixed to the two horizontal rotating shafts (elements P and 1) (Masaru ¶ [0005]) and Masaru does not disclose through holes at, near, or through these rotations shafts (*see* Masaru at Fig. 1), so a POSITA would understand that a communication conduit could not be placed in the pair of slots occupied by the brackets.  Thus, a POSITA would have found it obvious for the communication conduit to travel through the laptop's display holding structure and, specifically, through the fastener 12 to keep it internal to the laptop computer system.  Accordingly, it is my opinion that Masaru in view of the knowledge and common sense of a POSITA renders this limitation obvious.



[FIG. 8]

Display Screen

Communication Conduit (not shown)

Intermediate Region

Opening in Keyboard Base

[FIG. 1]

Pair of Slots

Bottom Edge

56



123. A POSITA would have known that a communication cable between a base and a rotatable display (like that disclosed by Masaru) should be inherently located in the center of the base between the two side walls, which is where Masaru illustrates that the hole formed by fastener 12 is located. A cable placed in the center can rotate within the hole unimpeded as the display rotates, so that movement of the display places the least stress on the cable as discussed above in Part IV. A POSITA would have known that a cable located elsewhere would have been disadvantageous. For example, a cable entering into the back of the display, or to the bottom edge at a non-centered location, would have to extend or retract as the display rotates, which would place unnecessary stress on the communication cable and increase the rate of failure.

124. The claim chart below provides exemplary disclosures from Masaru combined with Sach, Kumar, or Satoshi, that in my opinion render claim 1 obvious to a POSITA at the time of the invention of the '931 patent.

| Limitation | Masaru in view of Sach, Kumar, or Satoshi |
|---|---|
| **1[pre]**. A computer system comprising: | **Masaru**<br>*See, e.g.:*<br>**[0001]**: "The present invention relates to a display holding structure of an electronic apparatus such as a personal computer, a word processor, or an information communication terminal device equipped with a flat display device."<br>**Figs. 1, 8, 9.** |
| **[1a]** a) a keyboard unit including a computer keyboard and a keyboard base that includes a front wall and a back wall; | **Masaru:**<br>*See, e.g.:*<br>**[0002]**: "Conventionally, there are various kinds of electronic apparatus, including personal computers and the like, with a main body unit and an attached flat display device that can be freely opened and closed. For flat display devices, an arrangement is normally provided whereby the flat display is mounted on the main body unit on a single shaft so as to rotate only in an open-close direction. However, due to demand for additional degrees of freedom in the range of rotation of the display device, proposals have been made for electronic apparatus having a main body unit and a flat display device, known as a biaxial flat display device, that permits left-right rotation in addition to the rotation in the open-close direction."<br>**[0008]**: "In FIG. 1(a), reference numeral 11 denotes a fixed member formed by the main body unit, and 9 denotes a semicircular rotating member provided in a recessed area of an upper surface 11a of the fixed member 11."<br>**Figs. 1(a), 8, 9.** |
| **[1b]** b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge; | **Masaru:**<br>*See, e.g.:*<br>**[0001]**: "The present invention relates to a display holding structure of an electronic apparatus such as a personal computer, a word processor, or an information communication terminal device equipped with a flat display device."<br>**[0008]**: "Further, provided standing on both sides of the rotating member 9 are a pair of holding devices P, with the flat display device 13 being pivotally supported by the holding devices P."<br>**Figs. 8, 9.** |
| **[1c]** c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending | **Masaru:**<br>*See, e.g.:*<br>**[0008]**: "In FIG. 1(a), reference numeral 11 denotes a fixed member formed by the main body unit, and 9 denotes a semicircular rotating member provided in a recessed area of |

58

| Limitation | Masaru in view of Sach, Kumar, or Satoshi |
|---|---|
| upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and | an upper surface 11a of the fixed member 11. The rotating member 9 is attached to the fixed member 11 by a fastener 12 so as to be rotatable around a vertical axis. Further, provided standing on both sides of the rotating member 9 are a pair of holding devices P, with the flat display device 13 being pivotally supported by the holding devices P." <br> **[0009]:** "Note also that the horizontal rotating shafts 1,1 of the two holding devices P,P rotate about a horizontal axis, and that the display device 13 is fixed to the horizontal rotating shafts 1,1." <br> **[0012]:** "The display device 13 can freely rotate in the left-right direction (direction of arrow D), while rotation in the open-close direction (direction of arrow E) is angle-limited" <br> **Figs. 1, 8, 9.** |
| **[1d]** d) a port positioned proximate said front wall of said keyboard base, said port adapted to receive a signal from an ancillary computer system; | **Kumar** <br> *See, e.g.:* <br> **1:15-25:** "Since the advent of the personal computer, manufacturers and industrial users have continually developed faster, smaller and more versatile machines, including portable computers that are dedicated to perform a specific function such as word processing, data collection or item identification. Alternatively, portable computers may be all purpose computing machines capable of running a variety of types of software programs. These portable personal computers may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc." <br> **4:21-24:** "Additionally, portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8." <br> **Fig. 4** <br><br> **Satoshi** <br> *See, e.g.:* <br> **[0007]:** "As illustrated in FIG. 1, a tablet stowing portion 3 for stowing a tablet 2 may, for example, be provided on the side of the body. A tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard. The tablet 2, provided in place of the trackball, is a pointing device that allows pointing/movement of a cursor (not shown in the drawings) displayed on the display of the personal computer |

59

| Limitation | Masaru in view of Sach, Kumar, or Satoshi |
|---|---|
| | 1, and the input of handwritten information such as graphics and text information."<br>**Fig. 1**<br><br>**Sach**<br>*See, e.g.:*<br>**1:59-61:**  "A two-slot VME processor box is disposed in the housing and is designed to receive two VME cards that are slid into the VME processor box from one side of the workstation."<br>**2:57-60:**  "A two-slot VME processor box 16 is disposed in the housing 11 and is designed to receive two VME cards 17 (one of which is shown) which are slid into the VME processor box 16 from one side of the workstation 10."<br>**3:4-7:**  "The [VME] processor card 17 has a plurality of input and output ports 19, including a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d."<br>(Sach at 3:4-7; see FIG. 1).<br>**3:35-42:**  "The VME processor card 17 has a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 1ge for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19/ for connection to the display panel 13."<br>**Fig. 1** |
| **[1e]** wherein a signal from said ancillary computer system delivered to said port is effective to generate a computer-generated image on said display screen; and | **Kumar**<br>*See* **claim chart in this table for Kumar citations for limitations [1d] immediately above**<br><br>**Satoshi**<br>*See* **claim chart in this table for Satoshi citations for limitations [1d] immediately above**<br><br>**Sach**<br>*See* **claim chart in this table for Sach citations for limitations [1d] immediately above** |
| **[1f]** wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly | **Masaru:**<br>*See, e.g.:*<br>**[0008]:**  "The rotating member 9 is attached to the fixed member 11 by a fastener 12 so as to be rotatable around a vertical axis.  Further, provided standing on both sides of the rotating member 9 are a pair of holding devices P, with the |

| Limitation | Masaru in view of Sach, Kumar, or Satoshi |
|---|---|
| into said intermediate region of said display screen. | flat display device 13 being pivotally supported by the holding devices P." **Figs. 1, 7, 8, 9** |

**4.      Claim 2 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi alone or in further combination with Ioka.**

> **2.** *A computer system according to claim 1, further comprising a central processing unit mounted within said keyboard unit.*

125.    Claim 2 depends from claim 1 and adds:  *"further comprising a central processing unit mounted within said keyboard unit."*  Masaru in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.A.3.)

126.    Masaru discloses a rotatable display for a "personal computer, a word processor, or an information communication terminal device," but does not expressly disclose a *central processing unit*.  A POSITA would have known that a *central processing unit* was inherent to and required for the disclosed personal computer, word processor, or information communication terminal.  It is my opinion that Masaru inherently discloses the additional limitation of dependent claim 2.

127.    A POSITA would also have found it obvious to include this essential component in the system disclosed by Masaru.  Sach, for example, expressly discloses a central processing unit (CPU) as part of the portable computer system.  (Sach at 2:64-66 ("The VME processor card 17 may use a model HP743i PS RISC processor (CPU), manufactured by Hewlett-Packard Company, for example.").)  Further, a POSITA would have known that a *central processing unit* is typically located in the base of a laptop computer rather than in the display portion (as discussed in Part IV).  Accordingly, it is also my opinion that Masaru in view of the knowledge and common sense of a POSITA renders obvious the additional limitation of dependent claim 2.

61

128.    To the extent that Blackbird argues that a laptop does not inherently contain a CPU or that it would not have been obvious for one to be included, it is also my opinion that claim 2 is rendered obvious by Masaru in combination with Ioka in view of Sach, Kumar, or Satoshi.  Ioka, like Masaru, describes a portable computer system with a rotatable display.  Ioka also discloses additional components and elements commonly included in a laptop computer.  Ioka describes a computer "composed of a main unit 10 that has a power supply, CPU [(*central processing unit*)] and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction."  (Ioka, ¶ [0006], Fig. 1).  Masaru does not disclose any obstructions or teachings that would exclude or discourage the use of a CPU as described by Ioka.  The placement of components inside the base would not interfere with the combination of Masaru with Satoshi, Kumar or Sach either because each of those references refers to the location of ports on the outside of the base.  As a result, a POSITA would have had a reasonable expectation of success when combining the teachings of Ioka with the combination of Masaru with Sach, Kumar, or Satoshi.  A POSITA would have incorporated Ioka's CPU into Masarus's laptop to perform the various processes and control various computing functions typical of laptop computers at the relevant time.  Accordingly, it is also my opinion that Ioka discloses the additional limitation of claim 2 and that the combination of Masaru and Ioka in view of Sach, Kumar, or Satoshi discloses all the limitations of claim 2.



[Figure 1]

129.    The claim chart below provides exemplary disclosures from Masaru, Sach, and Ioka that disclose the elements of claim 2.

| Limitation | Masaru, Sach, or Ioka |
|---|---|
| **2.** A computer system according to claim 1, further comprising a central processing unit mounted within said keyboard unit. | **Masaru:** <br> *See, e.g.:* <br> **[0001]:** <br> "personal computer, a word processor, or an information communication terminal device," <br><br> **Sach:** <br> *See, e.g.:* <br> **2:64-66**: "The VME processor card 17 may use a model HP743i PS RISC processor (CPU), manufactured by Hewlett-Packard Company, for example." <br><br> **Ioka:** <br> *See, e.g.:* <br> **[0006]:** "A description of the embodiment of the present invention is provided on based on the figures. As shown in Figure 1, the portable information processor in the present embodiment is composed of a main unit 10 that has a power supply, CPU and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction.  Here the display part 20 has an input coordinate position determination device with which pen touch is possible." <br> **Fig. 1.** |

63

**5.      Claim 3 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi alone or in further combination with Ioka or Kim.**

**3.** *A computer system according to claim 1, wherein said display screen is a flat screen unit.*

130.    Claim 3 depends from claim 1 and adds:  *"wherein said display screen is a flat screen unit."*  As described above, Masaru in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.A.3.)

131.    It is my opinion that the "flat display device" disclosed in Masaru discloses the *flat screen unit* limitation of claim 3.  (*See* Masaru, ¶ [0001], Figs. 8, 9.)  The flat display device in Masaru is generally referred to as display device 13.  (*See, e.g.,* Masaru, ¶¶ [0008]-[0015].)  A POSITA would have understood the flat display device in Masaru to be a *flat screen unit*.  In fact, the '931 patent states that "[l]aptop computers generally employ flat-panel monitors for reasons of necessity, given space/weight constraints and the desire to pivotally mount the monitor relative to the base/keyboard for system protection and portability."  ('931 patent at 1:60-63.)  Accordingly, it is my opinion that Masaru discloses the additional limitation of claim 3.



[FIG. 8]

132.    Similarly, Sach, Kumar, and Satoshi each disclose display screens that are flat screen units.  As an example, the computer disclosed by Sach includes "a liquid crystal display

64

[LCD] panel." (Sach at 2:39-49.). The '931 patent states that "[d]isplay monitor 104 typically employs a liquid crystal display ('LCD') for the screen." ('931 patent at 6:44-46.) Kumar and Satoshi both illustrate a laptop computer with a flat screen. (Kumar at Fig. 4; Satoshi at Fig. 1.)



| Kumar, Fig. 4 | Satoshi, Fig. 1 |

133. To the extent that Blackbird argues that Masaru, Sach, Kumar, and/or Satoshi do not disclose a flat screen unit or that it would not have been obvious to a POSITA based on his knowledge to modify Masaru with a flat screen unit, it is also my opinion that the limitation of claim 3 is disclosed by Kim and Ioka. At the time of the invention, as the '931 patent admits, flat-panel monitors were typically used in laptop systems. (*See* '931 patent at 1:60-63.) Laptops universally employed flat screen displays, with several different types of displays being available. For example, Kim discloses that "[n]otebook computers generally have . . . a flat screen display such as an active matrix or LCD display." (Kim at 1:12-22; *see also* Kim at 2:29-41, Fig. 2.) Ioka similarly discloses a flat screen unit. (Ioka at Fig. 1) Thus, a portable computer having a flat-panel display is not an inventive contribution to the art. And, while it is my opinion that Masaru discloses a *flat screen unit*—to the extent necessary—it would have also been

obvious to a POSITA at the time of filing the '931 patent to combine Masaru with the display of

Kim and Ioka in view of Sach, Kumar, or Satoshi.





| Kim's display | Ioka's display |

134.    The claim chart below provides exemplary disclosures from Masaru, Sach, Kumar,

Satoshi, Kim, and Ioka that in my opinion disclose the elements of claim 3.

| Limitation | Masaru, Sach, Kumar, Satoshi, Kim, or Ioka |
| --- | --- |
| **3.** A computer system according to claim 1, wherein said display screen is a flat screen unit. | **Masaru:**<br>*See, e.g.:*<br>**[0001]:** "The present invention relates to a display holding structure of an electronic apparatus such as a personal computer, a word processor, or an information communication terminal device equipped with a flat display device."<br>**[0008]:** "Further, provided standing on both sides of the rotating member 9 are a pair of holding devices P, with the flat display device 13 being pivotally supported by the holding devices P."<br>**[0008]-[0015]:** "display device 13" *passim*<br>**FIG. 8**.<br><br>**Sach**<br>*See, e.g.:*<br>**2:39-49:** "The portable miniaturized tactical workstation 10 comprises a housing 11 that has a rotatable top cover 12 that houses a display 13, such as a liquid crystal display panel 13, a field emission display panel 13, or a plasma display panel |

66

| Limitation | Masaru, Sach, Kumar, Satoshi, Kim, or Ioka |
|---|---|
|  | 13, for example.  The cover 12 is lockable and rotatable and is rotated upward to expose a viewing screen 13a of the display panel 13.  A display panel 13 used in a reduced to practice embodiment of the present invention is a 13 inch 1280 by 1024 24 bit color liquid crystal display panel 13, although other sizes or types of display screens 13 may be employed." <br><br> **Kumar** <br> *See, e.g.:* <br> **Fig. 4** <br><br> **Satoshi** <br> *See, e.g.:* <br> **Fig. 1** <br><br> **Kim** <br> *See, e.g.:* <br> **1:12-22:**  "Notebook computers generally have a main body which houses the processor and associated electronic components, disk drives, cursor control and switches.  A keyboard is carried by the upper surface of the main body, and a cover is suitably hinged to the body whereby in its closed position it covers and protects the keyboard.  The cover includes a flat screen display such as an active matrix or LCD display.  In the closed position the display overlies the keyboard.  In the open position it generally faces the keyboard whereby the operator views the display as he performs various tasks commanded by the keyboard and cursor control." <br> **2:29-41:**  "FIGS. 2 and 3 show notebook computer 10 with cover 12 in a raised position.  On the bottom of cover 12 is a main display 21, for example a matrix or liquid crystal display.  Display 21 is protected by cover 12 when in a lowered position.  On top of body 11 is a keyboard 16, cursor control 17, and switches and controls 18.  In the rear of body 11 are interface ports 19, such as serial and USB.  Cover 12 overlies and protects keyboard 16, cursor control 17, and switches and controls 18, as well as protecting main display 21.  In accordance with another feature of the present invention, the rear of cover 12 houses an auxiliary display 26, which lies against cover 12 when in the closed position, as shown in FIGS. 1 and 3." <br> **Fig. 2** |

67

| Limitation | Masaru, Sach, Kumar, Satoshi, Kim, or Ioka |
|---|---|
| | **Ioka**<br>*See, e.g.:*<br>**Fig. 1** |

**6.      Claim 6 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi alone or in further combination with Ioka or Kim.**

**6.** *A computer system according to claim 1, wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees.*

135.    Claim 6 depends from claim 1 and adds: "*wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees.*"    As described above, Masaru in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.A.3.)

136.    Masaru discloses a rotating display in response to "demand for additional degrees of freedom in the range of rotation of the display device."  (Masaru, ¶ [0002].)  Masaru discloses that the rotating member 9 "can rotate freely with respect to fixed member 11."  (Masaru, ¶ [0012].)  Describing Figure 9, Masaru states that "[t]he display device 13 can freely rotate in the left-right direction (direction of arrow D)."  (Masaru, ¶ [0012].)  Nothing in the disclosure of Masaru suggests that the rotating member 9 cannot rotate a full 180 degrees in either direction. As Masaru points out, even when one holding device P comes off the fixed member 11 due to rotation of rotating member 9, the other holding device P remains on the surface of the fixed member 11.  (Masaru, ¶ [0013].).  An inspection of Figure 9 shows that this is true even when the display is pointed away from the front wall of the base.  Because the axis of rotation is at the top surface of fixed member 11 next to the back wall (Masaru, Fig. 1(a)), but is offset a small distance from the back wall, when the display is rotated to face away from the user, *both* holding devices P are on the fixed member 11, just like when the display faces the user as in Figure 8. Given these disclosures, it is my opinion that Masaru discloses or renders obvious a mounting

68

assembly that "*permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees*."  It is, therefore, my opinion that claim 6 is rendered obvious by the combination of Masaru with Sach, Kumar, or Satoshi.



137.  To the extent that Blackbird argues that Masaru does not disclose or render obvious the limitation of claim 6, the limitation of claim 6 is disclosed by Kim and Ioka.  For example, a POSITA looking to further widen the visible range of a laptop display and increase a laptop's working efficiency would also have found Kim's disclosure of a display screen that could rotate at least 180 degrees.  (Kim at 4:15-16.)  Kim teaches a display screen that "rotates about a rotatable joint 23 to face an observer across from operator . . . [in order for] the operator to make a presentation to others without the aid of projector or the inconvenience of having others crowd around the operator to view the display from the same side as the operator."  (Kim at 2:42-57; *compare* Kim, Fig. 2; *with* Kim, Fig. 4.)  A POSITA would have known that the display holding structure of Masaru could be used in the same way as Kim to swivel about the vertical axis by at least 180 degrees in order to make a presentation without the need of a projector or having others crowd around the operator.

69



*FIGURE 2*



*FIGURE 4*

138.    As another example, a POSITA looking to further widen the visible range of a laptop display and increase a laptop's working efficiency would have found Ioka's disclosure of a display screen that could rotate at least 180 degrees.  (Ioka, ¶ [0006-7].)  Ioka teaches a display screen that can be pivoted by 180 degrees (via the hinge mechanism) with respect to the computer body and closed with the display facing up.  (*Compare* Ioka, Fig. 4; *with* Ioka, Fig. 5.) Because the hinge mechanism of Ioka allows for up to 180 degrees of rotation about the vertical axis in either direction, Ioka teaches up to 360 degrees of rotation of the display screen about the vertical axis.  (Ioka, ¶ [0007].)  A POSITA would have known that the swivel mechanism of Masaru could be adapted as taught by Ioka to swivel about the vertical axis by at least 180 degrees.



139.    Thus, it is my opinion that a POSITA would have found it obvious to modify the swivel mechanism of Masaru, to the extent necessary, in light of the disclosures of Kim and/or Ioka.  Similarly, a POSITA would have been motivated to combine Masaru with Kim and/or Ioka to widen the visible range of Masaru's display.  Accordingly, it is my opinion that Masaru in combination with Sach, Kumar, or Satoshi and in further combination with Kim or Ioka renders claim 6 obvious.

140.    The claim chart below provides exemplary disclosures from Masaru and, to the extent necessary, Kim and Ioka that disclose the elements of claim 6.

| Limitation | Masaru, Kim, or Ioka |
|---|---|
| **6.** A computer system according to claim 1, wherein said mounting assembly permits | **Masaru:** <br> *See, e.g.:* <br> **[0002]:** "demand for additional degrees of freedom in the |

| Limitation | Masaru, Kim, or Ioka |
|---|---|
| angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees. | range of rotation of the display device." **[0012]** "can rotate freely with respect to fixed member 11." "[t]he display device 13 can freely rotate in the left-right direction (direction of arrow D)." **Fig. 9.** <br><br> **Kim** <br> *See, e.g.:* <br> **4:15-16:** "The notebook computer of claim 2 Wherein the cover rotates through an angle from 1 to 180 degrees." <br> **2:44-57:** "When main display 21 is in a raised position and oriented as shown in FIG. 2 the operator and immediately adjacent observers have a view of the images on main display 21, but observers across from the operator cannot see the images. <br>    In order for observers across from operator to view images, main display 21 rotates about a rotatable joint 23 to face an observer across from operator, as shown in FIG. 4. Main display 21 also pivots about hinge 13 for a better viewing angle for observer.  This enables the operator to make a presentation to others without the aid of a projector or the inconvenience of having the others crowd around the operator to view the display from the same side as the operator." <br> **Figs. 2, 4** <br><br> **Ioka** <br> *See, e.g.:* <br> **[0006]:**  "A description of the embodiment of the present invention is provided on based on the figures. As shown in Figure 1, the portable information processor in the present embodiment is composed of a main unit 10 that has a power supply, CPU and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction.  Here the display part 20 has an input coordinate position determination device with which pen touch is possible." <br> **[0007]**: "Moreover, since the connection part 30 prevents the severing of the wire between the main unit 10 and the display part 20, the angle of rotation is restricted in a range from +180º to -180º for the rotation in the perpendicular direction of the display part when the angle of the front surface of the |

72

| Limitation | Masaru, Kim, or Ioka |
|---|---|
|  | display panel of the above-mentioned display part is set at 0°." **Figs. 1, 4, 5** |

**7.** **Claim 8 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi.**

> **8.** *A computer system according to claim 1, wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer.*

141.   Claim 8 depends from claim 1 and adds: "*wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer.*"  As described above, Masaru in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (*See supra* Part VI.A.3.)

142.   As described for claim 1 above (*see supra* ¶¶ 112-115), Sach and Kumar teach a plurality of input/output ports on the front and side walls of a laptop's base.  (Sach at 3:4-7, 3:35-42; Kumar at 4:21-24, Fig. 4.)  The input/output ports of Sach and Kumar suggest to a POSITA that ancillary devices could be connected to input/output ports.  (Sach at 3:35-42; Kumar at 1:22-25.)  For example, Kumar teaches that input/output devices, such as printers, light pens, image scanners, video scanners, etc., could be connected to the input/output ports of the laptop. (Kumar 1:22-25.)  In addition to these example devices disclosed by Kumar, a POSITA would understand that many other types of input/output devices including *ancillary computer systems* could be connected to a laptop via appropriate input/output ports proximate the front wall of the base.  These ancillary devices could include one of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer. Accordingly, it is my opinion that Masaru in view of Sach or Kumar renders claim 8 obvious.



Sach, Fig. 1                                    Kumar, Fig. 4

143.   It is also my opinion that claim 8 would have been obvious in view of Satoshi.  As described for claim 1, (*see supra* ¶¶ 116117), Satoshi discloses a tablet-integrated personal computer that uses a tablet as an input device that can be "removably stowed at predetermined position within the personal computer body."  (Satoshi, ¶ [0005], Fig. 1.)  The tablet allows for a user's handwritten graphics to be displayed on the display of the personal computer.  (Satoshi, ¶ [0007].)  The tablet inherently includes some processing ability to transform the strokes made by a user into data transmitted to the personal computer.  Thus, a POSITA would have considered the disclosed  tablet to be an example of a palm top computer, hand-held computer, electronic book, or pocket computer.  For these reasons, it is my opinion that the tablet in Satoshi could be characterized as one or more of the *ancillary computer systems* listed in claim 8.  Accordingly, it is my opinion that Masaru in view of Satoshi renders claim 8 obvious.

74



[FIG. 1]

144.    The claim chart below provides exemplary disclosures from Sach, Kumar, and/or

Satoshi that discloses the elements of claim 8.

| Limitation | Sach, Kumar, or Satoshi |
|---|---|
| **8.** A computer system according to claim 1, wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer. | **Sach**<br>*See, e.g.:*<br>**1:59-61:** "A two-slot VME processor box is disposed in the housing and is designed to receive two VME cards that are slid into the VME processor box from one side of the workstation."<br>**2:57-60:** "A two-slot VME processor box 16 is disposed in the housing 11 and is designed to receive two VME cards 17 (one of which is shown) which are slid into the VME processor box 16 from one side of the workstation 10."<br>**3:4-7:** "The [VME] processor card 17 has a plurality of input and output ports 19, including a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d."<br>(Sach at 3:4-7; see FIG. 1).<br>**3:35-42:** "The VME processor card 17 has a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 1ge for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19/ for connection to the display panel 13." |

75

| Limitation | Sach, Kumar, or Satoshi |
|---|---|
|  | **Fig. 1**<br><br>**Kumar**<br>*See, e.g.:*<br>**1:15-25:** "Since the advent of the personal computer, manufacturers and industrial users have continually developed faster, smaller and more versatile machines, including portable computers that are dedicated to perform a specific function such as word processing, data collection or item identification. Alternatively, portable computers may be all purpose computing machines capable of running a variety of types of software programs. These portable personal computers may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc."<br>**4:21-24:** "Additionally, portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8."<br>**Fig. 4**<br><br>**Satoshi**<br>*See, e.g.:*<br>**[0005]:** "To solve the above-described problem, the tablet-integrated personal computer of the present invention uses a tablet as the pointing device, and is provided with a stowing portion in which the tablet can be removably stowed at predetermined position within the personal computer body, and a tablet connection portion for connecting the tablet at a predetermined position on the personal computer body."<br>**[0007]:** "As illustrated in FIG. 1, a tablet stowing portion 3 for stowing a tablet 2 may, for example, be provided on the side of the body. A tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard. The tablet 2, provided in place of the trackball, is a pointing device that allows pointing/movement of a cursor (not shown in the drawings) displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information. When the personal computer 1 is carried around, the tablet 2 is stowed in the tablet stowing portion 3. The tablet stowing portion 3 is provided with a lock mechanism not shown in the drawings to ensure that the tablet 2 is not jolted out by impacts that occur while the |

76

| Limitation | Sach, Kumar, or Satoshi |
|---|---|
| | personal computer 1 is being carried. When used, the tablet 2 is taken out of the tablet stowing portion 3 and connected to the tablet connection portion 4." **Fig. 1** |

**8.    Claim 9 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi.**

> **9.** *A computer system according to claim 1, further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base.*

145.   Claim 9 depends from claim 1 and adds: *"further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base."*  As described above, Masaru in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.A.3.)

146.   Masaru discloses a rotatable display holding structure.  Masaru describes the operation of the hinge when the display is closed:

> As illustrated in FIG. 1(b) and FIG. 3, the lower end 6b of the stopper 6 is engaged with the recess portion 11b of the fixed member 11, the upper end 6a of the stopper 6 is in contact with the outer peripheral surface of the angle limiting member 5, and the movement of stopper 6 is restricted to the vertical direction (direction of the arrow A).  Therefore, the engagement between the lower end 6b of the stopper 6 and recess portion 11b of the fixed member 11 is not released, and the rotating member 9 is unable to rotate with respect to the fixed member 11.  (Masaru, ¶ [0010].)

In other words, as shown in Figure 3, when the display is closed, the lower end of the stopper 6 (*one stop*) fits into a recessed portion 11b (i.e. a hole or groove) of the fixed member 11 (*keyboard base*).  The stopper 6 cannot move up because the top of stopper 6 is held in place by angle limiting member 5, which encircles the display holder 1.  When stopper 6 cannot move, rotating member 9, to which the *display screen* is attached, cannot rotate relative to fixed member 11 (*limiting rotational motion of said display screen relative to said keyboard base*).  Given these disclosures, it is my opinion that Masaru discloses "*at least one stop for limiting*

*rotational motion of said display screen relative to said keyboard base.*"  It is therefore my opinion that claim 9 is rendered obvious by the combination of Masaru with Sach, Kumar, or Satoshi.





147.   The claim chart below provides exemplary disclosures from Masaru that disclose the elements of claim 9.

| Limitation | Masaru |
|---|---|
| **9.** A computer system according to claim 1, further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base. | **Masaru**<br>*See, e.g.:*<br>**[0010]: "**As illustrated in FIG. 1(b) and FIG. 3, the lower end 6b of the stopper 6 is engaged with the recess portion 11b of the fixed member 11, the upper end 6a of the stopper 6 is in contact with the outer peripheral surface of the angle limiting member 5, and the movement of stopper 6 is restricted to the vertical |

| Limitation | Masaru |
|---|---|
| | direction (direction of the arrow A).  Therefore, the engagement between the lower end 6b of the stopper 6 and recess portion 11b of the fixed member 11 is not released, and the rotating member 9 is unable to rotate with respect to the fixed member 11.  . . .  Fig. 7 shows the state of the display device 13 in FIG. 1(b) and FIG. 3, with the display device 13 being unable to rotate in the left-right direction (direction of arrow D), and being able to rotate freely in the open-close direction (direction of arrow E)."<br>**Figs. 1(b), 3, 7.** |

### 9.    Claim 10 is obvious over the combination of Masaru with Sach, Kumar, or Satoshi.

**10.** *A computer system according to claim 1, wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.*

148.    Claim 10 depends from claim 1 and adds:  "*wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.*"    As described above, Masaru in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.A.3.)

149.    As described in claim 1 above, Masaru describes a semicircular rotating member 9 (*rotatable element* or *turret*), which is "attached to the fixed member 11 by a fastener 12 so as to be rotatable around a vertical axis."  (Masaru, ¶ [0008], Fig. 1.)  Masaru also discloses that "[t]he upper surface 11a of the fixed member 11 is provided with a hemispherical recess portion 11b" (*circular opening*) as seen in Figure 9.  (Masaru at ¶ [0009], Fig. 9.)  Given these disclosures, it is my opinion that Masaru discloses that "*said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.*"  It is therefore my opinion that claim 10 is rendered obvious by the combination of Masaru with Sach, Kumar, or Satoshi.







150.   The claim chart below provides exemplary disclosures from Masaru that in my opinion discloses the elements of claim 10.

| Limitation | Masaru |
|---|---|
| **10.** A computer system according to claim 1, wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base. | **Masaru**: <br> *See, e.g.:* <br> **[0008]:** "An embodiment of the present invention is described below with reference to FIGS. 1 to 9. FIG. 1(a) is a perspective view of the electronic apparatus, FIG. 1(b) is a front sectional view of the holding device, and FIG. 2 is a perspective view of the holding device. In FIG. 1(a), reference numeral 11 denotes a fixed member formed by the main body unit, and 9 denotes a semicircular rotating member provided in a recessed area of an upper surface 11a of the fixed member 11. The rotating member 9 is attached to the fixed member 11 by a fastener 12 so as to be rotatable around a vertical axis. Further, provided standing on both sides of the rotating member 9 are a pair of holding devices P, with the |

80

| Limitation | Masaru |
|---|---|
|  | flat display device 13 being pivotally supported by the holding devices P." |
|  | **[0009]:** "As illustrated in FIG. 1(b) and FIG. 2, reference numeral 2 denotes a fixed bracket that is fixed to the rotating member 9 by a fastener 10. Reference numeral 1 denotes a horizontal rotating shaft that is rotatably attached to fixed bracket 2. Reference numeral 3 denotes a torque control member that generates a load to resist the rotation of horizontal rotating shaft 1. Reference numeral 4 denotes a fastener that functions to prevent the torque control member 3 from falling off the horizontal rotating shaft 1. Reference numeral 5 denotes an angle limiting member, which has a groove portion 5a in the circumferential direction of the outer peripheral surface, and is mounted on the horizontal rotating shaft 1 in an integrated manner. Reference numeral 6 denotes a stopper having an upper end 6a with flat form and a lower end 6b with a hemispherical form. The stopper 6 is passed through the holes 2a and 2b of the fixed bracket 2 and a through hole 9a formed in the rotating member 9, and is held in a way that allows only vertical movement (direction of arrow A). Reference numeral 7 is a pin projecting from the stopper 6. A pressing force from the urging means formed by a compression spring 8 fitted around the stopper 6 is applied to the stopper 6 via the pin 7, pressing the stopper 6 in a downward direction (direction of arrow B). The upper surface 11a of the fixed member 11 is provided with a hemispherical recess portion 11b into which the lower end 6b of the stopper 6 can be fitted and which engages with the lower end 6b of the stopper 6 when the stopper 6 is pressed by the spring 8. Note also that the horizontal rotating shafts 1,1 of the two holding devices P,P rotate about a horizontal axis, and that the display device 13 is fixed to the horizontal rotating shafts 1,1." |
|  | **[0010]:** "As illustrated in FIG. 1(b) and FIG. 3, the lower end 6b of the stopper 6 is engaged with the recess portion 11b of the fixed member 11, the upper end 6a of the stopper 6 is in contact with the outer peripheral surface of the angle limiting member 5, and the movement of stopper 6 is restricted to the vertical direction (direction of the arrow A). Therefore, the engagement between the lower end 6b of the stopper 6 and recess portion 11b of the fixed member 11 is not released, and the rotating member 9 is unable to rotate with respect to the fixed member 11. . . . Fig. 7 shows the state of the display device 13 in FIG. 1(b) and FIG. 3, with the display device 13 being unable to rotate in the left-right direction |

81

| Limitation | Masaru |
|---|---|
| | (direction of arrow D), and being able to rotate freely in the open-close direction (direction of arrow E)."<br><br>**[0011]:** "As illustrated in FIG. 4, when the horizontal rotating shaft 1 rotates and the upper end 6a of the stopper 6 locates within the groove portion 5a of the angle limiting member 5, the engagement between the stopper 6 and the recess portion 11b of the fixed member 11 enters a releasable state.<br>FIG. 8 shows the state of the display device 13 in FIG. 4, with the display device 13 being able to rotate in the left-right direction (direction of arrow D), and being able to rotate in the open-close direction (direction of arrow E) without an angle limit."<br><br>**[0012]:** "As shown in FIG. 5, as the rotating member 9 rotates with respect to the fixed member 11, a force exceeding the pressing force of the spring 8 is applied upward (in the direction of the arrow B') to the stopper 6, and the hemispherical lower end 6b overcomes the inner walls of the recess portion 11b and arrives at the upper surface 11a of the fixed member 11. At the same time, the upper end 6a of the stopper 6 enters the groove portion 5a of the angle limiting member 5. In this state, the rotating member 9 can rotate freely with respect to the fixed member 11. Further, the upper end 6a of the stopper 6 is not released from the groove portion 5a of the angle limiting member 5 and, as illustrated in FIG. 6, when the upper end 6a of the stopper 6 contacts an end portion 5b of the groove portion 5a of the angle limiting member 5, the horizontal rotating shaft 1 cannot rotate any further in the direction of arrow C. Rotation of the horizontal rotating shaft 1 in the direction opposite to the direction of the arrow C is limited in the same way. FIG. 9 shows the state of display device 13 in FIG. 5. The display device 13 can freely rotate in the left-right direction (direction of arrow D), while rotation in the open-close direction (direction of arrow E) is angle-limited. Note also that the range of rotation of the horizontal rotating shaft 1 can be adjusted by changing the length of the groove portion 5a of the angle limiting member 5."<br><br>**[0013]:** "It is also to be noted that while rotation of the rotating member 9 through a certain angle with respect to the fixed member 11 may result in the holding device P coming off the fixed member 11, this is not a problem. Since the holding device P is provided on at left and right locations on the rotating member 9 as illustrated in FIG. 1(a), when one holding device P comes off the fixed member 11, the other is |

82

| Limitation | Masaru |
|---|---|
| | always on the upper surface 11a of the fixed member 11. Moreover, by making the recess portion 11b of the fixed member 11 into a groove shape extending along the movement locus of the stopper 6 as the rotating member 9 rotates, the range over which the display device 13 can be rotated in left-right direction (direction of arrow E) without restriction can be extended." <br><br> **[0014]**: "With the display holding structure configured in this way, when the lower end 6b of the stopper 6 is engaged with the recess portion 11b in the fixed member 11, the horizontal rotating shaft 1 rotates freely, allowing the display device 13 to rotate freely about the axis of rotation of the horizontal rotating shaft 1. Further, when the upper end 6a of the stopper 6 is inserted into the groove portion 5a of the angle limiting member 5, the lower end 6b is released from the recess portion 11b and the rotating member 9 rotates freely with respect to the fixed member 11, allowing the display device 13 to rotate freely around the axis of rotation of the rotating member 9. In this way, there is sufficient freedom in the range of rotation of the display device 13." <br> **Figs. 1, 8, 9.** |

## E. Wu Renders the Asserted Claims Obvious.

151. In my opinion, Wu in combination with Sach, Kumar, or Satoshi renders obvious claims 1-3, 8, and 10. It is also my opinion that Wu in combination with Sach, Kumar, or Satoshi and in further combination with Ioka, Kim, Masaru, or Anderson renders claims 2, 3, 6, 9, and 10 obvious.

### 1. A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Wu with Sach, Kumar, or Satoshi.

152. It is my opinion that it would have been obvious to a POSITA to modify Wu in view of the knowledge of a POSITA and/or in combination with the teachings of Sach, Kumar, or Satoshi. At the time of the invention, laptop computers commonly had one or more input/output ports. Sach, Kumar, and Satoshi each discloses exemplary locations and use of input/output ports. Each reference provides additional functionality and a specific benefit to the computer

system described by Wu, which provides a motivation to combine these references. A POSITA would also have had a reasonable expectation of success because each reference is in the field of portable computer systems and is compatible with the system disclosed by Wu.

153. Wu teaches a swivel mechanism for the display monitor of a laptop computer. (Wu at Abstract.) Wu recognized that the working efficiency and practicality of a laptop computer could be improved by providing a swivel mechanism that allowed for rotation about a horizontal axle and for rotation about a vertical axle. (Wu at 1:23-36.) Wu designed a swivel mechanism that provided for rotation about two perpendicular axles using a platform that could twist (rotate) about a vertical axle. (Wu at 1:63-2:9.) Wu also designed the swivel mechanism to allow rotation about a horizontal axle that is connected to the platform. (Wu at 2:10-43.)

154. It would have been obvious to a POSITA that the laptop disclosed by Wu would also include other hardware and components typically found in laptop computers. A POSITA would also understand that Wu disclosed a swivel mechanism and did not address many of the other features or aspects of a laptop computer. For example, Wu does not address the location or use of input/output ports commonly found on laptop computers. To add input/output ports and similar components, a POSITA would have looked at pre-existing, available, and known laptop computers systems to address the same efficiency and practical usefulness design goals addressed by Wu. The POSITA would have considered other laptop and electronic systems that improved the working efficiency and practicality of standard laptop computer systems consistent with the design considerations disclosed by Wu. Each of Sach, Kumar, and Satoshi describes additional functionality intended to be integrated into laptop computer systems. The combination of Wu with Sach, Kumar, or Satoshi provides additional functionality, efficiency, and practicality to the Wu laptop computer system.

84

155.    For example, a POSITA would have been motivated to look at the laptop computer disclosed by Sach with a plurality of input and output ports.  Sach discloses multiple input/output ports including "a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 19e for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19f for connection to the display panel 13."   (Sach at 3:35-42.)   It would have been obvious to incorporate the types of input/output ports from Sach with the laptop of Wu that incorporates a swivel mechanism to improve the efficiency, usability, and practicality of the laptop.

156.    As another example, a POSITA would have been motivated to look at the laptop computer disclosed by Kumar with ports on the front wall and side wall of the laptop base. Kumar discloses multiple input/output ports on the front and side walls of the base.  (Kumar at 4:21-24.)    Kumar also discusses that laptop computers interact with a wide variety of input/output devices that have various functions.  (Kumar at 1:22-25 ("These portable personal computer may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc.").)  It would have been obvious to incorporate the discussion of input/output ports from Kumar with the laptop of Wu that incorporates a swivel mechanism to improve the efficiency, usability, and practicality of the laptop.  A POSITA would have recognized that input/output ports on or proximate the front wall would have been an obvious location selection (although not the only desirable location) because it would allow the user to connect ancillary devices while displaying content or images from the ancillary devices on the laptop flat-panel display to nearby persons.

157. Similarly, a POSITA looking in this area would have found Satoshi's tablet-integrated personal computer. Satoshi discloses a tablet and "a tablet connection portion for connecting the tablet at a predetermined position on the personal computer body." (Satoshi, ¶ [0005].) Satoshi also discloses that the "tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard." (Satoshi, ¶ [0007].) The connector placement in Satoshi is meant to maximize the keyboarding efficiency of the user. (*See* Satoshi, ¶ [0010] ("[T]he invention has the effect of allowing the user to use the tablet . . . even when typing.").) A POSITA would have found it obvious to consider where the user would be located when determining an efficient placement of input/output ports in Wu's laptop with a swivel mechanism. This combination would further Wu's goal of providing a laptop computer system that improved upon the work efficiency and practicality of laptop computer systems. A POSITA would have been motivated to locate the tablet connection portion of Satoshi or similar ports proximate the front wall of the base to allow convenient connection of ancillary devices to provide various features and functionalities, including displaying images to the laptop users or other people viewing the laptop's display from nearby.

158. Wu, Sach, Kumar, and Satoshi each describe portable computers. Because these references deal with portable computers, a POSITA would have had a reasonable expectation of success combining the features of Wu with Sach, Kumar, or Satoshi to produce a laptop computer system having the combined features. Design incentives would have motivated a person of skill in the art to combine Wu with Sach, Kumar, or Satoshi. For example, Sach, Kumar, and Satoshi each provides an added functionality that is not expressly disclosed by Wu, and each provides a benefit derived from that added functionality. Furthermore, the combination

86

of these references produces a predictable product in the form of a portable computer having the features of Wu plus the features added from Sach, Kumar, and/or Satoshi. As a result, it is my opinion that a POSITA would have been motivated to combine Wu with Sach, Kumar, or Satoshi.

159. In my opinion, common design incentives would have motivated a POSITA to combine Wu with Sach, Kumar, or Satoshi leading to a predictable and obvious laptop computer system.

### 2. A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Wu with Ioka, Masaru, or Kim.

160. It is my opinion that it would have been obvious to a POSITA to modify Wu in view of the knowledge of a POSITA and/or in combination with the teachings of Ioka, Masaru, or Kim. Wu, Ioka, Masaru, and Kim each discloses a display for a laptop computer that can be rotated about two perpendicular axes. Each reference uses a swivel hinge assembly to provide rotation of a laptop display screen about two perpendicular axes. Each reference also uses the swivel hinge assembly for similar objectives to improve the convenience, functionality, and usability of laptop computers. For example, the references teach a rotatable display screen improves accessibility and viewing angles relative to the laptop display screen. (Wu at 1:10-14, 1:31-36; Ioka, ¶ [0003]; Masaru, ¶ [0002]; Kim at 1:23-29, 36-38.) Because Ioka, Masaru, and Kim solve the same issue in a similar way as Wu, a POSITA would have been motivated to consider these references for other beneficial features.

161. A POSITA would have had a reasonable expectation of success combining Wu with Ioka, Masaru, and/or Kim because they provided similar solutions and there are a finite number of ways to improve upon the convenience and versatility of the laptop display swivel mechanism. For example, Ioka and Kim disclose at least 180 degrees of rotation of the display about the vertical axes to allow someone sitting across from the laptop user to view the screen.

87

(Ioka, ¶ [0003]; Kim at 2:49-51, 4:15-16). A POSITA would have found it obvious and would have been motivated to combine the disclosure of Wu with the disclosure(s) in Ioka or Kim to provide at least 180 degrees of rotation about the vertical axes because this would have furthered the common goal of improving the convenience and functionality of a laptop system. As another example, Masaru and Ioka disclose a rotational stop for the disclosed swivel mechanisms. (Masaru at ¶ [0010]; Ioka at ¶ [0007].) A POSITA would have found it obvious and been motivated to combine the disclosure of Wu with the disclosure in Masaru or Ioka to provide a rotational stop to avoid excessive stress on the cable running between the laptop base and display. Based on the teachings of Ioka, Kim, or Masaru, a POSITA would have recognized the value of modifying the swivel mechanism of Wu to allow for at least 180 degrees of smooth rotation about a vertical axis so that display could be rotated to share with nearby persons. A POSITA would have similarly been motivated to consider the teachings of Ioka, Kim, and Masaru to modify the swivel mechanism of Wu to provide additional beneficial features and functionality.

### 3.    A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Wu with Anderson.

162. It is my opinion that it would have been obvious to a POSITA to modify Wu in view of the knowledge of a POSITA and/or in combination with the teachings of Anderson. Wu and Anderson both use a swivel hinge mechanism to provide rotation of a laptop display about two perpendicular axes. Wu and Anderson both use a swivel hinge mechanism to improve the convenience, functionality, and usability of a laptop display screen. (Wu at 1:10-14, 1:31-36; Anderson at 1:30-54.) Anderson addresses a similar issue in a similar way as Wu.

163. A POSITA would have had a reasonable (and high) expectation of success combining Wu and Anderson because there are a finite number of ways in which these

components could have been configured to address Wu's objectives. As one example, Anderson uses stops to limit angular rotation about the vertical axis. (Anderson at Abstract, Figs. 7-9.) Anderson also discloses a communication cable passing through the swivel mechanism. (Anderson at 6:38-43, 6:47-55, Figs. 7-9.) It would have been obvious to a POSITA to use the swivel stops of Anderson in the swivel mechanism of Wu. The swivel stops would prevent excessive twist of the communication cable, which is a practical requirement to avoid accelerated wear and damage to the cable. A POSITA would have combined Wu with Anderson to provide an obvious, simple means to prevent damage to the communication cable between the display and keyboard base. Wu was ready for improvement, and the combination of Wu with Anderson yields a predictable result.

164. Additionally, a POSITA would have looked to the rotation mechanism of Anderson to simplify the swivel mechanism in Wu. Wu's objectives include a simple hinge construction or design. (Wu at 1:37-38.) Like Wu, Anderson teaches a turret design with rotation about the vertical and horizontal axes that occur with respect to a single rotatable element. Because a POSITA would have recognized that Anderson's circular mounting ring simplified Wu's swivel mechanism design, it would have found it obvious to incorporate Anderson's circular opening into Wu's laptop.

### 4. Claim 1 is obvious over the combination of Wu with Sach, Kumar, or Satoshi.

**1.** *A computer system comprising:*

[1a] *a) a keyboard unit including a computer keyboard and a keyboard base that includes a front wall and a back wall;*

165. Wu teaches a laptop computer system with a base that includes a *computer keyboard* with a *front wall* and a *back wall*. (Wu at 1:21-22, Figs. 1, 2, 4, 5.) The *keyboard unit*

of Wu is depicted in Fig. 2. The *base* includes a *front wall* and a *back wall*. (Wu at Fig. 2.) It is

my opinion that Wu teaches the preamble and limitation 1[a].



keyboard unit

back wall

Fig.1

front wall

Fig. 2

keyboard

keyboard base

Fig.5

[1b]  *b)  a  display  screen  for  displaying  computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;*

166. Wu  discloses  a  monitor  (*display  screen*)  for  displaying  computer-generated

images. (Wu at 1:21-22, 1:28-30.) The monitor includes two *side walls* and a *bottom edge* that

extends between the side walls. (Wu at Fig. 2.) The monitor has *two spaced slots* in the *bottom*

90

*edge* where inner sides 51 and 52 are the inner side walls to the *spaced slots*. (Wu at 2:26-29, Figs. 2, 3.) Accordingly, it is my opinion that Wu teaches this limitation.



[1c] *c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and*

167.   It is my understanding that the term "proximate" has been construed as being "next to, very near, or close to." (*See supra* ¶ 22.)

168.   Wu discloses a swivel mechanism (*mounting assembly*) that allows the monitor (*display screen*) to rotate about a horizontal axle (*rotational motion . . . relative to a first axis*), and rotate about a vertical axle (*pivotal motion . . . relative to a second axis*). (Wu at 1:15-18, Fig. 5.) The vertical and horizontal axles are perpendicular to each other. (Wu at 1:15-18, 1:23-

91

27, 1:59-63.)  Wu's swivel mechanism (*mounting assembly*) connects the monitor (*display screen*) to the base proximate the *back wall* of the *keyboard base*.  (Wu at Figs. 2-3.)  The swivel mechanism (*mounting assembly*) includes a fixed seat 11 or platform (*rotatable element*) that rotates relative to the fixed base.  (Wu at 1:63-64, 2:2-7, Fig. 3.)  The longitudinal axles 22 and 24 (*spaced mounting brackets*) along with the fixed blocks protrude upward from the fixed seat. The axles and fixed blocks are arranged to fit inside the *two spaced slots* on the *bottom edge* of the monitor.  (Wu at 2:10-16, 2:26-29, Fig. 3.)  The axles are kept in position by two positioning plates and two side covers.  (Wu at 2:29-41.)  Wu's swivel mechanism allows the monitor to rotate with respect to the horizontal axles.  (Wu at 2:41-43.)  It is my opinion that Wu teaches this limitation.



92



Fig. 5

[1d]  *d) a port positioned proximate said front wall of said keyboard base, said port adapted to receive a signal from an ancillary computer system;*

[1e]  *wherein a signal from said ancillary computer system delivered to said port is effective to generate a computer-generated image on said display screen; and*

169.   It is my understanding that the term "port" has been construed as an "interface not including a PC card slot." (*See supra* ¶ 22.) It is also my understanding that the term "proximate" has been construed as being "next to, very near, or close to." (*See supra* ¶ 22.)

170.   Wu shows *ports* and/or jacks on the side wall of the base in Fig. 2, but does not expressly disclose the specific type or use of these *ports*. This limitation, however, would have been obvious in view of Sach, Kumar, or Satoshi because laptop computers commonly included at least one input/output port and a flat screen display. A POSITA would have known that a flat screen display inherently displays computer-generated images regardless of whether the images are generated from internal signals or from external signals.

93



Fig. 2

171.   It is my opinion that limitations 1[d] and 1[e] are disclosed by the combination of Wu with Sach.  Although Sach is primarily directed to a self-contained tactical workstation, Sach discloses features of portable computers that were common at the time of the invention of the '931 patent, particularly the types of connections to other devices that computers had and the port arrangements that were commonly used for communicating with these devices.  Sach discloses various types of *ports* including "a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d."  (Sach at 3:4-7.)  More specifically, Sach discloses "a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 19e for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19f for connection to the display panel 13."  (Sach at 3:35-42.)  Sach describes these *ports* as being accessible from one side of the workstation.  (Sach at 1:59-61; 2:57-60; 3:4-7, Fig. 1.)  Under plaintiff's infringement theory, the location of the parallel port 19c or the serial port 19d would satisfy the court's construction of being proximate the front wall.  Further, under

94

plaintiff's infringement theory, the LAN, AUI, SCSI, parallel, and serial ports can be used to interface with a variety of devices including an *ancillary computer system* through which a *computer-generated image* could be displayed on the display screen.

172.    Input/output ports, such as those disclosed in Sach, could be placed on other portable computer systems, like the portable computer system described by Wu.  Given the specific arrangement of the ports in Sach, a POSITA combining Wu and Sach would have been motivated to arrange the ports in the same or a similar manner.  Wu does not show any obstructions that would prevent placement of the ports in the arrangement shown by Sach.  As a result, a POSITA would have had a reasonable expectation of success when combining the teachings of Wu and Sach.  Under plaintiff's infringement theory, a POSITA would have known that the input/output ports in Sach, particularly the disclosed LAN port 19a, SCSI port 19b, parallel port 19c and serial port 19d, could be used by Wu's laptop to communicate with ancillary computer systems and generate an image on the laptop's display from a signal received from the ancillary computer system.  (*See* '931 patent at 5:65-6:14 ("Port 112 generally constitutes a 15 pin D-sub video connector, serial port, parallel port and/or universal serial bus ("USB"),  . . . or an IEEE 1394 port.").)  Accordingly, it is my opinion that Wu in view of Sach discloses limitations 1[d] and 1[e] of the '931 patent.



FIG. 1

173.   As another example, it is my opinion that limitations 1[d] and 1[e] are disclosed by the combination of Wu with Kumar.  Although Kumar is primarily directed to a carrying case for a portable computer, Kumar discloses features of portable computers that were common at the time of the invention of the '931 patent.  Kumar discloses that a "portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8.  (Kumar at 4:21-24; Fig. 4.)  Kumar also discusses that laptop computers interact with a variety of types of input/output devices with a variety of functions and features, including "printers, light pens, image scanners, video scanners, etc."  (Kumar at 1:22-25.)  Kumar discloses ports on the front wall and side wall that, according to Blackbird's interpretation of the claim, satisfies the proximate limitation.  The disclosed input/output ports could be used under plaintiff's infringement theory to interface with a variety of devices and are capable of receiving a signal from an ancillary computer input device and generating a computer-generated image on the display screen from the received signal.

174.   Input/output ports, such as those disclosed in Kumar, could be combined with other laptop computers and positioned proximate the front wall of the laptop base.  Given the

96

express disclosure of a port in the front wall or side wall of a portable computer, a POSITA combining Wu and Kumar would have been motivated to arrange the ports in the same or a similar manner. Wu describes a generic portable computer and does not show any obstructions that would prevent placement of a port proximate the front wall, so a POSITA would have had a reasonable expectation of success when combining the teachings of Wu and Kumar. Under plaintiff's infringement theory, a POSITA would have known that the input/output ports on the front and side walls of the base in Kumar could be used by Wu's laptop to communicate with ancillary computer systems and generate an image on the laptop's display from a signal received from the ancillary computer system. This is particularly true given Kumar's mention of light pens, image scanners, and video scanners, which would each create or modify an image on the display, though many other devices were known at the time of the invention of the '931 patent. Further, a POSITA would have been familiar at the time of the invention of the '931 patent with display ports that would have allowed the laptop computer system to project computer-generated images from connected computer systems. (*See* '931 patent at 5:65-6:14 ("Port 112 generally constitutes a 15 pin D-sub video connector, serial port, parallel port and/or universal serial bus ("USB"), . . . or an IEEE 1394 port.").) Accordingly, it is my opinion that a POSITA would have been motivated to combine Wu with Kumar, which combination discloses limitations 1[d] and 1[e] of the '931 patent.



FIG-4

175. Similarly, it is my opinion that limitations 1[d] and 1[e] are also disclosed by the combination of Wu with Satoshi. For example, a POSITA looking to add common features to Wu's laptop, including generating *a computer generated image* on the laptop's *display screen* from external components such as an ancillary computer system, would have found Satoshi's tablet-integrated computer that discloses connecting a tablet (*ancillary computer system*) to a connector (*port* (or interface)) "that allows pointing/movement of a cursor . . . displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information." (Satoshi, ¶ [0007]; Fig. 1.) A POSITA would have understood that Satoshi's tablet was an ancillary computer system that sent signals to the disclosed laptop that were effective to generate computer-generated images on the laptop's display screen. It would have been obvious for a POSITA to modify the laptop of Wu with the type of *port* disclosed in Satoshi. Specifically, by using a tablet as an input device, the goal of Wu to increase the working efficiency of the laptop would be advanced by allowing a user's handwritten graphics to be displayed as a *computer generated image* for presentation purposes. Alternatively, a POSITA may have chosen to use the "tablet connector portion" for the display of other types of *computer generated images*.

98

176. Satoshi also discloses that the "tablet connection portion" is located on "a front side portion of the personal computer keyboard, that allows the user to use the tablet without removing their hands from the keyboard." (Satoshi, ¶ [0010]). Accordingly, the user is able "to use the tablet . . . even when typing." (Satoshi, ¶ [0010]). In order for a user to maintain control of both the laptop and the ancillary computer system, placement of the port proximate the front wall of the laptop, as shown by Satoshi under Blackbird's interpretation of the proximate limitation, would have been obvious to a POSITA. Wu discloses no feature next to the front wall of the device that would conflict or hinder the port or tablet disclosed by Satoshi. A POSITA, therefore, would have had a reasonable likelihood of success at augmenting the computer system described by Wu with the additional functionality described by Satoshi because both devices are portable computer systems. Accordingly, it is my opinion that Wu in view of Satoshi discloses limitations 1[d] and 1[e] of the '931 patent.



99

177.    For these reasons, it is my opinion that a POSITA would have been motivated to combine Wu with Sach, Kumar, or Satoshi, which combination discloses limitations 1[d] and 1[e] of the '931 patent.

> [1f] *wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen.*

178.    It is my understanding that the Court has construed "directly" as used in "wherein a communication conduit extends from said keyboard base directly into said intermediate region" as "passing through the mounting assembly, but no other structure."

179.    Wu discloses that the *bottom edge* of the monitor has an *intermediate region* (framed by the inner sides 51 and 52) between the pair of slots. (Wu, Figs. 2-3, 2:26-29.) Wu also discloses that the swivel mechanism includes a hole and sits on top of a vertical hole in the positioning block. The positioning block is attached to a fixed frame of the main body (*keyboard base*). (Wu at 1:64-68, Fig. 3.) While Wu does not expressly disclose a *communication conduit*, it would have been obvious to a POSITA that cabling (or *a communication conduit*) extends directly from the main body 10 through the vertical hole 131 and the hole in the fixed seat 11 directly into the intermediate region of the display to connect the laptop display monitor disclosed in Wu with the processing and graphics components of the laptop. A POSITA would have known that a *communication conduit* was required in laptop computer systems in order for the monitor to communicate with the processing and graphics components located in the base. (*See* Pl. Final Infringement Contentions, Ex. A at A-11 (July 24, 2017) ("As its name implies, the LCD cable is a conduit through which display information is communicated form the processing elements on the laptop to the LCD display, and constitutes a 'communication conduit,' as claimed.").) Wu's invention relates to "a swivel mechanism for a monitor of a laptop computer"

100

(Wu at 1:21-22.) and a POSITA would have known that a laptop computer requires communication between the processor in the base and the laptop. And a POSITA would have found it obvious for the *communication conduit* to travel through the laptop's swivel hinge mechanism to keep it internal to the laptop computer system. Accordingly, it is my opinion that Wu in view of the knowledge and common sense of a POSITA renders this limitation obvious.



180. The claim chart below provides exemplary disclosures from Wu combined with Sach, Kumar, or Satoshi that in my opinion render claim 1 obvious.

| Limitation | Wu, Kumar, Satoshi, or Sach |
|---|---|
| **1[pre]**. A computer system comprising: | **Wu:**<br>*See, e.g.:*<br>**1:21-22:** "This invention relates to a swivel mechanism for a monitor of a laptop computer."<br>**Figs. 1, 2** |
| **[1a]** a) a keyboard unit including a computer keyboard and a keyboard base that includes a front wall and a back wall; | **Wu:**<br>*See, e.g.:*<br>**1:64-66:** "The positioning block 13 is a generally rectangular member disposed on a fixed frame 14 within a main body 10 through a hole 7."<br>**Figs. 2, 5** |
| **[1b]** b) a display screen for displaying computer-generated images, said display screen | **Wu:**<br>*See, e.g.:*<br>**1:21-22:** "This invention relates to a swivel mechanism for a |

101

| Limitation | Wu, Kumar, Satoshi, or Sach |
|---|---|
| defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge; | monitor of a laptop computer." <br> **1:28-30:** "It is another object of the present invention to provide a swivel mechanism which may widen the visible range." <br> **2:26-29:** "The axles 22 and 24 are engaged with the monitor 5 and the fixed blocks 221 and 241 are respectively disposed beside the inner sides 52 and 51 of the monitor 5." <br> **Figs. 2, 3** |
| **[1c]** c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and | **Wu:** <br> *See, e.g.:* <br> **1:15-18:** "It is, therefore, an object of the present invention to provide a swivel mechanism which enables the monitor of a laptop computer to rotate about a horizontal and a vertical axes." <br> **1:21-22:** "This invention relates to a swivel mechanism for a monitor of a laptop computer." <br> **1:23-27:** "It is the primary object of the present invention to provide a swivel mechanism which utilizes four tightly fitted axles in the same direction to be the horizontal axis of a monitor of a laptop computer and an upright axle to be the vertical axis thereof." <br> **1:59-63:** "With reference to the drawings and in particular to Figs. 1, 2 and 3 thereof, the swivel mechanism for a monitor of a laptop computer according to the present invention mainly comprises a vertical axle 1 and a horizontal axle 2." <br> **2:2-7:** "The bottom of the fixed seat 11 has an upright axle 115 formed with longitudinal raised lines and tightly fitted into the spring 12 thereby enabling the fixed seat 11 to rotate with respect to the fixed frame 14 and therefore, obviating the limit of vertical vision angle of 35 degrees." <br> **2:10-14:** "The horizontal axle 2 is mainly constituted by four longitudinal axles 21, 22, 23 and 24 in the same direction, four springs 25, 26, 27 and 28, two positioning plates 31 and 32, two side covers 41 and 42, and a protective cover 6." <br> **2:26-29:** "The axles 22 and 24 are engaged with the monitor 5 and the fixed blocks 221 and 241 are respectively disposed beside the inner sides 52 and 51 of the monitor 5." <br> **Figs. 2, 3** |
| **[1d]** d) a port positioned proximate said front wall of said keyboard base, said port adapted to receive a signal from an ancillary computer system; | **Wu** <br> *See, e.g.:* <br> **Fig. 2** <br><br> **Kumar** <br> *See, e.g.:* <br> **1:15-25:** "Since the advent of the personal computer, |

102

| Limitation | Wu, Kumar, Satoshi, or Sach |
|---|---|
| | manufacturers and industrial users have continually developed faster, smaller and more versatile machines, including portable computers that are dedicated to perform a specific function such as word processing, data collection or item identification. Alternatively, portable computers may be all purpose computing machines capable of running a variety of types of software programs. These portable personal computers may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc." **4:21-24:** "Additionally, portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8." **Fig. 4** <br><br> **Satoshi** *See, e.g.:* **[0007]:** "As illustrated in FIG. 1, a tablet stowing portion 3 for stowing a tablet 2 may, for example, be provided on the side of the body.  A tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard. The tablet 2, provided in place of the trackball, is a pointing device that allows pointing/movement of a cursor (not shown in the drawings) displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information." **Fig. 1** <br><br> **Sach** *See, e.g.:* **1:59-61:** "A two-slot VME processor box is disposed in the housing and is designed to receive two VME cards that are slid into the VME processor box from one side of the workstation." **2:57-60:** "A two-slot VME processor box 16 is disposed in the housing 11 and is designed to receive two VME cards 17 (one of which is shown) which are slid into the VME processor box 16 from one side of the workstation 10." **3:4-7:** "The [VME] processor card 17 has a plurality of input and output ports 19, including a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d." |

| Limitation | Wu, Kumar, Satoshi, or Sach |
|---|---|
|  | (Sach at 3:4-7; see FIG. 1).<br>**3:35-42:** "The VME processor card 17 has a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 1ge for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19/ for connection to the display panel 13."<br>**Fig. 1** |
| **[1e]** wherein a signal from said ancillary computer system delivered to said port is effective to generate a computer-generated image on said display screen; and | **Kumar**<br>*See* **claim chart in this table for Kumar citations for limitations [1d] immediately above**<br><br>**Satoshi**<br>*See* **claim chart in this table for Satoshi citations for limitations [1d] immediately above**<br><br>**Sach**<br>*See* **claim chart in this table for Sach citations for limitations [1d] immediately above** |
| **[1f]** wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen. | **Wu**<br>*See, e.g.:*<br>**1:64-2:7:** "The positioning block 13 is a generally rectangular member disposed on a fixed frame 14 within a main body 10 through a hole 7. The positioning block 13 is formed with a vertical hole 131 in which is mounted the spring 12. The fixed frame 14 is installed by known means which has no need to be described here in detail. The bottom of the fixed seat 11 has an upright axle 115 formed with longitudinal raised lines and tightly fitted into the spring 12 thereby enabling the fixed seat 11 to rotate with respect to the fixed frame 14 and therefore, obviating the limit of vertical vision angle of 35 degrees."<br>**2:26-29:** "The axles 22 and 24 are engaged with the monitor 5 and the fixed blocks 221 and 241 are respectively disposed beside the inner sides 52 and 51 of the monitor 5."<br>**Figs. 2-3** |

104

**5.**  **Claim 2 is obvious over the combination of Wu with Sach, Kumar, or Satoshi alone or in further combination with Ioka.**

> **2.** *A computer system according to claim 1, further comprising a central processing unit mounted within said keyboard unit.*

181.    Claim 2 depends from claim 1 and adds: *"further comprising a central processing unit mounted within said keyboard unit."*  Wu in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.B.4.)

182.    Wu discloses a swivel mechanism for a monitor of a laptop computer but does not expressly disclose a *central processing unit*.  The disclosure in Wu that the invention relates to a laptop computer inherently discloses to a POSITA that a *central processing unit* is included in the invention.  In fact, a POSITA would have known that a *central processing unit* was required for the disclosed laptop system.  Wu contains an implicit reference to a *central processing unit* by stating that the development efforts of the computer are now directed to "heightening the speed of a computer" among other things.  (Wu at 1:6-10.)  A POSITA would have understood the "speed of a computer" to refer to the clock speed and processing performance of the *central processing unit*.  It is my opinion that Wu inherently discloses the additional limitation of dependent claim 2.

183.    A POSITA would have also found it obvious to include this essential component in the system disclosed by Wu.  Sach, for example, expressly discloses a central processing unit (CPU) as part of the portable computer system.  (Sach at 2:64-66 ("The VME processor card 17 may use a model HP743i PS RISC processor (CPU), manufactured by Hewlett-Packard Company, for example.").)  In addition, a POSITA would have known that a *central processing unit* is typically located in the base of a laptop computer rather than in the display portion (as discussed in Part IV).  Accordingly, it is also my opinion that Wu in view of the knowledge and common sense of a POSITA renders obvious the additional limitations in dependent claim 2.

184.    To the extent that Blackbird argues that a laptop does not inherently contain a CPU, it is also my opinion that claim 2 is rendered obvious by Wu in combination with Ioka in view of Sach, Kumar, or Satoshi.  Ioka, like Wu, describes a portable computer system with a rotatable display.  Ioka also discloses additional components and elements commonly included in a laptop computer.  For example, Ioka discloses a computer "composed of a main unit 10 that has a power supply, CPU [(*central processing unit*)] and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction." (Ioka, ¶ [0006], Fig. 1).  Wu does not disclose any obstructions or teachings that would exclude or discourage the use of a CPU as described by Ioka.  The placement of components inside the base would not interfere with the combination of Wu with Ioka in view of Satoshi, Kumar, or Sach because each of those references refers to the location of ports on the outside of the base. As a result, a POSITA would have had a reasonable expectation of success when combining the teachings of Wu with Ioka in view of Sach, Kumar, or Satoshi.  A POSITA would have incorporated Ioka's CPU into Wu's laptop to perform the various processes and control various computing functions typical of laptop computers at the relevant time.  Accordingly, it is my opinion that Ioka discloses the additional limitation of claim 2 and that the combination of Wu with Ioka in view of Sach, Kumar, or Satoshi discloses all the limitations of claim 2.



185.  The claim chart below provides exemplary disclosures from Wu, Sach, and Ioka that disclose the elements of claim 2.

| Limitation | Wu, Sach, or Ioka |
|---|---|
| **2.** A computer system according to claim 1, further comprising a central processing unit mounted within said keyboard unit. | **Wu**<br>*See, e.g.:*<br>**Title**:  "Swivel Mechanism for a Monitor of a Laptop Computer"<br>**Abstract**:  "This invention relates a swivel mechanism for a monitor of a laptop computer."<br>1:6-19:  "It is found that the development of the computer is now directed in facilitating the communication in addition to increasing the function, reducing the size as well as heightening the speed of a computer so as to transmit information more effectively.  Hence, a so-called LAPTOP COMPUTER is developed to meet the need, the research of which is aimed at the convenience of use and portability thereby extending the applicable space and besides the above-mentioned trends.<br>It is, therefore, an object of the present invention to provide a swivel mechanism which enables the monitor of a laptop computer to rotate about a horizontal and a vertical axes."<br>**1:21-22:**  "This invention relates to a swivel mechanism for a monitor of a laptop computer."<br><br>**Sach:**<br>*See, e.g.:*<br>**2:64-66**:  "The VME processor card 17 may use a model HP743i PS RISC processor (CPU), manufactured by Hewlett-Packard Company, for example." |

| Limitation | Wu, Sach, or Ioka |
|---|---|
| | **Ioka:**<br>*See, e.g.:*<br>**[0006]:** "A description of the embodiment of the present invention is provided on based on the figures. As shown in Figure 1, the portable information processor in the present embodiment is composed of a main unit 10 that has a power supply, CPU and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction.  Here the display part 20 has an input coordinate position determination device with which pen touch is possible." |

6. **Claim 3 is obvious over the combination of Wu with Sach, Kumar, or Satoshi alone or in further combination with Ioka, Kim, or Anderson.**

**3.** *A computer system according to claim 1, wherein said display screen is a flat screen unit.*

186. Claim 3 depends from claim 1 and adds: *"wherein said display screen is a flat screen unit."*  As described above, Wu in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.B.4.)

187. It is my opinion that the flat screen monitor illustrated in Wu discloses the *flat screen unit* limitation of claim 3.  (*See* Wu at Fig. 2.)  The *display screen* in Wu is referred to as "a monitor of a laptop computer."  (*See, e.g.,* Wu at [54] Title; 1:15-18; 21-27; 49-50; 59-63.)  A POSITA would have understood "a monitor of a laptop computer" to be a *flat screen unit*.  In fact, the '931 patent states that: "**Laptop computers** generally employ flat-panel **monitors** for reasons of necessity, given space/weight constraints and the desire to pivotally mount the monitor relative to the base/keyboard for system protection and portability."  ('931 patent at 1:60-63 (emphasis added).)  Accordingly, it is my opinion that Wu discloses the additional limitations of claim 3.



Display Screen

Fig. 2

188. Similarly, Sach, Kumar, and Satoshi each disclose display screens that are flat screen units. As an example, the computer disclosed by Sach includes "a liquid crystal display [LCD] panel." (Sach at 2:39-49.). The '931 patent states that "[d]isplay monitor 104 typically employs a liquid crystal display ('LCD') for the screen." ('931 patent at 6:44-46.) Kumar and Satoshi both illustrate a laptop computer with a flat screen. (Kumar at Fig. 4; Satoshi at Fig. 1.)



Kumar, Fig. 4                    Satoshi, Fig. 1

189. To the extent that Blackbird argues that Wu in view of Sach, Kumar, or Satoshi does not disclose a flat screen unit or that it would not have been obvious to a POSITA in view of

109

his knowledge to modify Wu with a flat screen unit, it is also my opinion that the limitation of claim 3 is disclosed by Kim, Anderson, and/or Ioka.  At the time of the invention, as the '931 patent admits, flat-panel monitors were typically used in laptop systems.  (*See* '931 patent at 1:60-63.)  Laptops universally employed flat screen displays, with several different types of displays being available.  For example, Kim discloses that "[n]otebook computers generally have . . . a flat screen display such as an active matrix or LCD display."  (Kim at 1:12-22; *see also* Kim at 2:29-41.).  Ioka similarly discloses a flat screen unit.  (Ioka at Fig. 1.)  In addition, Anderson discusses how "LCDs are desirable for personal computers in that they are lightweight and have an extremely low power consumption in contrast to cathode ray tube (CRT) displays of conventional computers."  (Anderson at 1:19-24, Fig. 2.)  Thus, a laptop having a flat-panel display is not an inventive contribution to the art.  And, while it is my opinion that Wu discloses a *flat screen unit*—to the extent necessary—it would have also been obvious to a POSITA at the time of filing the '931 patent to combine Wu with the display of Kim, Anderson, or Ioka in view of Sach, Kumar, or Satoshi.



| Kim's display | Anderson's display | Ioka's display |

190.    The claim chart below provides exemplary disclosures from Wu, Sach, Anderson, Kim and Ioka that in the combinations discussed above render claim 3 obvious.

| Limitation | Wu, Sach, Kumar, Satoshi, Kim, Anderson, or Ioka |
|---|---|
| **3.** A computer system according to claim 1, wherein said display screen is a flat screen unit. | **Wu**<br>*See, e.g.:*<br>**Title:** "SWIVEL MECHANISM FOR A MONITOR OF A LAPTOP COMPUTER"<br>**1:15-18:** "It is, therefore, an object of the present invention to provide a swivel mechanism which enables the monitor of a laptop computer to rotate about a horizontal and a vertical axes."<br>**1:21-27:** "This invention relates to a swivel mechanism for a monitor of a laptop computer.<br>It is the primary object of the present invention to provide a swivel mechanism which utilizes four tightly fitted axles in the same direction to be the horizontal axis of a monitor of a laptop computer and an upright axle to be the vertical axis thereof."<br>**1:49-50:** "FIG. 2 is an exploded view of the swivel mechanism for a monitor of a laptop computer."<br>**1:59-63:** "With reference to the drawings and in particular to FIGS. 1, 2 and 3 thereof, the swivel mechanism for a monitor of a laptop computer according to the present invention mainly comprises a vertical axle 1 and a horizontal axle 2."<br>**Fig. 2**<br><br>**Sach**<br>*See, e.g.:*<br>**2:39-49:** "The portable miniaturized tactical workstation 10 comprises a housing 11 that has a rotatable top cover 12 that houses a display 13, such as a liquid crystal display panel 13, a field emission display panel 13, or a plasma display panel 13, for example.  The cover 12 is lockable and rotatable and is rotated upward to expose a viewing screen 13a of the display panel 13.  A display panel 13 used in a reduced to practice embodiment of the present invention is a 13 inch 1280 by 1024 24 bit color liquid crystal display panel 13, although other sizes or types of display screens 13 may be employed."<br><br>**Kumar**<br>*See, e.g.:*<br>**Fig. 4** |

111

| Limitation | Wu, Sach, Kumar, Satoshi, Kim, Anderson, or Ioka |
|---|---|
|  | **Satoshi**<br>*See, e.g.:*<br>**Fig. 1**<br><br>**Kim**<br>*See, e.g.:*<br>**1:12-22:** "Notebook computers generally have a main body which houses the processor and associated electronic components, disk drives, cursor control and switches.  A keyboard is carried by the upper surface of the main body, and a cover is suitably hinged to the body whereby in its closed position it covers and protects the keyboard.  The cover includes a flat screen display such as an active matrix or LCD display.  In the closed position the display overlies the keyboard.  In the open position it generally faces the keyboard whereby the operator views the display as he performs various tasks commanded by the keyboard and cursor control."<br>**2:29-41:** "FIGS. 2 and 3 show notebook computer 10 with cover 12 in a raised position.  On the bottom of cover 12 is a main display 21, for example a matrix or liquid crystal display.  Display 21 is protected by cover 12 when in a lowered position.  On top of body 11 is a keyboard 16, cursor control 17, and switches and controls 18.  In the rear of body 11 are interface ports 19, such as serial and USB.  Cover 12 overlies and protects keyboard 16, cursor control 17, and switches and controls 18, as well as protecting main display 21.  In accordance with another feature of the present invention, the rear of cover 12 houses an auxiliary display 26, which lies against cover 12 when in the closed position, as shown in FIGS. 1 and 3."<br>**Fig. 2**<br><br>**Anderson**<br>*See, e.g.:*<br>**1:19-26:** "Liquid crystal displays (LCDs) are used in many personal computer screens. LCDs are desirable for personal computers in that they are lightweight and have an extremely low power consumption in contrast to cathode ray tube (CRT) displays of conventional desktop computers. In addition, an LCD generally retains a great clarity of display in the presence of bright light."<br>**Fig. 2**<br><br>**Ioka** |

112

| Limitation | Wu, Sach, Kumar, Satoshi, Kim, Anderson, or Ioka |
|---|---|
|  | *See, e.g.:*<br>Fig. 1 |

### 7. Claim 6 is obvious over the combination of Wu with Sach, Kumar, or Satoshi and in further combination with Ioka or Kim.

**6.** *A computer system according to claim 1, wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees.*

191. Claim 6 depends from claim 1 and adds: "*wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees.*" As described above, Wu in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (*See supra* Part VI.B.4.)

192. Wu discloses a swivel mechanism to widen the visible range of the monitor and to increase the working efficiency of the laptop. (Wu at 1:28-33.) For example, a POSITA looking to further widen the visible range of a laptop display and increase a laptop's working efficiency would have found Ioka's disclosure of a display screen that could rotate at least 180 degrees. (Ioka, ¶ [0006-7].) Ioka teaches a display screen that can be pivoted by 180 degrees (via the hinge mechanism) with respect to the computer body and closed with the display facing up. (*Compare* Ioka, Fig. 4; *with* Ioka, Fig. 5.) Because the hinge mechanism of Ioka allows for up to 180 degrees of rotation about the vertical axis in either direction, Ioka teaches up to 360 degrees of rotation of the display screen about the vertical axis. (Ioka, ¶ [0007].) A POSITA would have known that the swivel mechanism of Wu could be adapted as taught by Ioka to swivel about the vertical axis by at least 180 degrees. Accordingly, it is my opinion that Wu in combination with Sach, Kumar, or Satoshi and in further combination with Ioka renders obvious claim 6.





193.   It is also my opinion that claim 6 would have been obvious in view of Kim.  For example, a POSITA looking to further widen the visible range of a laptop display and increase a laptop's working efficiency would also have found Kim's disclosure of a display screen that could rotate at least 180 degrees.  (Kim at 4:15-16.)  Kim teaches a display screen that "rotates about a rotatable joint 23 to face an observer across from operator . . . [in order for] the operator to make a presentation to others without the aid of projector or the inconvenience of having others crowd around the operator to view the display form the same side as the operator."  (Kim at 2:42-57; *compare* Kim, Fig. 2; *with* Kim, Fig. 4.).  A POSITA would have known that the swivel mechanism of Wu could be adapted as taught by Kim to swivel about the vertical axis by at least 180 degrees.  Thus, it is my opinion that a POSITA would have found it obvious to modify the swivel mechanism of Wu in light of the disclosures of Kim and/or Ioka.  Similarly, a

114

POSITA would have been motivated to combine Wu with Kim and/or Ioka to widen the visible range of Wu's display. Accordingly, it is my opinion that Wu in combination with Sach, Kumar, or Satoshi and in further combination with Ioka or Kim renders obvious claim 6.



FIGURE 2                    FIGURE 4

194. Thus, it is my opinion that a POSITA would have found it obvious to modify the swivel mechanism of Wu in light of the disclosures of Kim and/or Ioka. Similarly, a POSITA would have been motivated to combine Wu with Kim and/or Ioka. Accordingly, it is my opinion that Wu in combination with Sach, Kumar, or Satoshi and in further combination with Kim or Ioka renders obvious claim 6.

195. The claim chart below provides exemplary disclosures from Ioka and Kim that disclose the elements of claim 6.

| Limitation | Ioka or Kim |
|---|---|
| **6.** A computer system according to claim 1, wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees. | **Kim**<br>*See, e.g.:*<br>**4:15-16:** "The notebook computer of claim 2 Wherein the cover rotates through an angle from 1 to 180 degrees."<br>**2:44-57:** "When main display 21 is in a raised position and oriented as shown in FIG. 2 the operator and immediately adjacent observers have a view of the images on main display 21, but observers across from the operator cannot see the images.<br>    In order for observers across from operator to view images, main display 21 rotates about a rotatable joint 23 to |

115

| Limitation | Ioka or Kim |
|---|---|
| | face an observer across from operator, as shown in FIG. 4. Main display 21 also pivots about hinge 13 for a better viewing angle for observer.  This enables the operator to make a presentation to others without the aid of a projector or the inconvenience of having the others crowd around the operator to view the display from the same side as the operator." **Figs. 2, 4** <br><br> **Ioka** *See, e.g.:* **[0006]:** "A description of the embodiment of the present invention is provided on based on the figures. As shown in Figure 1, the portable information processor in the present embodiment is composed of a main unit 10 that has a power supply, CPU and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction.  Here the display part 20 has an input coordinate position determination device with which pen touch is possible." **[0007]**: "Moreover, since the connection part 30 prevents the severing of the wire between the main unit 10 and the display part 20, the angle of rotation is restricted in a range from +180° to -180° for the rotation in the perpendicular direction of the display part when the angle of the front surface of the display panel of the above-mentioned display part is set at 0°." **Figs. 1, 4, 5** |

8. **Claim 8 is obvious over the combination of Wu with Sach, Kumar, or Satoshi.**

> **8.** *A computer system according to claim 1, wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer.*

196.   Claim 8 depends from claim 1 and adds:  "*wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer.*"    As

116

described above, Wu in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (*See supra* Part VI.B.4.)

197.   As described for claim 1 above (*see supra* ¶¶ 171-174), Sach and Kumar teach a plurality of input/output ports on the front and side walls of a laptop's base.  (Sach at 3:4-7, 3:35-42; Kumar at 4:21-24, Fig. 4.)  The input/output ports of Sach and Kumar suggest to a POSITA that ancillary devices could be connected to input/output ports.  (Sach at 3:35-42; Kumar at 1:22-25.)  For example, Kumar teaches that input/output devices, such as printers, light pens, image scanners, video scanners, etc., could be connected to the input/output ports of the laptop. (Kumar 1:22-25.)  In addition to these example devices disclosed by Kumar, a POSITA would understand that many other types of input/output devices including *ancillary computer systems* could be connected to a laptop via appropriate input/output ports proximate the front wall of the base.  These ancillary devices could include one of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer. Accordingly, it is my opinion that the combination of Wu with Sach or Kumar renders claim 8 obvious.



Sach, Fig. 1                                                   Kumar, Fig. 4

117

198.    It is also my opinion that claim 8 would have been obvious in view of Satoshi.  As described for claim 1, (*see supra* ¶¶ 175-176), Satoshi discloses a tablet-integrated personal computer that uses a tablet as an input device that can be "removably stowed at predetermined position within the personal computer body."  (Satoshi, ¶ [0005], Fig. 1).  The tablet allows for a user's handwritten graphics to be displayed on the display of the personal computer.  (Satoshi, ¶ [0007].)  The tablet inherently includes some processing ability to transform the strokes made by a user into data transmitted to the personal computer.  Thus, a POSITA would have considered the disclosed  tablet to be an example of a palm top computer, hand-held computer, electronic book, or pocket computer.  For these reasons, it is my opinion that the tablet in Satoshi could be characterized as one or more of the *ancillary computer systems* listed in claim 8.  Accordingly, it is my opinion that the combination of Wu with Satoshi renders claim 8 obvious.



199.    The claim chart below provides exemplary disclosures from Sach, Kumar, and Satoshi that discloses the elements of claim 8.

| Limitation | Sach, Kumar, or Satoshi |
|---|---|
| **8.** A computer system according to claim 1, wherein said ancillary computer system is selected from | **Sach**<br>*See, e.g.:*<br>**1:59-61:** "A two-slot VME processor box is disposed in the |

| Limitation | Sach, Kumar, or Satoshi |
|---|---|
| the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer. | housing and is designed to receive two VME cards that are slid into the VME processor box from one side of the workstation." **2:57-60:** "A two-slot VME processor box 16 is disposed in the housing 11 and is designed to receive two VME cards 17 (one of which is shown) which are slid into the VME processor box 16 from one side of the workstation 10." **3:4-7:** "The [VME] processor card 17 has a plurality of input and output ports 19, including a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d." (Sach at 3:4-7; see FIG. 1). **3:35-42:** "The VME processor card 17 has a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 1ge for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19/ for connection to the display panel 13." **Fig. 1** <br><br> **Kumar** *See, e.g.:* **1:15-25:** "Since the advent of the personal computer, manufacturers and industrial users have continually developed faster, smaller and more versatile machines, including portable computers that are dedicated to perform a specific function such as word processing, data collection or item identification. Alternatively, portable computers may be all purpose computing machines capable of running a variety of types of software programs. These portable personal computers may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc." **4:21-24:** "Additionally, portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8." **Fig. 4** <br><br> **Satoshi** *See, e.g.:* **[0005]:** "To solve the above-described problem, the tablet-integrated personal computer of the present invention uses a |

119

| Limitation | Sach, Kumar, or Satoshi |
|---|---|
| | tablet as the pointing device, and is provided with a stowing portion in which the tablet can be removably stowed at predetermined position within the personal computer body, and a tablet connection portion for connecting the tablet at a predetermined position on the personal computer body." **[0007]:** "As illustrated in FIG. 1, a tablet stowing portion 3 for stowing a tablet 2 may, for example, be provided on the side of the body. A tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard. The tablet 2, provided in place of the trackball, is a pointing device that allows pointing/movement of a cursor (not shown in the drawings) displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information. When the personal computer 1 is carried around, the tablet 2 is stowed in the tablet stowing portion 3. The tablet stowing portion 3 is provided with a lock mechanism not shown in the drawings to ensure that the tablet 2 is not jolted out by impacts that occur while the personal computer 1 is being carried. When used, the tablet 2 is taken out of the tablet stowing portion 3 and connected to the tablet connection portion 4." **Fig. 1** |

### 9. Claim 9 is obvious over the combination of Wu with Sach, Kumar, or Satoshi and in further combination with Anderson, Masaru, or Ioka

**9.** *A computer system according to claim 1, further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base.*

200. Claim 9 depends from claim 1 and adds: *"further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base."* As described above, Wu in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (*See supra* Part VI.B.4.)

201. A POSITA would recognize the need to design a swivel and tilt mechanism that did not over twist the communication conduit. With this design requirement, a POSITA would have looked to Anderson and its disclosure of a swivel mechanism with a stop because the stop would

120

prevent excessive twisting of the conduit from continual and over rotation in the same direction. Rotational stops limit twisting of the communication conduit. Anderson teaches stop tabs 72 positioned in the swivel mechanism to contact stop blocks 70 and limit the rotation about the vertical axis of the swivel mechanism and the display screen. (Anderson at 4:63-5:2, 5:7-18, Fig. 7, Fig. 9.) Accordingly, it is my opinion that the combination of Wu with Anderson in view of Sach, Kumar, or Satoshi renders claim 9 obvious.



202. It is also my opinion that claim 9 would have been obvious over the combination of Wu with Masaru in view of Sach, Kumar, or Satoshi. A POSITA, looking to design a swivel and tilt mechanism that did not over twist the communication conduit or did not twist when in the closed position, would also have found Masaru and its disclosure of a rotatable display holding structure. Masaru describes the operation of the hinge when the display is closed:

121

> As illustrated in FIG. 1(b) and FIG. 3, the lower end 6b of the stopper 6 is engaged with the recess portion 11b of the fixed member 11, the upper end 6a of the stopper 6 is in contact with the outer peripheral surface of the angle limiting member 5, and the movement of stopper 6 is restricted to the vertical direction (direction of the arrow A).  Therefore, the engagement between the lower end 6b of the stopper 6 and recess portion 11b of the fixed member 11 is not released, and the rotating member 9 is unable to rotate with respect to the fixed member 11.

(Masaru, ¶ [0010].)  In other words, as shown in Figure 3, when the display is closed, the lower end of the stopper 6 (*one stop*) fits into a recessed portion 11b (i.e. a hole or groove) of the fixed member 11 (*keyboard base*).  The stopper 6 cannot move up because the top of stopper 6 is held in place by angle limiting member 5, which encircles the display holder 1.  When stopper 6 cannot move, rotating member 9, to which the *display screen* is attached, cannot rotate relative to fixed member 11 (*limiting rotational motion of said display screen relative to said keyboard base*).  Accordingly, it is my opinion that the combination of Wu with Masaru in view of Sach, Kumar, or Satoshi renders claim 9 obvious.





203.    It is further my opinion that claim 9 would have been obvious over the combination of Wu with Ioka in view of Sach, Kumar, or Satoshi.  A POSITA, looking to design a swivel and tilt mechanism that did not over twist the communication conduit, would also have found Ioka and its disclosure of a rotatable display connection part.  (Ioka, ¶ [0006], Fig. 1.)  Ioka also describes an angle restriction part (*stop*) for limiting rotational motion of the display part 20.  Ioka states that "the inside of the fixing part 100 has . . . a vertical member support part 110 that has an angle restriction part that is composed of a projection that restricts the angle of rotation of the vertical part 50 to a range from +180° to -180°."  (Ioka, ¶ [0007].)  Additionally, Ioka discloses that the angle restricting part along with the impelling part "prevent the display part from rotating unintentionally when it is being carried, and to prevent the wire between the main unit and the display part from being severed."  (Ioka, ¶ [0007].)  It is therefore my opinion that claim 9 is rendered obvious by the combination of Wu with Ioka in view of Sach, Kumar, or Satoshi.



204.  The claim chart below provides exemplary disclosures from Anderson, Masaru, and Ioka that disclose the elements of claim 9.

| Limitation | Anderson, Masaru, or Ioka |
|---|---|
| **9.** A computer system according to claim 1, further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base. | **Anderson**<br>*See, e.g.:*<br>**4:63-5:2:** "The peripheral edge of the swivel disk 46 rides in a channel or groove 62 formed on the inner circumference of the mounting ring 54. The groove 62 retains the swivel disk 46 in a close sliding fit. A stop block 70 is provided within the groove 62 approximately 90° around the perimeter of the ring 54 from the adjoining ends (i.e., approximately halfway between the two ends)."<br>**5:7-18:** "The outer rim of the disk 46 includes two outwardly projecting stop tabs 72, spaced apart from each other by approximately 120° around the perimeter of the disk. The stop tabs 72 project within the groove 62 of the mounting ring 54 to contact the stop blocks 70. Both stop tabs 72 are disposed angularly forward of the stop blocks 70, and the orientation of the stop tabs 72 is such that the swivel disk 46 has a 60° range of movement. Thus, as in the illustration of Fig. 7, the swivel disk 46 may turn 30° from the neutral position shown in either direction of arrow 52 before the stop tabs 72 hit the stop blocks 70."<br>**Figs. 7, 9**<br><br>**Masaru**<br>*See, e.g.:*<br>**[0010]: "**As illustrated in FIG. 1(b) and FIG. 3, the lower end 6b of the stopper 6 is engaged with the recess portion 11b of the fixed member 11, the upper end 6a of the stopper |

| Limitation | Anderson, Masaru, or Ioka |
|---|---|
| | 6 is in contact with the outer peripheral surface of the angle limiting member 5, and the movement of stopper 6 is restricted to the vertical direction (direction of the arrow A). Therefore, the engagement between the lower end 6b of the stopper 6 and recess portion 11b of the fixed member 11 is not released, and the rotating member 9 is unable to rotate with respect to the fixed member 11. . . . Fig. 7 shows the state of the display device 13 in FIG. 1(b) and FIG. 3, with the display device 13 being unable to rotate in the left-right direction (direction of arrow D), and being able to rotate freely in the open-close direction (direction of arrow E)." **Figs. 1(b), 3, 7.**<br><br>**Ioka:**<br>*See, e.g.:*<br>**[0007]:** "Moreover, the inside of the fixing part 100 has an impelling part that imparts frictional resistance to the vertical part 50 and with which the display part 20 in Figure 1 can be fixed to a suitable rotating position, and a vertical member support part 110 that has an angle restriction part that is composed of a projection that restricts the angle of rotation of the vertical part 50 to a range from +180° to -180°. . . . In addition, owing to the impelling part and the angle restriction part, it is possible to prevent the display part from rotating unintentionally when it is being carried, and to prevent the wire between the main unit and the display part from being severed" **Fig. 1.** |

10. **Claim 10 is obvious over the combination of Wu with Sach, Kumar, or Satoshi alone or in further combination with Masaru, Anderson, or Kim.**

> **10.** *A computer system according to claim 1, wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.*

205.   Claim 10 depends from claim 1 and adds: "*wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.*"   Wu in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (*See supra* Part VI.B.4.)

206.   Wu discloses that the swivel mechanism includes a fixed seat 11 (*rotatable element or turret*) that rotates with respect to the fixed frame 14.  (Wu at 2:2-7, Figs. 2-3.)  The fixed frame 14 is located within the main body 10 (*keyboard base*). (Wu at 1:64-68, Figs. 2-3.) Figures 2 and 3 illustrate *a circular opening* formed in the main body 10 (*keyboard base*). Accordingly, it is my opinion that Wu discloses "*said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base*" and Wu in combination with Sach, Kumar, or Satoshi renders obvious claim 10.



207.   It is also my opinion that claim 10 would have been obvious over the combination of Wu with Masaru in view of Sach, Kumar, or Satoshi.  While it is my opinion that Wu discloses a *circular opening*, to the extent that plaintiff argues that Wu does not disclose the elements of claim 10, it would have been obvious to a POSITA to combine the disclosure in Masaru with Wu. Masaru discloses a semicircular rotating member 9 (*rotatable element* or *turret*), which is "attached to the fixed member 11 by a fastener 12 so as to be rotatable around a vertical axis." (Masaru, ¶ [0008], Fig. 1.)  Masaru also discloses that "[t]he upper surface 11a of the fixed member 11 is provided with a hemispherical recess portion 11b" (*circular opening*) as seen in

126

Figure 9. (Masaru at ¶ [0009], Fig. 9.) Given these disclosures, it is my opinion that Masaru discloses that "*said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.*" It is therefore my opinion that claim 10 is rendered obvious by the combination of Wu and Masaru in view of Sach, Kumar, or Satoshi.



208. Additionally, it is my opinion that the additional limitations in claim 10 are disclosed by Anderson. For example, a POSITA looking for a hinge construction that could rotate about two perpendicular axes would have found Anderson's disclosure. Anderson teaches that the swivel hinge sits on a circular mount or swivel disk 46 (*turret*) and the swivel disk rotates about a vertical axis relative to a circular mounting ring 54 (*circular opening*) affixed to the laptop's base. (Anderson at 4:24-27, 4:30-38, Figs. 1, 2, 7, 8.) A POSITA would have known that the swivel mechanism of Wu could be adapted to provide the swivel mechanism of Anderson to provide a simpler and more aesthetically pleasing swivel construction. Accordingly, it is my opinion that the combination of Wu and Anderson in view of Sach, Kumar, or Satoshi renders obvious claim 10.

127





209.   As another example, it is my opinion that the additional limitations in claim 10 are disclosed by Kim.  A POSITA looking in this area of technology would have found Kim's disclosure of a rotatable joint and socket.  Kim discloses that "[r]otatable joint 23 [*rotatable element* or *turret*)] fits into socket 36 [(*circular opening*)] . . . within body 11 (*keyboard base*). (Kim at 3:9-10, Fig. 6.)  A POSITA would have known that the fixed seat 11 (*rotatable element or turret*) of Wu could be adapted to fit into a socket (*circular opening*) as disclosed in Kim. Accordingly, it is my opinion that Wu in combination Kim in view of Sach, Kumar, or Satoshi renders claim 10 obvious.

128



*FIGURE 6*

210. The claim chart below provides exemplary disclosures from Wu, Masaru, Anderson, and/or Kim that disclose the elements of claim 10.

| Limitation | Wu, Masaru, Anderson, or Kim |
|---|---|
| **10.** A computer system according to claim 1, wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base. | **Wu**<br>*See, e.g.:*<br>**1:64-68:** "The positioning block 13 is a generally rectangular member disposed on a fixed frame 14 within a main body 10 through a hole 7. The positioning block 13 is formed with a vertical hole 131 in which is mounted the spring 12."<br>**2:2-7:** "The bottom of the fixed seat 11 has an upright axle 115 formed with longitudinal raised lines and tightly fitted into the spring 12 thereby enabling the fixed seat 11 to rotate with respect to the fixed frame 14 and therefore, obviating the limit of vertical vision angle of 35 degrees."<br>**Figs. 2-3**<br><br>**Masaru**:<br>*See, e.g.:*<br>**[0008]:** "An embodiment of the present invention is described below with reference to FIGS. 1 to 9. FIG. 1(a) is a |

129

| Limitation | Wu, Masaru, Anderson, or Kim |
|---|---|
| | perspective view of the electronic apparatus, FIG. 1(b) is a front sectional view of the holding device, and FIG. 2 is a perspective view of the holding device.  In FIG. 1(a), reference numeral 11 denotes a fixed member formed by the main body unit, and 9 denotes a semicircular rotating member provided in a recessed area of an upper surface 11a of the fixed member 11.  The rotating member 9 is attached to the fixed member 11 by a fastener 12 so as to be rotatable around a vertical axis.  Further, provided standing on both sides of the rotating member 9 are a pair of holding devices P, with the flat display device 13 being pivotally supported by the holding devices P."<br><br>[0009]:  "As illustrated in FIG. 1(b) and FIG. 2, reference numeral 2 denotes a fixed bracket that is fixed to the rotating member 9 by a fastener 10.  Reference numeral 1 denotes a horizontal rotating shaft that is rotatably attached to fixed bracket 2.  Reference numeral 3 denotes a torque control member that generates a load to resist the rotation of horizontal rotating shaft 1.  Reference numeral 4 denotes a fastener that functions to prevent the torque control member 3 from falling off the horizontal rotating shaft 1.  Reference numeral 5 denotes an angle limiting member, which has a groove portion 5a in the circumferential direction of the outer peripheral surface, and is mounted on the horizontal rotating shaft 1 in an integrated manner.  Reference numeral 6 denotes a stopper having an upper end 6a with flat form and a lower end 6b with a hemispherical form.  The stopper 6 is passed through the holes 2a and 2b of the fixed bracket 2 and a through hole 9a formed in the rotating member 9, and is held in a way that allows only vertical movement (direction of arrow A).  Reference numeral 7 is a pin projecting from the stopper 6.  A pressing force from the urging means formed by a compression spring 8 fitted around the stopper 6 is applied to the stopper 6 via the pin 7, pressing the stopper 6 in a downward direction (direction of arrow B).  The upper surface 11a of the fixed member 11 is provided with a hemispherical recess portion 11b into which the lower end 6b of the stopper 6 can be fitted and which engages with the lower end 6b of the stopper 6 when the stopper 6 is pressed by the spring 8.  Note also that the horizontal rotating shafts 1,1 of the two holding devices P,P rotate about a horizontal axis, and that the display device 13 is fixed to the horizontal rotating shafts 1,1."<br><br>[0010]: "As illustrated in FIG. 1(b) and FIG. 3, the lower end 6b of the stopper 6 is engaged with the recess portion 11b of |

130

| Limitation | Wu, Masaru, Anderson, or Kim |
|---|---|
|  | the fixed member 11, the upper end 6a of the stopper 6 is in contact with the outer peripheral surface of the angle limiting member 5, and the movement of stopper 6 is restricted to the vertical direction (direction of the arrow A).  Therefore, the engagement between the lower end 6b of the stopper 6 and recess portion 11b of the fixed member 11 is not released, and the rotating member 9 is unable to rotate with respect to the fixed member 11.  . . .  Fig. 7 shows the state of the display device 13 in FIG. 1(b) and FIG. 3, with the display device 13 being unable to rotate in the left-right direction (direction of arrow D), and being able to rotate freely in the open-close direction (direction of arrow E)."<br>**[0011]:**  "As illustrated in FIG. 4, when the horizontal rotating shaft 1 rotates and the upper end 6a of the stopper 6 locates within the groove portion 5a of the angle limiting member 5, the engagement between the stopper 6 and the recess portion 11b of the fixed member 11 enters a releasable state.<br>FIG. 8 shows the state of the display device 13 in FIG. 4, with the display device 13 being able to rotate in the left-right direction (direction of arrow D), and being able to rotate in the open-close direction (direction of arrow E) without an angle limit."<br>**[0012]:**  "As shown in FIG. 5, as the rotating member 9 rotates with respect to the fixed member 11, a force exceeding the pressing force of the spring 8 is applied upward (in the direction of the arrow B') to the stopper 6, and the hemispherical lower end 6b overcomes the inner walls of the recess portion 11b and arrives at the upper surface 11a of the fixed member 11.  At the same time, the upper end 6a of the stopper 6 enters the groove portion 5a of the angle limiting member 5.  In this state, the rotating member 9 can rotate freely with respect to the fixed member 11.  Further, the upper end 6a of the stopper 6 is not released from the groove portion 5a of the angle limiting member 5 and, as illustrated in FIG. 6, when the upper end 6a of the stopper 6 contacts an end portion 5b of the groove portion 5a of the angle limiting member 5, the horizontal rotating shaft 1 cannot rotate any further in the direction of arrow C.  Rotation of the horizontal rotating shaft 1 in the direction opposite to the direction of the arrow C is limited in the same way.  FIG. 9 shows the state of display device 13 in FIG. 5.  The display device 13 can freely rotate in the left-right direction (direction of arrow D), while rotation in the open-close direction (direction of arrow E) is angle-limited.  Note also that the range of rotation |

131

| Limitation | Wu, Masaru, Anderson, or Kim |
|---|---|
| | of the horizontal rotating shaft 1 can be adjusted by changing the length of the groove portion 5a of the angle limiting member 5." <br><br> **[0013]**:  "It is also to be noted that while rotation of the rotating member 9 through a certain angle with respect to the fixed member 11 may result in the holding device P coming off the fixed member 11, this is not a problem.  Since the holding device P is provided on at left and right locations on the rotating member 9 as illustrated in FIG. 1(a), when one holding device P comes off the fixed member 11, the other is always on the upper surface 11a of the fixed member 11. Moreover, by making the recess portion 11b of the fixed member 11 into a groove shape extending along the movement locus of the stopper 6 as the rotating member 9 rotates, the range over which the display device 13 can be rotated in left-right direction (direction of arrow E) without restriction can be extended." <br><br> **[0014]**:  "With the display holding structure configured in this way, when the lower end 6b of the stopper 6 is engaged with the recess portion 11b in the fixed member 11, the horizontal rotating shaft 1 rotates freely, allowing the display device 13 to rotate freely about the axis of rotation of the horizontal rotating shaft 1.  Further, when the upper end 6a of the stopper 6 is inserted into the groove portion 5a of the angle limiting member 5, the lower end 6b is released from the recess portion 11b and the rotating member 9 rotates freely with respect to the fixed member 11, allowing the display device 13 to rotate freely around the axis of rotation of the rotating member 9.  In this way, there is sufficient freedom in the range of rotation of the display device 13." <br> **Figs. 1, 9.** <br><br> **Anderson** <br> *See, e.g.:* <br> **4:24-27:**  "Referring to Fig. 7, the tilt/swivel hinge 26 generally comprises a cover attachment yoke 42 which tilts about a tilt base 44 attached to a circular mount or swivel disk 46." <br> **4:30-34:**  "The tilt base 44, the attached yoke 42 and the swivel disk 46 rotate about a vertical axis in either direction shown by a double-headed arrow 52 relative to a swivel mounting ring 54 affixed to the base 22 of the computer." <br> **4:35-38:**  "With reference to both Figs. 7 and 9, the swivel mounting ring 54 forms a continuous circle defined by a two-part plastic assembly held together with machine screws 56 |

132

| Limitation | Wu, Masaru, Anderson, or Kim |
|---|---|
| | and threaded holes 60 at their abutting ends." **Figs. 2, 8, 9** <br><br> **Kim** <br> *See, e.g.:* <br> **1:52-56:** "There is provided a notebook computer having a body and a cover which is hinged to a support rotatably carried by the body. The cover has a main display which in a closed position overlies the body and in an open position pivots and rotates the main display away from the body." <br> **2:42-57:** "When cover 12 is in the lowered position, latching mechanism 14 releases cover 12, which pivots about hinge 13, so that cover 12 reveals main display 21 to an operator. When main display 21 is in a raised position and oriented as shown in FIG. 2 the operator and immediately adjacent observers have a view of the images on main display 21, but observers across from the operator cannot see the images. <br><br> In order for observers across from operator to view images, main display 21 rotates about a rotatable joint 23 to face an observer across from operator, as shown in FIG. 4. Main display 21 also pivots about hinge 13 for a better viewing angle for observer. This enables the operator to make a presentation to others without the aid of a projector or the inconvenience of having the others crowd around the operator to view the display from the same side as the operator." <br> **3:1-12:** "FIG. 6 shows cover 12 removed from hinge 13. In one embodiment hinge 13 is integral with rotatable joint 23. Power and data lines 30 connect cover 12 with body 11 through hinge 13 and rotatable joint 23. Lines 30 enter body 11 through a slot 34. Slot 34 is in a socket 36 and is long enough to allow free movement for lines 30 while cover 12 rotates about rotatable hinge 23. Receptors 34 of cover 12 slidably receive the ends 32 of hinge 13 and enable cover 12 to pivot about hinge 13. Rotatable joint 23 fits into socket 36 and is secured with screw 38 and cap 40 from the underside of socket 36, within body 11. Other embodiments include a ball and socket joint." <br> **Fig. 6.** |

    **C.    Kim Renders the Asserted Claims Obvious.**

211.   In my opinion, Kim alone or in combination with Sach, Kumar, or Satoshi renders claims 1-3, 6, 8, and 10 of the '931 patent obvious. It is also my opinion that Kim with Masaru,

133

Anderson, or Ioka alone or in further combination with Sach, Kumar, or Satoshi renders claim 9 obvious.

### 1.    A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Kim with Sach, Kumar, or Satoshi.

212.    It is my opinion that it would have been obvious to a POSITA to modify Kim in view of the knowledge of a POSITA and/or in combination with the teachings of Sach, Kumar, or Satoshi.    At the time of the invention, laptop computers commonly had one or more input/output ports.    Sach, Kumar, and Satoshi each discloses exemplary locations and use of input/output ports.    Each reference provides additional functionality and a specific benefit to the computer system described by Kim, which provides a motivation to combine these references.    A POSITA would also have had a reasonable expectation of success because each reference is in the field of portable computer systems and is compatible with the system disclosed by Kim.

213.    Kim discloses a laptop computer with a display that is capable of pivoting and rotating for making presentations.    (Kim at 1:23-24, 52-56, Fig. 4)    In particular, Kim discusses how the invention can be used for making presentations to "individuals sitting on the opposite side of a table or desk."    (Kim at 1:37-38.)    The laptop disclosed by Kim has several notable advantages:    First, Kim discusses how its invention is an improvement over the prior art because it maintains the portability advantage of a laptop computer.    (*See* Kim at 1:23-37.)    For example, "[a]nother method of displaying information to others is to connect the computer to a video projector and project the data onto a screen[, but here,] . . . the projector must be carried along with the notebook computer or arrangements must be made to have a projector available for each presentation."    (Kim at 1:29-35.)    Second, Kim also addresses the need to reduce crowding around the operator when others wish to view the content on the display.    (Kim at 2:53-57.)    And

134

third, Kim teaches that a rotatable display allows the display and keyboard to be protected when the cover is closed.  (Kim at 1:15-18, 42-45; 2:32-37, Fig. 1.)



FIGURE 4          FIGURE 1

214.    The laptop computer in Kim also includes, "[i]n the rear of the body 11, . . . interface ports 19, such as serial and USB."  (Kim at 2:34-35, Fig. 4. (partial).)  It would have been obvious to a POSITA that ports on the back wall of the base would not have been the only location for such ports.  A POSITA would also have understood that Kim primarily disclosed a rotatable display and the description and illustration of other features common to laptop computers is not intended to be limiting.  (*See* Kim at 3:16-32.)  For example, a POSITA would have looked at pre-existing and available laptop computers systems when evaluating port locations with the same design goals in mind as addressed by Kim.  That is, the POSITA would have considered other laptop and electronic systems that (1) maintained portability of the device, (2) considered the position of the laptop operator and others viewing the display, and (3) protected sensitive components.

135



FIGURE 4

215.    As an example, a POSITA looking in this area of technology would have found the

laptop computer disclosed by Sach that includes a plurality of input and output ports.  Sach

addressed the need in the art to have "a portable workstation that has reduced size and weight

and that is easy to carry."  (Sach at 1:29-31.)  Similarly, Kim aimed to maintain the portability of

the laptop computer.  Thus, motivated by a common goal to enhance portability, it would have

been obvious for a POSITA to look at the advantages disclosed by Sach when designing a laptop

computer with the rotatable display of Kim.  In doing so, a POSITA would have seen how Sach

describes multiple ports being accessible from one side of the workstation.  (Sach at 1:59-61;

2:57-60; 3:4-7, Fig. 1.)  And, it would have been obvious for a POSITA to modify Kim by

placing the ports with the same or similar functionality in comparable locations as disclosed by

Sach.

216.    As another example, a POSITA looking in this area would have found the laptop

computer disclosed by Kumar.  Kumar discloses "[a] protective case for housing portable

computers having a keyboard and a display."  (Kumar at Abstract.)  It would have been obvious

for a POSITA to evaluate the benefits of the protective case in Kumar to further the design goal

of Kim to protect the keyboard and display when in the closed position.  Kumar also discloses

multiple input/output ports on the front and side walls of the base that interact with a wide

variety of input/output devices having various functions.  (Kumar at 1:22-25 ("These portable personal computer may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc."); 4:21-24.)  Similarly, it would have been obvious for a POSITA—cognizant of the position of the laptop operator and others viewing the display—to have considering including ports on the front of the laptop—as disclosed in Kumar—to improve the presentation experience of others viewing the display. Moreover, a POSITA would have recognized that input/output ports on or proximate the front wall would have been an obvious location selection (although not the only desirable location) because it would allow the user to connect ancillary devices while displaying content or images from the ancillary devices on the main display to individuals sitting on the opposite side of a table or desk.

217.  As another example, a POSITA looking in this area of technology would have found Satoshi's tablet-integrated personal computer.  Satoshi discloses a tablet and a "tablet connection portion . . . at a position that allows a user to use the tablet 2 without removing their hands from the keyboard." (Satoshi, ¶ [0007].)  In other words, Satoshi evaluated the position of the operator when choosing the location of the tablet connection portion.  (*See* Satoshi, ¶ [0010] ("[T]he invention has the effect of allowing the user to use the tablet . . . even when typing.").) Satoshi shares its design goal with Kim, which also considers the position of the operator and others viewing the display screen.  (*See* Kim at 2:53-57.)  Another objective of Satoshi was to allow the tablet to be stowed inside of the personal computer so the user doesn't forget to bring it along.  (Satoshi, ¶ [Objective].)  Kim also recognized that having non-integrated components (e.g. the tablet in Satoshi or the projector in Kim) reduced the portability advantage of laptop computers.  (*See* Kim at 1:23-37.)  Thus, Kim and Satoshi both disclose a system where the user

137

did not have to remember to bring or be inconvenienced by additional components.  For at least these reasons, a POSITA would have been motivated to combine Kim and Satoshi.

218.   Kim, Sach, Kumar, and Satoshi each describes portable computers.  Because these references deal with portable computers, a POSITA would have had a reasonable expectation of success combining the features of Kim with Sach, Kumar, or Satoshi to produce a laptop computer system having the combined features.  Common design incentives would have motivated a person of skill in the art to combine Kim with Sach, Kumar, or Satoshi.  For example, Sach, Kumar, and Satoshi each provides an added functionality that is not expressly disclosed by Kim, and each provides a benefit derived from that added functionality.  Furthermore, the combination of these references produces a predictable product in the form of a portable computer having the features of Kim plus the features added from Sach, Kumar, and/or Satoshi.  As a result, it is my opinion that a POSITA would have been motivated to combine Kim with Sach, Kumar, or Satoshi.

### 2.    A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Kim with Masaru or Ioka.

219.   It is my opinion that it would have been obvious to a POSITA to modify Kim in view of the knowledge of a POSITA and/or in combination with the teachings of Masaru or Ioka.  Kim, Masaru, and Ioka each discloses a display for a laptop computer that can be rotated about two perpendicular axes.  Each reference uses a rotatable hinge assembly to provide rotation of a laptop display screen about two perpendicular axes.  And, all use the rotatable hinge assembly for similar objectives to improve the convenience, functionality, and usability of laptop computers.  For example, a rotatable display screen improves accessibility and viewing angles relative to the laptop display screen.  (Kim at 1:23-29, 36-38; Masaru, ¶ [0002]; Ioka, ¶ [0003].)

138

Because Masaru and Ioka solve the same issue in a similar way as Kim, a POSITA would have been motivated to consider these references for other beneficial features.

220.   Further, a POSITA would have had a reasonable expectation of success combining Kim with Masaru or Ioka because each reference provides a similar solution and there are a finite number of ways to improve upon the convenience and versatility of the rotatable hinge assembly. For example, Masaru discloses a configuration that allows for the rotation of the display while preventing interference between the display and the base of the laptop.  (Masaru, ¶ [0004].) Similarly, Ioka discloses a configuration that allows for the rotation of the display while preventing unintentional rotation of the display.  (Ioka, ¶ [0007].)  As another example, Masaru and Ioka disclose a rotational stop for the disclosed swivel mechanisms.  (Masaru at ¶ [0010]; Ioka at ¶ [0007].)  A POSITA would have found it obvious and been motivated to combine Kim with Masaru or Ioka to provide a rotation stop to avoid excessive stress on or severing of the communication cable.

### 3.   A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Kim with Anderson.

221.   It is my opinion that it would have been obvious to a POSITA to modify Kim in view of the knowledge of a POSITA and/or in combination with the teachings of Anderson.  Kim and Anderson each discloses a rotatable hinge assembly for a laptop display that provides for rotation of the laptop display about two perpendicular axes.   Additionally, as discussed previously, Kim is concerned with maintaining the portability of the device, enhancing the viewing experience of the operator and others looking at the laptop display, and protecting sensitive components.  (*See supra* ¶¶ 213, 214.)  Similarly, Anderson discloses how that "a hinged cover . . . protects the keyboard when the computer is not being operated."  (Anderson at 1:15-18.)  Anderson also discloses that one disadvantage of a fixed display screen is that viewers

"must crowd behind the personal computer or physically turn the computer base to show the information." (Anderson at 1:30-34.) Accordingly, Kim and Anderson both seek to improve the functionality and usability of a laptop display screen, and a POSITA would have been motivated to combine Kim with Anderson.

222. Further, a POSITA would have had a reasonable expectation of success combining Kim and Anderson because there are a finite number of ways in which these components could have been configured to address Kim's objectives. As one example, Anderson uses stops to limit angular rotation about the vertical axis. (Anderson at Abstract, Figs. 7-9.) It would have been obvious to a POSITA to use the hinge assembly stops of Anderson in the rotatable hinge assembly of Kim. The hinge assembly stops would prevent excessive twisting of the communication cable to avoid accelerated wear and damage to the cable. A POSITA would have combined Kim with Anderson to provide an obvious, simple means to prevent damage to the communication cable between the display and keyboard base. Accordingly, it is my opinion that a POSITA would have been motivated to combine Kim with Anderson.

### 4. Claim 1 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi.

*1.* A computer system comprising:

*[1a]* a) a keyboard unit including a computer keyboard and a keyboard base that includes a front wall and a back wall;

223. Kim teaches a notebook computer that has a body 11 (*keyboard base*) and a hinged cover 12. (Kim at 1:52-56, 2:21-25, Figs. 1-2.) Kim also discloses that the main body (*keyboard base*) of a notebook computer generally carries a keyboard (*computer keyboard*). (Kim at 1:12-17.) The *keyboard unit* of Kim is depicted in Figs. 1 and 2 where "[o]n top of body 11 is a keyboard 16." (Kim at 2:33.) The body (*keyboard base*) includes a *front wall* and a *back wall*. (Kim at Fig. 2.) It is my opinion that Kim teaches the preamble and limitation 1[a].

140



Keyboard Unit

Back Wall

Computer Keyboard

Front Wall

Keyboard Base

*FIGURE 1*

*FIGURE 2*

> [1b]  b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;

224.   Kim discloses that the cover 12 includes a flat screen display (*display screen*) overlying the keyboard that an operator views as he performs various tasks commanded by the keyboard and cursor control.   (Kim at 1:17-22; 2:30-31.)   The operator views *computer-generated images* displayed on the display screen.   The display includes *two side walls* and a *bottom edge* that extends between the side walls.   (Kim at Fig. 2.)   The display has two slots 34 (*two spaced slots*) in the *bottom edge* to receive the ends 32 of hinge 13.   (Kim at 3:4-9, Fig. 6.))   Accordingly, it is my opinion that Kim teaches this limitation.

141



FIGURE 6

FIGURE 2

*[1c]  c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and*

225.   It is my understanding that the term "proximate" has been construed as being "next to, very near, or close to."  (*See supra* ¶ 22.)

226.   Kim discloses a hinge and rotatable joint (collectively, *mounting assembly*) that allows the monitor to rotate about a vertical axis (*rotational motion . . . relative to a first axis*) and a horizontal axis (*pivotal motion . . . relative to a second axis*).  (Kim at 3:1-12.)  The vertical and horizontal axes are perpendicular to each other.  (Kim at 1:52-56, 2:42-57, 3:1-12.) Kim's hinge and rotatable joint (*mounting assembly*) connects the monitor to the base proximate

142

the *back wall* of the *keyboard base*. (*See* Kim, Fig. 4 ("a rear perspective view of the notebook computer showing the hinge 13 and rotatable joint 23").) Kim discloses that the "hinge 13 is integral with rotatable joint 23" and extends *upwardly* from the rotatable joint (*rotatable element*). (Kim at 3:1-2, Fig. 6). Thus, the two ends 32 (*two spaced mounting brackets*) of the hinge also extend upwardly and are received in the two slots 34 (*two spaced slots*) of the display. (Kim at 3:7-9, Fig. 6.) The hinge and rotatable joint (*mounting assembly*), thereby join the monitor (*display screen*) to the *keyboard unit*. Given these features, it is my opinion that Kim discloses this limitation.



Two Spaced Mounting Brackets

Display Screen

Mounting Assembly

Back Wall

Two Space Slots

*FIGURE 6*

Keyboard Unit

*FIGURE 2*

143

> *[1d] d) a port positioned proximate said front wall of said keyboard base, said port adapted to receive a signal from an ancillary computer system;*
>
> *[1e] wherein a signal from said ancillary computer system delivered to said port is effective to generate a computer-generated image on said display screen; and*

227. It is my understanding that the term "port" has been construed as an "interface not including a PC card slot." (*See supra* ¶ 22.) It is also my understanding that the term "proximate" has been construed as being "next to, very near, or close to." (*See supra* ¶ 22.)

228. It is my opinion that Kim modified by the knowledge of a POSITA discloses the limitations of 1[d] and 1[e]. Kim discloses that its laptop includes "interface *ports* 19, such as serial and USB." (Kim at 2:34-35 (emphasis added).) A POSITA would have known that a flat screen display inherently displays computer-generated images regardless of whether the images are generated from internal signals or from external signals. For example, under Blackbird's infringement theory, Kim's USB port could be used to *receive a signal from an ancillary computer* and that *signal* could *generate a computer-generated image on said display screen.* (Pl.'s Infringement Contentions, Ex. A at A-9 (July 24, 2017) ("The USB 3.0 connector on the ThinkPad Twist is adapted to receive a signal from an ancillary computer system that is effective to generate a computer-generated image on the display screen.").) Kim shows these ports to be "[i]n the rear of body." (Kim at 2:34-35.) A POSITA, however, would have known that these ports could be relocated elsewhere on the laptop computer including proximate the *front wall* of the *keyboard base.* A POSITA would have been familiar with the prior art that discloses *ports positioned proximate said front wall of said keyboard base* (as discussed below). For these reasons, it is my opinion that Kim in view of the knowledge and common sense of a POSITA renders this limitation obvious.

144



Interface Ports (such as USB)

*FIGURE 4*

229.   It is also my opinion that limitations 1[d] and 1[e] are also disclosed by the combination of Kim with Sach.  Although Sach is primarily directed to a self-contained tactical workstation, Sach discloses features of portable computers that were common at the time of the invention of the '931 patent, particularly the types of connections to other devices that computers had and the port arrangements that were commonly used for communicating with these devices. Sach discloses various types of *ports* including "a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d."  (Sach at 3:4-7.)  More specifically, Sach discloses "a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 19e for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19f for connection to the display panel 13."  (Sach at 3:35-42.)  Sach describes these *ports* as being accessible from one side of the workstation.  (Sach at 1:59-61; 2:57-60; 3:4-7, Fig. 1.) Under plaintiff's infringement theory, the location of the parallel port 19c or the serial port 19d

145

would satisfy the court's construction of being proximate the front wall. Further, under plaintiff's infringement theory, the LAN, AUI, SCSI, parallel, and serial ports can be used to interface with a variety of devices including an *ancillary computer system* through which a *computer-generated image* could be displayed on the display screen.

230. Input/output ports, such as those disclosed in Sach, could be placed on other portable computer systems, like the portable computer system described by Masaru. Given the specific arrangement of the ports in Sach, a POSITA combining Kim and Sach would have been motivated to arrange the ports in the same or a similar manner. Kim does not show any obstructions that would prevent placement of the ports in the arrangement shown by Sach. As a result, a POSITA would have had a reasonable expectation of success when combining the teachings of Kim and Sach. Under plaintiff's infringement theory, a POSITA would have known that the input/output ports in Sach, particularly the disclosed LAN port 19a, SCSI port 19b, parallel port 19c and serial port 19d, could be used by Kim's laptop to communicate with ancillary computer systems and generate an image on the laptop's display from a signal received from the ancillary computer system. (*See* '931 patent at 5:65-6:14 ("Port 112 generally constitutes a 15 pin D-sub video connector, serial port, parallel port and/or universal serial bus ("USB"), . . . or an IEEE 1394 port.").) Accordingly, it is my opinion that Kim in view of Sach discloses limitations 1[d] and 1[e] of the '931 patent.

146



FIG. 1

231.    It is also my opinion that limitations 1[d] and 1[e] are disclosed by the combination of Kim with Kumar.  Although Kumar is primarily directed to a carrying case for a portable computer, Kumar discloses features of portable computers that were common at the time of the invention of the '931 patent.  Kumar discloses that a "portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8."  (Kumar at 4:21-24; Fig. 4.)  Kumar also discusses that laptop computers interact with a variety of types of input/output devices with a variety of functions and features, including "printers, light pens, image scanners, video scanners, etc." (Kumar at 1:22-25.)  Kumar discloses ports on the front wall and side wall that, according to Blackbird's interpretation of the claim, satisfies the proximate limitation.  The disclosed input/output ports could be used under plaintiff's infringement theory to interface with a variety of devices and are capable of receiving a signal from an ancillary computer input device and generating a computer-generated image on the display screen from the received signal.

232.    Input/output ports, such as those disclosed in Kumar, could be combined with other laptop computers and positioned proximate the front wall of the laptop base.  Given the express disclosure of a port in the front wall or side wall of a portable computer, a POSITA

147

combining Kim and Kumar would have been motivated to arrange the ports in the same or a similar manner. Kim describes a portable computer having a particular type of display and does not show any obstructions that would prevent placement of a port proximate the front wall, so a POSITA would have had a reasonable expectation of success when combining the teachings of Kim and Kumar. Under plaintiff's infringement theory, a POSITA would have known that the input/output ports on the front and side walls of the base in Kumar could be used by Kim's laptop to communicate with ancillary computer systems and generate an image on the laptop's display from a signal received from the ancillary computer system. This is particularly true given Kumar's mention of light pens, image scanners, and video scanners, which would each create or modify an image on the display, though many other devices were known at the time of the invention of the '931 patent. Further, a POSITA would have been familiar at the time of the invention of the '931 patent with display ports that would have allowed the laptop computer system to project computer-generated images from connected computer systems. (*See* '931 patent at 5:65-6:14 ("Port 112 generally constitutes a 15 pin D-sub video connector, serial port, parallel port and/or universal serial bus ("USB"), . . . or an IEEE 1394 port.").) Accordingly, it is my opinion that a POSITA would have been motivated to combine Kim with Kumar, which combination discloses limitations 1[d] and 1[e] of the '931 patent.



FIG−4

148

233.  Similarly, it is my opinion that limitations 1[d] and 1[e] are also disclosed by the combination of Kim with Satoshi.  For example, a POSITA looking to add common features to Kim's laptop, including generating *a computer generated image* on the laptop's *display screen* from external components such as an ancillary computer system, would have found Satoshi's tablet-integrated computer that discloses connecting a tablet (*ancillary computer system*) to a connector (*port*) "that allows pointing/movement of a cursor . . . displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information."  (Satoshi, ¶ [0007]; Fig. 1.)  A POSITA would have understood that Satoshi's tablet was an ancillary computer system that sent signals to the disclosed laptop that were effective to generate computer-generated images on the laptop's display screen.  It would have been obvious for a POSITA to modify the laptop of Kim with the type of *port* disclosed in Satoshi.  Specifically, by using a tablet as an input device, the functionality of Kim would be augmented with the advantages of Satoshi by allowing a user to input and display "handwritten information such as graphics and text information."  Alternatively, a POSITA may have chosen to use the "tablet connector portion" for the display of other types of *computer generated images*.

234.  Satoshi also discloses that the "tablet connection portion" is located on "a front side portion of the personal computer keyboard, that allows the user to use the tablet without removing their hands from the keyboard."  (Satoshi, ¶ [0010]).  Accordingly, the user is able "to use the tablet . . . even when typing."  (Satoshi, ¶ [0010]).  In order for a user to maintain control of both the laptop and the ancillary computer system, placement of the port proximate the front wall of the laptop, as shown by Satoshi under Blackbird's interpretation of the proximate limitation, would have been obvious to a POSITA.  Kim discloses no feature next to the front wall of the device that would conflict or hinder the port or tablet disclosed by Satoshi.  A

149

POSITA, therefore, would have had a reasonable likelihood of success at augmenting the computer system described by Kim with the additional functionality described by Satoshi because both devices are portable computer systems. Accordingly, it is my opinion that Kim in view of Satoshi discloses limitations 1[d] and 1[e] of the '931 patent.



*[1f] wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen.*

235.    It is my understanding that the Court has construed "directly" as used in "wherein a communication conduit extends from said keyboard base directly into said intermediate region" as "passing through the mounting assembly, but no other structure."

236.    Kim discloses that the *bottom edge* of the *display screen* has an *intermediate region* between the *pair of slots* 34. (Kim at Figs. 2, 3.) Kim also discloses that power and data lines 30 (*communication conduit*) pass from the body 11 (*keyboard base*) through hinge 13 and rotatable joint 23 (*collectively, mounting assembly*) and through a slot 34 (*slot*). (Kim at 3:3-5, Fig. 6; *see* Pl. Final Infringement Contentions, Ex. A at A-11 (July 24, 2017) ("As its name

implies, the LCD cable is a conduit through which display information is communicated from the processing elements on the laptop top to the LCD display, and constitutes a 'communication conduit,' as claimed.").)).  Accordingly, the route of the power and data lines 30 (*communication conduit*) pass directly into the intermediate region.  Accordingly, it is my opinion that Kim discloses limitation 1[f] of claim 1.



*FIGURE 6*

*FIGURE 2*

237.  The claim chart below provides exemplary disclosures from Kim alone or in combination with Satoshi, Kumar, and/or Sach that in my opinion render claim 1 obvious.

| Limitation | Kim, Sach, Kumar, or Satoshi |
|---|---|
| **1[pre]**. A computer system comprising: | **Kim:**<br>*See, e.g.:*<br>**Abstract:** "A notebook computer has a body cover which is hinged to a support rotatably carried by the body."<br>**1:8-10**: "This invention relates generally to notebook computers, and more particularly to notebook computers having a two-way or dial display."<br>**1:52-56**: "There is provided a notebook computer having a body and a cover which is hinged to a support rotatably carried by the body. The cover has a main display which in a closed position overlies the body and in an open position pivots and rotates the main display away from the body." |
| **[1a]** a) a keyboard unit including a computer keyboard and a keyboard base that includes a front wall and a back wall; | **Kim:**<br>*See, e.g.:*<br>**1:12-22:** "Notebook computers generally have a main body which houses the processor and associated electronic components, disk drives, cursor control and switches. A keyboard is carried by the upper surface of the main body, and a cover is suitably hinged to the body whereby in its closed position it covers and protects the keyboard. The cover includes a flat screen display such as an active matrix or LCD display. In the closed position the display overlies the keyboard. In the open position it generally faces the keyboard whereby the operator views the display as he performs various tasks commanded by the keyboard and cursor control."<br>**2:29-41:** "FIGS. 2 and 3 show notebook computer 10 with cover 12 in a raised position. On the bottom of cover 12 is a main display 21, for example a matrix or liquid crystal display. Display 21 is protected by cover 12 when in a lowered position. On top of body 11 is a keyboard 16, cursor control 17, and switches and controls 18. In the rear of body 11 are interface ports 19, such as serial and USB. Cover 12 overlies and protects keyboard 16, cursor control 17, and switches and controls 18, as well as protecting main display 21. In accordance with another feature of the present invention, the rear of cover 12 houses an auxiliary display 26, which lies against cover 12 when in the closed position, as shown in FIGS. 1 and 3."<br>**Figs. 1, 2** |
| **[1b]** b) a display screen for displaying computer-generated images, said display screen defining first and second side | **Kim**<br>*See, e.g.:*<br>**Abstract:** "A notebook computer has a body cover which is hinged to a support rotatably carried by the body." |

152

| Limitation | Kim, Sach, Kumar, or Satoshi |
|---|---|
| walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge; | **1:8-10:** "This invention relates generally to notebook computers, and more particularly to notebook computers having a two-way or dial display." <br> **1:12-22:** "Notebook computers generally have a main body which houses the processor and associated electronic components, disk drives, cursor control and switches. A keyboard is carried by the upper surface of the main body, and a cover is suitably hinged to the body whereby in its closed position it covers and protects the keyboard. The cover includes a flat screen display such as an active matrix or LCD display. In the closed position the display overlies the keyboard. In the open position it generally faces the keyboard whereby the operator views the display as he performs various tasks commanded by the keyboard and cursor control." <br> **1:52-56:** "There is provided a notebook computer having a body and a cover which is hinged to a support rotatably carried by the body. The cover has a main display which in a closed position overlies the body and in an open position pivots and rotates the main display away from the body." <br> **2:29-41:** "FIGS. 2 and 3 show notebook computer 10 with cover 12 in a raised position. On the bottom of cover 12 is a main display 21, for example a matrix or liquid crystal display. Display 21 is protected by cover 12 when in a lowered position. On top of body 11 is a keyboard 16, cursor control 17, and switches and controls 18. In the rear of body 11 are interface ports 19, such as serial and USB. Cover 12 overlies and protects keyboard 16, cursor control 17, and switches and controls 18, as well as protecting main display 21. In accordance with another feature of the present invention, the rear of cover 12 houses an auxiliary display 26, which lies against cover 12 when in the closed position, as shown in FIGS. 1 and 3." <br> **Figs. 2, 6** |
| **[1c]** c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard | **Kim** <br> *See, e.g.:* <br> **1:52-56:** "There is provided a notebook computer having a body and a cover which is hinged to a support rotatably carried by the body. The cover has a main display which in a closed position overlies the body and in an open position pivots and rotates the main display away from the body." <br> **2:42-57:** "When cover 12 is in the lowered position, latching mechanism 14 releases cover 12, which pivots about hinge 13, so that cover 12 reveals main display 21 to an operator. When main display 21 is in a raised position and oriented as |

153

| Limitation | Kim, Sach, Kumar, or Satoshi |
|---|---|
| unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and | shown in FIG. 2 the operator and immediately adjacent observers have a view of the images on main display 21, but observers across from the operator cannot see the images.<br><br>    In order for observers across from operator to view images, main display 21 rotates about a rotatable joint 23 to face an observer across from operator, as shown in FIG. 4. Main display 21 also pivots about hinge 13 for a better viewing angle for observer. This enables the operator to make a presentation to others without the aid of a projector or the inconvenience of having the others crowd around the operator to view the display from the same side as the operator."<br><br>**3:1-12:** "FIG. 6 shows cover 12 removed from hinge 13. In one embodiment hinge 13 is integral with rotatable joint 23. Power and data lines 30 connect cover 12 with body 11 through hinge 13 and rotatable joint 23. Lines 30 enter body 11 through a slot 34. Slot 34 is in a socket 36 and is long enough to allow free movement for lines 30 while cover 12 rotates about rotatable hinge 23.  Receptors 34 of cover 12 slidably receive the ends 32 of hinge 13 and enable cover 12 to pivot about hinge 13. Rotatable joint 23 fits into socket 36 and is secured with screw 38 and cap 40 from the underside of socket 36, within body 11. Other embodiments include a ball and socket joint."<br><br>**Figs. 2, 6.** |
| **[1d]** d) a port positioned proximate said front wall of said keyboard base, said port adapted to receive a signal from an ancillary computer system; | **Kim**<br>*See, e.g.:*<br>**1:52-56:** "There is provided a notebook computer having a body and a cover which is hinged to a support rotatably carried by the body. The cover has a main display which in a closed position overlies the body and in an open position pivots and rotates the main display away from the body."<br>**2:29-41:** "FIGS. 2 and 3 show notebook computer 10 with cover 12 in a raised position. On the bottom of cover 12 is a main display 21, for example a matrix or liquid crystal display. Display 21 is protected by cover 12 when in a lowered position. On top of body 11 is a keyboard 16, cursor control 17, and switches and controls 18. In the rear of body 11 are interface ports 19, such as serial and USB. Cover 12 overlies and protects keyboard 16, cursor control 17, and switches and controls 18, as well as protecting main display 21. In accordance with another feature of the present invention, the rear of cover 12 houses an auxiliary display 26, which lies against cover 12 when in the closed position, as shown in FIGS. 1 and 3."<br>**2:42-57:** "When cover 12 is in the lowered position, latching |

154

| Limitation | Kim, Sach, Kumar, or Satoshi |
|---|---|
|  | mechanism 14 releases cover 12, which pivots about hinge 13, so that cover 12 reveals main display 21 to an operator. When main display 21 is in a raised position and oriented as shown in FIG. 2 the operator and immediately adjacent observers have a view of the images on main display 21, but observers across from the operator cannot see the images. In order for observers across from operator to view images, main display 21 rotates about a rotatable joint 23 to face an observer across from operator, as shown in FIG. 4. Main display 21 also pivots about hinge 13 for a better viewing angle for observer. This enables the operator to make a presentation to others without the aid of a projector or the inconvenience of having the others crowd around the operator to view the display from the same side as the operator." **3:1-12:** "FIG. 6 shows cover 12 removed from hinge 13. In one embodiment hinge 13 is integral with rotatable joint 23. Power and data lines 30 connect cover 12 with body 11 through hinge 13 and rotatable joint 23. Lines 30 enter body 11 through a slot 34. Slot 34 is in a socket 36 and is long enough to allow free movement for lines 30 while cover 12 rotates about rotatable hinge 23. Receptors 34 of cover 12 slidably receive the ends 32 of hinge 13 and enable cover 12 to pivot about hinge 13. Rotatable joint 23 fits into socket 36 and is secured with screw 38 and cap 40 from the underside of socket 36, within body 11. Other embodiments include a ball and socket joint." **Fig. 4** <br><br> **Kumar** *See, e.g.:* **1:15-25:** "Since the advent of the personal computer, manufacturers and industrial users have continually developed faster, smaller and more versatile machines, including portable computers that are dedicated to perform a specific function such as word processing, data collection or item identification. Alternatively, portable computers may be all purpose computing machines capable of running a variety of types of software programs. These portable personal computers may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc." **4:21-24:** "Additionally, portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8." |

| Limitation | Kim, Sach, Kumar, or Satoshi |
|---|---|
|  | **Fig. 4** <br><br> **<u>Satoshi</u>** <br> *See, e.g.:* <br> **[0007]**:  "As illustrated in FIG. 1, a tablet stowing portion 3 for stowing a tablet 2 may, for example, be provided on the side of the body.  A tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard. The tablet 2, provided in place of the trackball, is a pointing device that allows pointing/movement of a cursor (not shown in the drawings) displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information." <br> **Fig. 1** <br><br> **<u>Sach</u>** <br> *See, e.g.:* <br> **1:59-61:**  "A two-slot VME processor box is disposed in the housing and is designed to receive two VME cards that are slid into the VME processor box from one side of the workstation." <br> **2:57-60:**  "A two-slot VME processor box 16 is disposed in the housing 11 and is designed to receive two VME cards 17 (one of which is shown) which are slid into the VME processor box 16 from one side of the workstation 10." <br> **3:4-7:**  "The [VME] processor card 17 has a plurality of input and output ports 19, including a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d." <br> **3:35-42:**  "The VME processor card 17 has a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 1ge for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19/ for connection to the display panel 13." <br> **Fig. 1** |
| **[1e]** wherein a signal from said ancillary computer system delivered to said port is effective to generate a computer-generated image on said display screen; | **<u>Kim</u>** <br> *See* **claim chart in this table for Kim citations for limitations [1d] immediately above** <br><br> **<u>Kumar</u>** |

| Limitation | Kim, Sach, Kumar, or Satoshi |
|---|---|
| and | *See* **claim chart in this table for Kumar citations for limitations [1d] immediately above**<br><br>**Satoshi**<br>*See* **claim chart in this table for Satoshi citations for limitations [1d] immediately above**<br><br>**Sach**<br>*See* **claim chart in this table for Sach citations for limitations [1d] immediately above** |
| **[1f]** wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen. | **Kim**<br>*See, e.g.:*<br>**3:1-12:** "FIG. 6 shows cover 12 removed from hinge 13. In one embodiment hinge 13 is integral with rotatable joint 23. Power and data lines 30 connect cover 12 with body 11 through hinge 13 and rotatable joint 23. Lines 30 enter body 11 through a slot 34. Slot 34 is in a socket 36 and is long enough to allow free movement for lines 30 while cover 12 rotates about rotatable hinge 23. Receptors 34 of cover 12 slidably receive the ends 32 of hinge 13 and enable cover 12 to pivot about hinge 13. Rotatable joint 23 fits into socket 36 and is secured with screw 38 and cap 40 from the underside of socket 36, within body 11. Other embodiments include a ball and socket joint."<br>**Figs. 2, 6.** |

### 5. Claim 2 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi.

*2. A computer system according to claim 1, further comprising a central processing unit mounted within said keyboard unit.*

238.   Claim 2 depends from claim 1 and adds: *"further comprising a central processing unit mounted within said keyboard unit."*   Kim alone or in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.C.4.)

239.   Kim discloses that laptop computers generally have a body 11 which houses the processor (*central processing unit*).  (Kim at 1:12-22; 2:22-28, Fig. 2)  As discussed previously, Kim also discloses a *keyboard unit* comprising a main body (*keyboard base*), which includes a keyboard (*computer keyboard*).  (Kim at 1:12-17; 2:33, Figs 1, 2.)  Because the *keyboard base* is

157

part of the *keyboard unit*, Kim discloses *a central processing unit mounted within said keyboard unit.* Accordingly, it is my opinion that Kim discloses the additional limitations of claim 2. And, it is my opinion that Kim alone or in combination with Sach, Kumar, or Satoshi renders claim 2 obvious.



FIGURE 1                                   FIGURE 2

240. The claim chart below provides exemplary disclosures from Kim that in my opinion disclose the elements of claim 2.

| Limitation | Kim |
|---|---|
| **2.** A computer system according to claim 1, further comprising a central processing unit mounted within said keyboard unit. | **Kim**<br>*See, e.g.:*<br>**1:12-22:** "Notebook computers generally have a main body which houses the processor and associated electronic components, disk drives, cursor control and switches. A keyboard is carried by the upper surface of the main body, and a cover is suitably hinged to the body whereby in its closed position it covers and protects the keyboard. The cover includes a flat screen display such as an active matrix or LCD display. In the closed position the display overlies the keyboard. In the open position it generally faces the keyboard whereby the operator views the display as he performs various tasks commanded by the keyboard and cursor control."<br>**2:22-28:** "FIG. 1 shows a laptop or notebook computer 10 of the present invention. Notebook computer 10 includes a body 11 with a cover 12 that folds about the hinge 13 located at the back of computer 10 and is locked in closed position by a |

158

| Limitation | Kim |
|---|---|
| | suitable latching mechanism 14.  Body 11 houses the actual computer components, such as processors, disk drives, modem, microphone, speakers, etc." **Figs. 1, 2.** |

### 6. Claim 3 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi.

*3. A computer system according to claim 1, wherein said display screen is a flat screen unit.*

241.   Claim 3 depends from claim 1 and adds:  *"wherein said display screen is a flat screen unit."*  Kim alone or in combination Sach, Kumar, or Satoshi renders claims 1 obvious. (*See supra* Part VI.C.4.)

242.   Kim discloses that the cover 12 includes a flat screen display 12 (*flat screen unit*) such as an active matrix or LCD display.  (Kim at 1:12-22, 2: 29-41, Fig. 2)  Accordingly, Kim discloses the additional limitations of dependent claim 3.  It is my opinion that Kim alone or in combination with Sach, Kumar, or Satoshi renders claim 3 obvious.



FIGURE 2

243.   The claim chart below provides exemplary disclosures from Kim that disclose the additional limitations in claim 3.

| Limitation | Kim |
|---|---|
| **3.** A computer system according to claim 1, wherein said display screen is a flat screen unit. | **Kim**<br>*See, e.g.:*<br>**1:12-22:** "Notebook computers generally have a main body which houses the processor and associated electronic components, disk drives, cursor control and switches. A keyboard is carried by the upper surface of the main body, and a cover is suitably hinged to the body whereby in its closed position it covers and protects the keyboard. The cover includes a flat screen display such as an active matrix or LCD display. In the closed position the display overlies the keyboard. In the open position it generally faces the keyboard whereby the operator views the display as he performs various tasks commanded by the keyboard and cursor control."<br><br>**2:29-41:** "FIGS. 2 and 3 show notebook computer 10 with cover 12 in a raised position. On the bottom of cover 12 is a main display 21, for example a matrix or liquid crystal display. Display 21 is protected by cover 12 when in a lowered position. On top of body 11 is a keyboard 16, cursor control 17, and switches and controls 18. In the rear of body 11 are interface ports 19, such as serial and USB. Cover 12 overlies and protects keyboard 16, cursor control 17, and switches and controls 18, as well as protecting main display 21. In accordance with another feature of the present invention, the rear of cover 12 houses an auxiliary display 26, which lies against cover 12 when in the closed position, as shown in FIGS. 1 and 3."<br>**Fig. 2** |

7.    **Claim 6 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi.**

> **6.** *A computer system according to claim 1, wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees.*

244.    Claim 6 depends from claim 1 and adds: "*wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees.*" Kim alone or in combination with Satoshi, Kumar, or Kim renders claims 1 obvious. (*See supra* Part VI.C.4.)

160

245.    Kim also discloses that the display (*display screen*) rotates about a rotatable joint 23 (together with hinge 13, *mounting assembly*) relative to the body (*keyboard base*) to face an observer across from the user while the user continues to operate the computer.  (Kim at 1:52-56, 2:42-57; *compare* Kim Fig. 2; *with* Kim Fig. 4).  In addition, Kim discloses that the display can rotate "through an angle from 1 to 180 degrees."  (Kim at 4:15-16).  Accordingly, Kim discloses the *one hundred eighty degree* angular motion limitation.  And, it is my opinion that Kim alone or in combination with Sach, Kumar, or Satoshi renders claim 6 obvious.



FIGURE 2                               FIGURE 4

246.    The claim chart below provides exemplary disclosures from Kim that disclose the additional limitations of claim 6.

| Limitation | Kim |
|---|---|
| **6.** A computer system according to claim 1, wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees. | **Kim**<br>*See, e.g.:*<br>**1:52-56:**  "There is provided a notebook computer having a body and a cover which is hinged to a support rotatably carried by the body. The cover has a main display which in a closed position overlies the body and in an open position pivots and rotates the main display away from the body."<br>**2:44-57:**  "When main display 21 is in a raised position and oriented as shown in FIG. 2 the operator and immediately adjacent observers have a view of the images on main display 21, but observers across from the operator cannot see the images. |

161

| Limitation | Kim |
|---|---|
|  | In order for observers across from operator to view images, main display 21 rotates about a rotatable joint 23 to face an observer across from operator, as shown in FIG. 4. Main display 21 also pivots about hinge 13 for a better viewing angle for observer.  This enables the operator to make a presentation to others without the aid of a projector or the inconvenience of having the others crowd around the operator to view the display from the same side as the operator." **4:15-16:** "The notebook computer of claim 2 Wherein the cover rotates through an angle from 1 to 180 degrees." **Figs. 2, 4** |

### 8.    Claim 8 is obvious over Kim alone or in combination Sach, Kumar, or Satoshi.

> *8. A computer system according to claim 1, wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer.*

247.   Claim 8 depends from claim 1 and adds:  "wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer."   Kim alone or in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (See supra Part VI.C.4.)

248.   As discussed previously, Kim discloses that its laptop includes "interface ports 19, such as serial and USB.  (Kim at 2:34-35 (emphasis added).)  Under Blackbird's infringement theory, a USB port could be used to receive a signal from an *ancillary computer system*, including *a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer*.  (Pl.'s Infringement Contentions, Ex. A at A-9 (July 24, 2017) ("The USB 3.0 connector on the ThinkPad Twist is adapted to receive a signal from an ancillary computer system that is effective to generate a computer-generated

image on the display screen."); *see also id.* at A-14 (Plaintiff's contention that the USB 3.0 port on the accused device satisfies claim 8). For these reasons, it is my opinion that Kim in view of the knowledge and common sense of a POSITA discloses the additional limitations of claim 8 and that Kim alone or in combination with Sach, Kumar, or Satoshi renders claim 8 obvious.



*FIGURE 4*

249. Additionally (to the extent necessary), it is my opinion that the combination of Kim with Sach or Kumar renders obvious the additional limitations in claim 8. As described for claim 1 above (*see supra* ¶¶ 229-234232), Sach and Kumar teach a plurality of input/output ports on the front and side walls of a laptop's base. (Sach at 3:4-7, 3:35-42; Kumar at 4:21-24, Fig. 4.) The input/output ports of Sach and Kumar suggest to a POSITA that ancillary devices could be connected to input/output ports. (Sach at 3:35-42; Kumar at 1:22-25.) For example, Kumar teaches that input/output devices, such as printers, light pens, image scanners, video scanners, etc., could be connected to the input/output ports of the laptop. (Kumar 1:22-25.) In addition to these exemplary devices disclosed by Kumar, a POSITA would understand that many other types of input/output devices including *ancillary computer systems* could be connected to a laptop via appropriate input/output ports proximate the front wall of the base. These ancillary devices could include one of *a desktop computer, a personal digital assistant, a palmtop computer, a*

163

*hand-held computer, an electronic book, and a pocket computer.* Accordingly, it is my opinion that the combination of Kim with Sach or Kumar renders claim 8 obvious.



Sach, Fig. 1                                              Kumar, Fig. 4

250.    As another example, it is also my opinion that claim 8 would have been obvious in view of Kim with Satoshi. As described for claim 1 (*see supra* ¶¶ 233-234), Satoshi discloses a tablet-integrated personal computer that uses a tablet as an input device that can be "removably stowed at predetermined position within the personal computer body." (Satoshi, ¶ [0005], Fig. 1). The tablet allows for a user's handwritten graphics to be displayed on the display of the personal computer. (Satoshi, ¶ [0007].) The tablet inherently includes some processing ability to transform the strokes made by a user into data transmitted to the personal computer. Thus, a POSITA would have considered the disclosed tablet to be an example of a palm top computer, hand-held computer, electronic book, or pocket computer. For these reasons, it is my opinion that the tablet in Satoshi could be characterized as one or more of the *ancillary computer systems* listed in claim 8. Accordingly, it is my opinion that the combination of Kim with Satoshi renders claim 8 obvious.

164



[FIG. 1]

251.   The claim chart below provides exemplary disclosures from Kim, Sach, Kumar, and/or Satoshi that disclose the elements of claim 8.

| Limitation | Kim, Sach, Kumar, or Satoshi |
|---|---|
| **8.** A computer system according to claim 1, wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer. | **Kim**<br>*See, e.g.:*<br>**2:29-41:**  "FIGS. 2 and 3 show notebook computer 10 with cover 12 in a raised position. On the bottom of cover 12 is a main display 21, for example a matrix or liquid crystal display. Display 21 is protected by cover 12 when in a lowered position. On top of body 11 is a keyboard 16, cursor control 17, and switches and controls 18. In the rear of body 11 are interface ports 19, such as serial and USB. Cover 12 overlies and protects keyboard 16, cursor control 17, and switches and controls 18, as well as protecting main display 21. In accordance with another feature of the present invention, the rear of cover 12 houses an auxiliary display 26, which lies against cover 12 when in the closed position, as shown in FIGS. 1 and 3."<br>**Fig. 4**<br><br>**Sach**<br>*See, e.g.:*<br>**1:59-61:**  "A two-slot VME processor box is disposed in the housing and is designed to receive two VME cards that are slid into the VME processor box from one side of the workstation."<br>**2:57-60:**  "A two-slot VME processor box 16 is disposed in the housing 11 and is designed to receive two VME cards 17 |

165

| Limitation | Kim, Sach, Kumar, or Satoshi |
|---|---|
| | (one of which is shown) which are slid into the VME processor box 16 from one side of the workstation 10." **3:4-7:** "The [VME] processor card 17 has a plurality of input and output ports 19, including a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d." (Sach at 3:4-7; see FIG. 1). **3:35-42:** "The VME processor card 17 has a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 1ge for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19/ for connection to the display panel 13." **Fig. 1** <br><br> **Kumar** *See, e.g.:* **1:15-25:** "Since the advent of the personal computer, manufacturers and industrial users have continually developed faster, smaller and more versatile machines, including portable computers that are dedicated to perform a specific function such as word processing, data collection or item identification. Alternatively, portable computers may be all purpose computing machines capable of running a variety of types of software programs. These portable personal computers may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc." **4:21-24:** "Additionally, portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8." **Fig. 4** <br><br> **Satoshi** *See, e.g.:* **[0005]:** "To solve the above-described problem, the tablet-integrated personal computer of the present invention uses a tablet as the pointing device, and is provided with a stowing portion in which the tablet can be removably stowed at predetermined position within the personal computer body, and a tablet connection portion for connecting the tablet at a |

| Limitation | Kim, Sach, Kumar, or Satoshi |
|---|---|
| | predetermined position on the personal computer body." **[0007]:** "As illustrated in FIG. 1, a tablet stowing portion 3 for stowing a tablet 2 may, for example, be provided on the side of the body. A tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard. The tablet 2, provided in place of the trackball, is a pointing device that allows pointing/movement of a cursor (not shown in the drawings) displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information. When the personal computer 1 is carried around, the tablet 2 is stowed in the tablet stowing portion 3. The tablet stowing portion 3 is provided with a lock mechanism not shown in the drawings to ensure that the tablet 2 is not jolted out by impacts that occur while the personal computer 1 is being carried. When used, the tablet 2 is taken out of the tablet stowing portion 3 and connected to the tablet connection portion 4." **Fig. 1** |

9.    **Claim 9 is obvious over Kim in combination with Anderson, Masaru, or Ioka alone or in further combination with Sach, Kumar, or Satoshi.**

> **9.** *A computer system according to claim 1, further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base.*

252.    Claim 9 depends from claim 1 and adds: *"further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base."* Kim alone or in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (*See supra* Part VI.C.4.)

253.    Kim does not expressly disclose *at least one stop for limiting rotational motion.* A POSITA, however, would recognize the need to design a swivel and tilt mechanism that did not over twist the communication conduit. With this design requirement, a POSITA would have looked to Anderson and its disclosure of a swivel mechanism with a stop because the stop would prevent excessive twisting of the conduit from continual and over rotation in the same direction.

167

Rotational stops limit twisting of the communication conduit.  Anderson teaches stop tabs 72 positioned in the swivel mechanism to contact stop blocks 70 and limit the rotation about the vertical axis of the swivel mechanism and the display screen.  (Anderson at 4:63-5:2, 5:7-18, Fig. 7, Fig. 9.)  Accordingly, it is my opinion that Kim combined with Anderson alone or in further view of Sach, Kumar, or Satoshi renders claim 9 obvious.



254.   It is also my opinion that claim 9 would have been obvious over Kim combined with Masaru alone or in further view of Sach, Kumar, or Satoshi.  A POSITA, looking to design a rotatable hinge assembly that did not over twist the communication conduit, would also have found Masaru and its disclosure of a display holding structure that "offers sufficient degrees of freedom for the rotation range of the display device and prevents interference between the display device and the main body unit."  (Masaru, ¶ [0004]).  Masaru teaches rotating member 9 is allowed to rotate with respect to fixed member 11 depending on whether stopper 6 is engaged.

168

(Masaru, ¶ [0010])  Accordingly, it is my opinion that Kim combined with Masaru alone or in further view of Sach, Kumar, or Satoshi renders claim 9 obvious.





255.   It is further my opinion that claim 9 would have been obvious over Kim combined with Ioka alone or in further view of Sach, Kumar, or Satoshi.  A POSITA, looking to design a swivel and tilt mechanism that did not over twist the communication conduit, would also have found Ioka and its disclosure of a rotatable display connection part.  (Ioka, ¶ [0006], Fig. 1.) Ioka also describes an angle restriction part (*stop*) for limiting rotational motion of the display part 20.  Ioka states that "the inside of the fixing part 100 has . . . a vertical member support part 110 that has an angle restriction part that is composed of a projection that restricts the angle of rotation of the vertical part 50 to a range from +180° to -180°."  (Ioka, ¶ [0007].)  Additionally,

169

Ioka discloses that the angle restrict part along with the impelling part "prevent the display part from rotating unintentionally when it is being carried, and to prevent the wire between the main unit and the display part from being severed." (Ioka, ¶ [0007].) It is therefore my opinion that a POSITA would have been motivated to combine Kim with Ioka alone or in further view of Sach, Kumar, or Satoshi, and that claim 9 is rendered obvious by this combination.



256. The claim chart below provides exemplary disclosures from Anderson, Masaru, and/or Ioka that disclose the elements of claim 9.

| Limitation | Anderson, Masaru, or Ioka |
|---|---|
| **9.** A computer system according to claim 1, further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base. | **Anderson**<br>*See, e.g.:*<br>**4:63-5:2:** "The peripheral edge of the swivel disk 46 rides in a channel or groove 62 formed on the inner circumference of the mounting ring 54. The groove 62 retains the swivel disk 46 in a close sliding fit. A stop block 70 is provided within the groove 62 approximately 90° around the perimeter of the ring 54 from the adjoining ends (i.e., approximately halfway between the two ends)."<br><br>**5:7-18:** "The outer rim of the disk 46 includes two outwardly projecting stop tabs 72, spaced apart from each other by approximately 120° around the perimeter of the disk. The stop tabs 72 project within the groove 62 of the mounting ring 54 to contact the stop blocks 70. Both stop tabs 72 are disposed angularly forward of the stop blocks 70, and the orientation of the stop tabs 72 is such that the swivel disk 46 has a 60° range of movement. Thus, as in the illustration of Fig. 7, the swivel disk 46 may turn 30° from the neutral |

170

| Limitation | Anderson, Masaru, or Ioka |
|---|---|
|  | position shown in either direction of arrow 52 before the stop tabs 72 hit the stop blocks 70." <br><br> **Figs. 7, 9** <br><br> **Masaru** <br> *See, e.g.:* <br> **[0010]: "**As illustrated in FIG. 1(b) and FIG. 3, the lower end 6b of the stopper 6 is engaged with the recess portion 11b of the fixed member 11, the upper end 6a of the stopper 6 is in contact with the outer peripheral surface of the angle limiting member 5, and the movement of stopper 6 is restricted to the vertical direction (direction of the arrow A).  Therefore, the engagement between the lower end 6b of the stopper 6 and recess portion 11b of the fixed member 11 is not released, and the rotating member 9 is unable to rotate with respect to the fixed member 11.  . . .  Fig. 7 shows the state of the display device 13 in FIG. 1(b) and FIG. 3, with the display device 13 being unable to rotate in the left-right direction (direction of arrow D), and being able to rotate freely in the open-close direction (direction of arrow E)." <br> **Figs. 1(b), 3, 7.** <br><br> **Ioka:** <br> *See, e.g.:* <br> **[0007]:**  "Moreover, the inside of the fixing part 100 has an impelling part that imparts frictional resistance to the vertical part 50 and with which the display part 20 in Figure 1 can be fixed to a suitable rotating position, and a vertical member support part 110 that has an angle restriction part that is composed of a projection that restricts the angle of rotation of the vertical part 50 to a range from +180° to -180°. . . . In addition, owing to the impelling part and the angle restriction part, it is possible to prevent the display part from rotating unintentionally when it is being carried, and to prevent the wire between the main unit and the display part from being severed" <br> **Fig. 1.** |

### 10. **Claim 10 is obvious over Kim alone or in combination with Sach, Kumar, or Satoshi.**

> *10.* *A computer system according to claim 1, wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.*

257.   Claim 10 depends from claim 1 and adds:  "*wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.*"  Kim alone or in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.C.4.)

258.   As discussed previously, Kim discloses a hinge 13 that allows the screen to pivot on a horizontal axis, a rotatable joint 23 (*rotatable element* or *turret*) that allows the display to rotate about a vertical axis; and the hinge 13 and rotatable joint 23 together form the *mounting assembly*.  (Kim at 1:52-56, 2:42-57, 3:1-12.)  Kim also discloses that "[r]otatable joint 23 [*rotatable element* or *turret*)] fits into socket 36 [(*circular opening*)] . . . within body 11 (*keyboard base*).  (Kim at 3:9-10, Fig. 6.)  Fig. 6 depicts socket 36 (*circular opening*) as circular in shape.  (*See* Fig. 6).  Kim further discloses a slot 34 in the socket (*circular opening*) that "is long enough to allow free movement for lines 30 while cover 12 rotates about rotatable hinge 23."  (Kim at 3:5-7.)  Accordingly, Kim discloses *a turret that is rotatable relative to a circular opening formed in said keyboard base*.  And, it is my opinion that the Kim alone or in combination with Sach, Kumar, or Satoshi render obvious dependent claim 10



*FIGURE 6*

259.   The claim chart below provides exemplary disclosures from Kim that disclose the elements of claim 10.

| Limitation | Kim |
|---|---|
| **10.** A computer system according to claim 1, wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base. | **Kim**<br>*See, e.g.:*<br>**1:52-56:** "There is provided a notebook computer having a body and a cover which is hinged to a support rotatably carried by the body. The cover has a main display which in a closed position overlies the body and in an open position pivots and rotates the main display away from the body."<br>**2:42-57:** "When cover 12 is in the lowered position, latching mechanism 14 releases cover 12, which pivots about hinge 13, so that cover 12 reveals main display 21 to an operator. When main display 21 is in a raised position and oriented as shown in FIG. 2 the operator and immediately adjacent observers have a view of the images on main display 21, but observers across from the operator cannot see the images.<br>     In order for observers across from operator to view images, main display 21 rotates about a rotatable joint 23 to face an observer across from operator, as shown in FIG. 4. Main display 21 also pivots about hinge 13 for a better |

173

| Limitation | Kim |
|---|---|
| | viewing angle for observer. This enables the operator to make a presentation to others without the aid of a projector or the inconvenience of having the others crowd around the operator to view the display from the same side as the operator." **3:1-12:** "FIG. 6 shows cover 12 removed from hinge 13. In one embodiment hinge 13 is integral with rotatable joint 23. Power and data lines 30 connect cover 12 with body 11 through hinge 13 and rotatable joint 23. Lines 30 enter body 11 through a slot 34. Slot 34 is in a socket 36 and is long enough to allow free movement for lines 30 while cover 12 rotates about rotatable hinge 23.  Receptors 34 of cover 12 slidably receive the ends 32 of hinge 13 and enable cover 12 to pivot about hinge 13. Rotatable joint 23 fits into socket 36 and is secured with screw 38 and cap 40 from the underside of socket 36, within body 11. Other embodiments include a ball and socket joint." **Fig. 6.** |

### D.    Ioka Renders the Asserted Claims Obvious.

260.    In my opinion, Ioka in combination with Sach, Kumar, or Satoshi renders claims 1-3, 6, and 8-10 of the '931 patent obvious.

### 1.    A Person of Ordinary Skill in the Art Would Have Been Motivated to Combine Ioka with Sach, Kumar, or Satoshi.

261.    It is my opinion that it would have been obvious to a POSITA to modify Ioka in view of the knowledge of a POSITA and/or in combination with the teachings of Sach, Kumar, or Satoshi.  At the time of the invention, laptop computers commonly had one or more input/output ports.  Sach, Kumar, and Satoshi each discloses exemplary locations and use of input/output ports.  Each reference provides additional functionality and a specific benefit to the computer system described by Ioka, which provides a motivation to combine these references.  A POSITA would also have had a reasonable expectation of success because each reference is in the field of portable computer systems and is compatible with the system disclosed by Ioka.

174

262.   Ioka teaches a rotatable display for a "portable information processor" or personal computer that is equipped with a flat display device (e.g. a laptop computer).  (Ioka,  ¶ [0001], Figure 1.)  Ioka discusses how, in the prior art, "the display part is not configured such that it can rotate relative to the width direction of the main unit.  Therefore, there is a problem that the main unit must be rotated if for example one wants to show the display part to a person sitting across from oneself, such as a customer."  (Ioka, ¶ [0003].)  The invention of Ioka discloses a display part that is attached to a vertical member "such that it can rotate around the shaft of the vertical member."  (Ioka, ¶ [0004].)  In particular, the invention of Ioka addresses the need to provide a configuration where "it is possible to show the display without rotating the main unit to a customer who is seated opposite the person showing the display."  (Ioka, ¶ [0005].)



263.   It would have been obvious to a POSITA that the laptop disclosed by Ioka would also include other hardware and components typically found in laptop computers.  A POSITA would also have understood that Ioka discloses a display holding structure and does not address many of the other features or aspects of a laptop computer.  For example, Ioka recognizes that other devices could be connected to the laptop computer, including "a window for infrared communications, a connection part for a battery, a connection port for a printer, etc." connected

175

to the back of the computer. (Ioka, ¶ [0010].) Ioka does not address the location or use of other input/output ports commonly found on laptop computers. To add input/output ports and similar components, a POSITA would have looked at pre-existing, available, and known laptop computers systems to address the same optimal design configuration goals addressed by Ioka. The POSITA would have considered other laptop and electronic systems that improved the working efficiency and practicality of standard laptop computer systems consistent with the design considerations disclosed by Ioka. Each of Sach, Kumar, and Satoshi describes additional functionality intended to be integrated into laptop computer systems. The combination of Ioka with Sach, Kumar, or Satoshi provides additional functionality, efficiency, and practicality to the Ioka laptop computer system.

264. For example, a POSITA would have been motivated to look at the laptop computer of Sach with a plurality of input and output ports. Sach discloses multiple input/output ports including "a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 19e for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19f for connection to the display panel 13." (Sach at 3:35-42.) It would have been obvious to incorporate the types of input/output ports from Sach with the portable computer of Ioka to provide the functionality of these ports.

265. As another example, a POSITA would have been motivated to look at the laptop computer disclosed by Kumar with ports on the front wall and side wall of the laptop base. Kumar discloses multiple input/output ports on the front wall and side wall of the base. (Kumar at 4:21-24.) Kumar also discusses that laptop computers interact with a wide variety of

176

input/output devices that have various functions. (Kumar at 1:22-25 ("These portable personal computer may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc.").) It would have been obvious to incorporate the input/output ports from Kumar with the portable computer of Ioka. A POSITA would have recognized that input/output ports on or proximate the front wall would have been an obvious location selection (although not the only desirable location) because it would allow the user to connect ancillary devices while displaying content or images from the ancillary devices on the laptop flat-panel display to nearby persons.

266. As another example, a POSITA looking in this area would have found Satoshi's tablet-integrated personal computer. Satoshi discloses a tablet and "a tablet connection portion for connecting the tablet at a predetermined position on the personal computer body." (Satoshi, ¶ [0005].) Satoshi also discloses that the "tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard," thereby maximizing the keyboarding efficiency of the user. (Satoshi, ¶¶ [0007], [0010].) Similarly, a POSITA would have considered where the user would be located when determining an efficient placement of input/output ports in Ioka's laptop with a rotatable display holding structure. A POSITA would have been motivated to locate the tablet connection portion of Satoshi or similar ports proximate the front wall of the base to allow convenient connection of ancillary devices to provide various features and functionalities, including displaying images to the laptop users or other people viewing the laptop's display from nearby.

267. Ioka, Sach, Kumar, and Satoshi each describes portable computers. Because these references deal with portable computers, a POSITA would have had a reasonable expectation of

177

success combining the features of Ioka with Sach, Kumar, or Satoshi to produce a laptop computer system having the combined features.  Design incentives would have motivated a person of skill in the art to combine Ioka with Sach, Kumar, or Satoshi.  For example, Sach, Kumar, and Satoshi each provides an added functionality that is not expressly disclosed by Ioka, and each provides a benefit derived from that added functionality.  Furthermore, the combination of these references produces a predictable product in the form of a portable computer having the features of Ioka plus the features added from Sach, Kumar, and/or Satoshi.  As a result, it is my opinion that a POSITA would have been motivated to combine Ioka with Kumar, Satoshi and/or Sach.

### 2. Claim 1 is obvious over Ioka in view of Sach, Kumar, or Satoshi.

**1.** *A computer system comprising:*

[1a] *a) a keyboard unit including a computer keyboard and a keyboard base that includes a front wall and a back wall;*

268.   Ioka teaches a "portable information processor" (*computer system*) that is "composed of a main unit 10 that has a power supply, CPU and memory inside it, and keys for data entry on the upper surface thereof." (*keyboard unit*). (Ioka, ¶ [0006], Fig. 1.)  The *keyboard unit* of Ioka is depicted, for example, in Figure 1 and includes a *computer keyboard*.  (Ioka, Fig. 1.)  The *keyboard unit* also has a *keyboard base* that includes a *front wall* and a *back wall*.  (Ioka, Fig 1.)  All the features of the preamble and limitation 1[a] are shown in the annotated Figure 1 below.  Based on these features, it is my opinion that Ioka teaches these limitations.

178



back wall

keyboard base

front wall    keyboard

[1b] *b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge;*

269.   Ioka discloses a "display part 20 that has a display panel on the top surface" (*display screen*) for displaying computer-generated images.  (Ioka, ¶ [0006], Fig. 1)  The display panel includes two *side walls* and a *bottom edge* that extends between the *side walls*.  (Ioka, Fig. 1)  The display has "a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction."  (Ioka, ¶ [0006], Fig. 1.).  Ioka shows that connection part 30 has two "display part support plates 130."  (Ioka, ¶ [0008], Fig. 2.)  Those display part support plates 130 are internal to the display part 20, as shown in Figures 3 and 5, which show the front (display side) and back of the display part 20.  (Ioka, Figs. 3, 5.)  In display part 20, "an indented part [160] is provided for one part of the display 20 in order the connection part 30 enters it."  (Ioka, ¶

179

[0009], Figs. 3). As shown in Figures 1 and 3, the connection part 30 enters the display part at the sides of the indented part 160 and the display must accommodate both support plates 130. Therefore, the display part has *two spaced slots formed in the bottom edge* to accommodate connection part 30 and support plates 130. All these features are shown in annotated Figure 1, below. Accordingly, it is my opinion that Ioka teaches this limitation.



side wall

side wall

bottom edge

two spaced slots

270. To the extent that Blackbird argues that Ioka does not disclose *two spaced slots*, it would have been obvious to a POSITA to modify the display part 20 in Ioka to have two slots because the center portion of the indented part 160 in Ioka's display is not functional. Ioka's hinge mechanism is covered by a separate cover, as shown in Figures 1, 4 and 5. Figure 3 shows the hinge without the cover. The hinge cover is a separate piece and there is not a functional reason why the hinge cover could not be at least partially integrated into the display. As a result, a cover integrated into the display would be an obvious modification to a POSITA. The opening

180

of the indented part 160 could be partially covered with an integrated hinge cover that include two slots for the two support plates. For this reason, it is my opinion that it would have been obvious to a POSITA to modify the display part 20 to include an integrated cover that partially covered the opening of the indented part 160 to include two slots. In that circumstance, the display part 20 would include two slots where the horizontal member enters the sides of the indented part 160 and an opening in the center for vertical member 50. It is my opinion therefore, that, to the extent that Blackbird argues that Ioka does not disclose *two spaced slots*, this feature would have been obvious to a POSITA in view of his knowledge and common sense.



[1c] *c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and*

271.   It is my understanding that the term "proximate" has been construed as being "next to, very near, or close to." (*See supra* ¶ 22.)

272.   Ioka discloses a "connection part 30" (*mounting assembly*). (Ioka, ¶ [0006], Fig. 2.) "[T]he connection part 30 is fixed by a screw 200 at the surface to the rear of the main unit, and in addition it is also fixed by a screw to the reverse surface of the main unit." (*proximate said back wall of said keyboard base*). (Ioka, ¶ [0010, Fig. 3-5.) Connection part 30 has two display part support plates 130 (*two spaced mounting brackets*). (Ioka, ¶ [0008], Fig. 2.). "A linking part 120 is connected to the vertical member 50, and vertical member 50 in the vertical direction and the horizontal member 60 in the horizontal direction are fixed" (*rotatable element*). (Ioka, ¶ [0008], Fig. 2.) "[D]isplay part support plates 130 are disposed at a position where they can rotate around the shaft of the horizontal member 60." (Ioka, ¶ [0008], Fig. 2.) Each display part support plate 130 *extends upwardly* from the *rotatable element* when the display is opened. Furthermore, the two display part support plates 130 are *configured and dimensioned to be received within said two spaced slots*, as discussed above (*see supra* ¶ 269269), in order to attach the display part 20 to connection part 30. (Ioka, Figs. 1, 2.) Ioka discloses that the device includes "a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10" (*said mounting assembly joining said display screen to said keyboard unit*). (Ioka, ¶ [0006], Fig. 1.) Ioka discloses that the connection part and display

182

part are connected "rotatably in the perpendicular direction relative to the main unit 10 [*first axis*] and the direction that is orthogonal to the perpendicular direction [*second axis*]" (*permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis*).  (Ioka, ¶ [0006], Fig. 1.)  Given these features in Ioka, it is my opinion that Ioka teaches this limitation.



[1d] *d) a port positioned proximate said front wall of said keyboard base, said port adapted to receive a signal from an ancillary computer system;*

[1e] *wherein a signal from said ancillary computer system delivered to said port is effective to generate a computer-generated image on said display screen; and*

273.    It is my understanding that the term "port" has been construed as an "interface not including a PC card slot."   (*See supra* ¶ 22.)   It is also my understanding that the term "proximate" has been construed as being "next to, very near, or close to."   (*See supra* ¶ 22.) Ioka, being directed to a portable computer with a rotatable display, does not expressly disclose ports.  This limitation, however, would have been obvious in view of Sach, Kumar, or Satoshi

183

because laptop computers commonly included at least one input/output port and a flat screen display. A POSITA would have known that a flat screen display inherently displays computer-generated images regardless of whether the images are generated from internal signals or from external signals.

274. It is my opinion that limitations 1[d] and 1[e] are disclosed by the combination of Ioka and Sach. Although Sach is primarily directed to a self-contained tactical workstation, Sach discloses features of portable computers that were common at the time of the invention of the '931 patent, particularly the types of connections to other devices that computers had and the port arrangements that were commonly used for communicating with these devices. Sach discloses various types of *ports* including "a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d. (Sach at 3:4-7.) More specifically, Sach discloses "a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 19e for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19f for connection to the display panel 13." (Sach at 3:35-42.) Sach describes these *ports* as being accessible from one side of the workstation. (Sach at 1:59-61; 2:57-60; 3:4-7, Fig. 1.) Under plaintiff's infringement theory, the location of the parallel port 19c or the serial port 19d would satisfy the court's construction of being proximate the front wall. Further, under plaintiff's infringement theory, the LAN, AUI, SCSI, parallel, and serial ports can be used to interface with a variety of devices including an *ancillary computer system* through which a *computer-generated image* could be displayed on the display screen.

275.   Input/output ports, such as those disclosed in Sach, could be placed on other portable computer systems, like the portable computer system described by Ioka.  Although Ioka states that "it is possible to use the back surface" for connection ports, (Ioka, ¶ [0010]), nothing in Ioka limits connections to this position.  Given the specific arrangement of the ports in Sach, a POSITA combining Ioka and Sach would have been motivated to arrange the ports in the same or a similar manner.  Ioka does not show any obstructions that would prevent placement of the ports in the arrangement shown by Sach.  As a result, a POSITA would have had a reasonable expectation of success when combining the teachings of Ioka and Sach.  Under plaintiff's infringement theory, a POSITA would have known that the input/output ports in Sach, particularly the disclosed LAN port 19a, SCSI port 19b, parallel port 19c and serial port 19d, could be used by Ioka's laptop to communicate with ancillary computer systems and generate an image on the laptop's display from a signal received from the ancillary computer system.  (*See* '931 patent at 5:65-6:14 ("Port 112 generally constitutes a 15 pin D-sub video connector, serial port, parallel port and/or universal serial bus ("USB"),  . . . or an IEEE 1394 port.").)  For these reasons, it is my opinion that the combination of Ioka and Sach is an obvious combination, and that the combination of Ioka and Sach discloses limitations 1[d] and 1[e] of the '931 patent.



185

276. It is my opinion that limitations 1[d] and 1[e] are also disclosed by the combination of Ioka and Kumar. Although Kumar is primarily directed to a carrying case for a portable computer, Kumar discloses features of portable computers that were relevant at the time of the invention of the '931 patent. Kumar discloses that a "portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8. (Kumar at 4:21-24; Fig. 4.) Kumar also discusses that laptop computers interact with a variety of types of input/output devices with a variety of functions and features, including "printers, light pens, image scanners, video scanners, etc." (Kumar at 1:22-25.) Kumar discloses ports on the front wall and side wall that, according to Blackbird's interpretation of the claim, satisfies the proximate limitation. The disclosed input/output ports could be used under plaintiff's infringement theory to interface with a variety of devices and are capable of receiving a signal from an ancillary computer input device and generating a computer-generated image on the display screen from the received signal.

277. Input/output ports, such as those disclosed in Kumar, could be combined with other laptop computers and positioned proximate the front wall of the laptop base. Although Ioka states that "it is possible to use the back surface" for connection ports, (Ioka, ¶ [0010]), nothing in Ioka limits connections to this position. Given the express disclosure of a port in the front wall or side wall of a portable computer, a POSITA combining Ioka and Kumar would have a good reason to place a port in the front wall. Ioka describes a generic portable computer having a particular type of display, and does not show any obstructions that would prevent placement of a port proximate the front wall, so a POSITA would have had a reasonable expectation of success when combining the teachings of Ioka and Kumar. Under plaintiff's infringement theory, a POSITA would have known that the input/output ports on the front and

186

side walls of the base in Kumar could be used by Ioka's laptop to communicate with ancillary computer systems and generate an image on the laptop's display from a signal received from the ancillary computer system.  This is particularly true given Kumar's mention of light pens, image scanners, and video scanners, which would each create or modify an image on the display, though many other devices were known at the time of the invention of the '931 patent.  Further, a POSITA would have been familiar at the time of the invention of the '931 patent with display ports that would have allowed the laptop computer system to project computer-generated images from connected computer systems.  (*See* '931 patent at 5:65-6:14 ("Port 112 generally constitutes a 15 pin D-sub video connector, serial port, parallel port and/or universal serial bus ("USB"), . . . or an IEEE 1394 port.").)  Accordingly, it is my opinion that a POSITA would have been motivated to combine Ioka and Kumar, which combination discloses limitations 1[d] and 1[e] of the '931 patent.



FIG−4

278.  It is also my opinion that limitations 1[d] and 1[e] are disclosed by the combination of Ioka and Satoshi.  A POSITA looking to add common features to Ioka's laptop, including generating *a computer generated image* on the laptop's *display screen* from external components such as an ancillary computer system, would have found Satoshi's tablet-integrated

computer that discloses connecting a tablet (*ancillary computer system*) to a connector (*port*) "that allows pointing/movement of a cursor . . . displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information." (Satoshi, ¶ [0007]; Fig. 1.)  A POSITA would have understood that Satoshi's tablet was an ancillary computer system that sent signals to the disclosed laptop that were effective to generate computer-generated images on the laptop's display screen.  It would have been obvious for a POSITA to modify the laptop of Ioka with the type of *port* disclosed in Satoshi.  Specifically, by using a tablet as an input device, the functionality of Ioka would be augmented with the advantages of Satoshi by allowing a user to input and display "handwritten information such as graphics and text information."  Alternatively, a POSITA may have chosen to use the "tablet connector portion" for the display of other types of *computer generated images*.

279.    Satoshi also discloses that the "tablet connection portion" is located on "a front side portion of the personal computer keyboard, that allows the user to use the tablet without removing their hands from the keyboard."  (Satoshi, ¶ [0010]).  Accordingly, the user is able "to use the tablet . . . even when typing."  (Satoshi, ¶ [0010]).  In order for a user to maintain control of both the laptop and the ancillary computer system, placement of the port proximate the front wall of the laptop, as shown by Satoshi under Blackbird's interpretation of the proximate limitation, would have been obvious to a POSITA.  Although Ioka states that "it is possible to use the back surface" for connection ports, (Ioka, ¶ [0010]), nothing in Ioka limits connections to this position.  Ioka discloses no feature next to the wall of the device that would conflict or hinder the port or tablet disclosed by Satoshi.  A POSITA, therefore, would have had a reasonable likelihood of success at augmenting the computer system described by Ioka with the additional functionality described by Satoshi because both devices are portable computer systems.

188

Accordingly, it is my opinion that the combination of Ioka and Satoshi is obvious, and that Ioka in view of Satoshi discloses limitations 1[d] and 1[e] of the '931 patent.



280.   For these reasons, it is my opinion that a POSITA would have been motivated to combine Ioka with Sach, Kumar, or Satoshi, which combination discloses limitations 1[d] and 1[e] of the '931 patent.

> [1f] *wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen.*

281.   It is my understanding that the Court has construed "directly" as used in "wherein a communication conduit extends from said keyboard base directly into said intermediate region" as "passing through the mounting assembly, but no other structure."

282.   Ioka discloses an "indented part 160" *intermediate region* in the bottom edge of the display between the *pair of slots* as seen in Figure 1 and 3.  (Ioka, ¶ [0009], [Key], Figs. 1, 3.) Ioka discloses wiring between the main unit and the display part.  For example, Ioka discloses that "since the connection part 30 prevents the severing of the wire between the main unit 10 and

189

the display part 20, the angle of rotation is restricted in a range from +180° to -180°." (Ioka, ¶ [0007].) Similarly, "owing to the impelling part and the angle restriction part, it is possible to prevent the display part from rotating unintentionally when it is being carried, and to prevent the wire between the main unit and the display part from being severed." (Ioka, ¶ [0007].) Elsewhere, Ioka states "[s]ince the two sides of the indented part do not require a connection part, the wiring for sending and receiving the signals and coordinate input can be done easily." (Ioka, ¶ [0009].)

283. Ioka discloses that "an indented part is provided for one part of the display 20 in order the connection part 30 enters it." (Ioka, ¶ [0009].) Ioka also discloses that "when the display part 20 is opened or closed, the connection part 30 has a round shape in cross section such that it does not strike against the display part 20." (Ioka, ¶ [0009].) Finally, Ioka states that "[s]ince the two sides of the indented part do not require a connection part, the wiring for sending and receiving signals for display and coordinate input can be done easily." Given this disclosure, the wiring described by Ioka utilizes the indented part. Ioka discloses, for example, that the device prevents unintentional rotation and avoids severing the cable. A cable placed in the center can rotate as the display rotates, so that movement of the display places the least rotational stress on the cable as discussed above in Part IV. A POSITA would have known that a cable located elsewhere would have been disadvantageous. For example, a cable entering into the back of the display, or to the bottom edge at one side, would have to extend or retract as the display rotates, which would place unnecessary stress on the communication cable and increase the rate of failure. This would also conflict with Ioka's goal of preventing severing of the cable. In my opinion, the location and description of the indented part would have suggested to a POSITA that a *communication conduit* extends from the main unit 10 directly into the

190

*intermediate region* of the display part 20 to connect the display screen with the processing and graphics components of the laptop.  Thus, a POSITA would have found it obvious for the communication conduit to travel through the laptop's display holding structure to keep it internal to the laptop computer system.  Accordingly, it is my opinion that Ioka in view of the knowledge and common sense of a POSITA renders this limitation obvious.



Intermediate region

284.    The claim chart below provides exemplary disclosures from Ioka combined with Sach, Kumar, or Satoshi, that in my opinion render claim 1 obvious.

| Limitation | Ioka in view of Sach, Kumar, or Satoshi |
|---|---|
| **1[pre]**. A computer system comprising: | **Ioka:**<br><br>*See, e.g.:*<br>**[0001]**: "The present invention relates to a portable information processor of a display attachment part and a personal computer and so forth."<br><br>**Fig. 1** |
| **[1a]** a) a keyboard unit including a computer keyboard and a | **Ioka:** |

191

| Limitation | Ioka in view of Sach, Kumar, or Satoshi |
|---|---|
| keyboard base that includes a front wall and a back wall; | *See, e.g.:*<br>**[0006]:** "A description of the embodiment of the present invention is provided on based on the figures. As shown in Figure 1, the portable information processor in the present embodiment is composed of a main unit 10 that has a power supply, CPU and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction.  Here the display part 20 has an input coordinate position determination device with which pen touch is possible."<br><br>**Fig. 1** |
| **[1b]** b) a display screen for displaying computer-generated images, said display screen defining first and second side walls, a bottom edge that extends from the first side wall to the second side wall and two spaced slots formed in said bottom edge; | **Ioka:**<br><br>*See, e.g.:*<br>**[0006]:** "A description of the embodiment of the present invention is provided on based on the figures. As shown in Figure 1, the portable information processor in the present embodiment is composed of a main unit 10 that has a power supply, CPU and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction.  Here the display part 20 has an input coordinate position determination device with which pen touch is possible."<br><br>**[0008]:** "The round rod of the horizontal member 60 is made thin at both ends, and display part support plates 130 are connected slidably to both ends thereof, and the display part support plates 130 are disposed at a position where they can rotate around the shaft of the horizontal member 60."<br><br>**[0009]**: "In addition, the width of the connection part 30 is one part of the width direction of the display part 20, and an indented part is provided for one part of the display 20 in order the connection part 30 enters it."<br><br>**[Key]:** "160 Indented part" |

| Limitation | Ioka in view of Sach, Kumar, or Satoshi |
|---|---|
|  | **Figs. 1, 2, 3** |
| **[1c]** c) a mounting assembly proximate said back wall of said keyboard base, said mounting assembly including two spaced mounting brackets extending upwardly from a rotatable element and configured and dimensioned to be received within said two spaced slots, said mounting assembly joining said display screen to said keyboard unit and permitting both rotational motion of said display screen relative to a first axis and pivotal motion of said display screen relative to a second axis that is perpendicular to said first axis; and | **Ioka:**<br><br>*See, e.g.:*<br>**[0006]:** "A description of the embodiment of the present invention is provided on based on the figures. As shown in Figure 1, the portable information processor in the present embodiment is composed of a main unit 10 that has a power supply, CPU and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction. Here the display part 20 has an input coordinate position determination device with which pen touch is possible."<br><br>**[0008]**: "A linking part 120 is connected to the vertical member 50, and vertical member 50 in the vertical direction and the horizontal member 60 in the horizontal direction are fixed."<br><br>**[0008]**: "The round rod of the horizontal member 60 is made thin at both ends, and display part support plates 130 are connected slidably to both ends thereof, and the display part support plates 130 are disposed at a position where they can rotate around the shaft of the horizontal member 60."<br><br>**Fig. 2.** |
| **[1d]** d) a port positioned proximate said front wall of said keyboard base, said port adapted to receive a signal from an ancillary computer system; | **Kumar**<br><br>*See, e.g.:*<br>**1:15-25:** "Since the advent of the personal computer, manufacturers and industrial users have continually developed faster, smaller and more versatile machines, including portable computers that are dedicated to perform a specific function such as word processing, data collection or item identification. Alternatively, portable computers may be all purpose computing machines capable of running a variety of types of software programs. These portable personal computers may interact with a variety of portable and stationary peripheral input/output devices such as printers, |

193

| Limitation | Ioka in view of Sach, Kumar, or Satoshi |
|---|---|
| | light pens, image scanners, video scanners, etc." |
| | **4:21-24:** "Additionally, portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8." |
| | **Fig. 4** |
| | <u>Satoshi</u> |
| | *See, e.g.:* [0007]: "As illustrated in FIG. 1, a tablet stowing portion 3 for stowing a tablet 2 may, for example, be provided on the side of the body. A tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard. The tablet 2, provided in place of the trackball, is a pointing device that allows pointing/movement of a cursor (not shown in the drawings) displayed on the display of the personal computer 1, and the input of handwritten information such as graphics and text information." |
| | **Fig. 1** |
| | <u>Sach</u> |
| | *See, e.g.:* **1:59-61:** "A two-slot VME processor box is disposed in the housing and is designed to receive two VME cards that are slid into the VME processor box from one side of the workstation." |
| | **2:57-60:** "A two-slot VME processor box 16 is disposed in the housing 11 and is designed to receive two VME cards 17 (one of which is shown) which are slid into the VME processor box 16 from one side of the workstation 10." |
| | **3:4-7:** "The [VME] processor card 17 has a plurality of input and output ports 19, including a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d." |
| | **3:35-42:** "The VME processor card 17 has a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally |

194

| Limitation | Ioka in view of Sach, Kumar, or Satoshi |
|---|---|
|  | terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 1ge for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19/ for connection to the display panel 13."<br><br>**Fig. 1** |
| **[1e]** wherein a signal from said ancillary computer system delivered to said port is effective to generate a computer-generated image on said display screen; and | **Kumar**<br><br>*See* **claim chart in this table for Kumar citations for limitations [1d] immediately above**<br><br>**Satoshi**<br><br>*See* **claim chart in this table for Satoshi citations for limitations [1d] immediately above**<br><br>**Sach**<br><br>*See* **claim chart in this table for Sach citations for limitations [1d] immediately above** |
| **[1f]** wherein said bottom edge of said display screen defines an intermediate region between said pair of slots and wherein a communication conduit extends from said keyboard base directly into said intermediate region of said display screen. | **Ioka:**<br><br>*See, e.g.:*<br>**[0007]**: "Moreover, since the connection part 30 prevents the severing of the wire between the main unit 10 and the display part 20, the angle of rotation is restricted in a range from +180° to -180° for the rotation of the perpendicular direction of the display part when the angle of the front surface of the display panel of the above-mentioned display part is set at 0°."<br><br>**[0007]**: "In addition, owing to the impelling part and the angle restriction part, it is possible to prevent the display part from rotating unintentionally when it is being carried, and to prevent the wire between the main unit and the display part from being severed."<br><br>**[0009]**: "Figure 3 is a figure that shows from the back surface the inventive portable information processor, and when the display part 20 is opened or closed, the connection part 30 has a round shape in cross section such that it does not strike against the display part 20.  In addition, the width of the |

195

| Limitation | Ioka in view of Sach, Kumar, or Satoshi |
|---|---|
|  | connection part 30 is one part of the width direction of the display part 20, and an indented part is provided for one part of the display 20 in order the connection part 30 enters it. Since the two sides of the indented part do not require a connection part, the wiring for sending and receiving signals for display and coordinate input can be done easily."<br><br>**Fig. 1.** |

### 3.    Claim 2 is obvious over Ioka in combination with Sach, Kumar, or Satoshi.

> **2.** *A computer system according to claim 1, further comprising a central processing unit mounted within said keyboard unit.*

285.    Claim 2 depends from claim 1 and adds: *"further comprising a central processing unit mounted within said keyboard unit."*    Ioka in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (*See supra* Part VI.A.2.)

286.    Ioka states that "the portable information processor in the present embodiment is composed of a main unit 10 that has a power supply, CPU [(*central processing unit*)] and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction."   (Ioka, ¶ [0006], Fig. 1).   Accordingly, it is my opinion that Ioka discloses the additional limitation of claim 2 and that Ioka in combination with Sach, Kumar, or Satoshi renders obvious dependent claim 2.

196



287.   The claim chart below provides exemplary disclosures from Ioka that disclose the

elements of claim 2.

| Limitation | Ioka |
|---|---|
| **2.** A computer system according to claim 1, further comprising a central processing unit mounted within said keyboard unit. | **<u>Ioka</u>:**<br><br>*See, e.g.:*<br>**[0006]:**  "A description of the embodiment of the present invention is provided on based on the figures. As shown in Figure 1, the portable information processor in the present embodiment is composed of a main unit 10 that has a power supply, CPU and memory inside it, and keys for data entry on the upper surface thereof, a display part 20 that has a display panel on the top surface, and a connection part 30 that connects the display part 20 rotatably in the perpendicular direction relative to the main unit 10 and the direction that is orthogonal to the perpendicular direction.  Here the display part 20 has an input coordinate position determination device with which pen touch is possible."<br><br>**Fig. 1.** |

**4.    Claim 3 is obvious over Ioka in combination with Sach, Kumar, or Satoshi alone or in further combination with Kim.**

> **3.** *A computer system according to claim 1, wherein said display screen is a flat screen unit.*

288.    Claim 3 depends from claim 1 and adds: *"wherein said display screen is a flat screen unit."* As described above, Ioka in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (*See supra* Part VI.A.2.)

289.    It is my opinion that the "display part 20 that has a display panel on the top surface" illustrated in Ioka discloses the *flat screen unit* limitation of claim 3. (*See* Ioka, ¶ [0006], Fig. 1.) A POSITA would have understood display part 20 in Ioka to be a *flat screen unit*. In fact, the '931 patent states that "[l]aptop computers generally employ flat-panel monitors for reasons of necessity, given space/weight constraints and the desire to pivotally mount the monitor relative to the base/keyboard for system protection and portability." ('931 patent at 1:60-63.) Accordingly, it is my opinion that Ioka discloses the additional limitation of claim 3.



[Figure 1]

290.    Similarly, Sach, Kumar, and Satoshi each disclose display screens that are flat screen units. As an example, the computer disclosed by Sach includes "a liquid crystal display [LCD] panel." (Sach at 2:39-49.). The '931 patent states that "[d]isplay monitor 104 typically

198

employs a liquid crystal display ('LCD') for the screen." ('931 patent at 6:44-46.)  Kumar and

Satoshi both illustrate a laptop computer with a flat screen.  (Kumar at Fig. 4; Satoshi at Fig. 1.)



Kumar, Fig. 4                                   Satoshi, Fig. 1

291.   To the extent that Blackbird argues that Ioka, Sach, Kumar, and/or Satoshi do not

disclose a flat screen unit or that it would not have been obvious to a POSITA based on his

knowledge to modify Ioka with a flat screen unit, it is also my opinion that the limitation of

claim 3 is disclosed by Kim.  At the time of the invention, as the '931 patent admits, flat-panel

monitors were typically used in laptop systems.  (*See* '931 patent at 1:60-63.)   Laptops

universally employed flat screen displays, with several different types of displays being

available.  For example, Kim discloses that "[n]otebook computers generally have . . . a flat

screen display such as an active matrix or LCD display."  (Kim at 1:12-22; *see also* Kim at 2:29-

41, Fig. 2.)   Thus, a portable computer having a flat-panel display is not an inventive

contribution to the art.  And, while it is my opinion that Ioka discloses a *flat screen unit*—to the

extent necessary—it would have also been obvious to a POSITA at the time of filing the '931

patent to combine Ioka with the display of Kim in view of Sach, Kumar, or Satoshi.

199



FIGURE 2

Kim's display

292.   The claim chart below provides exemplary disclosures from Ioka, Sach, Kumar, Satoshi, and/or Kim that in my opinion disclose the elements of claim 3.

| Limitation | Ioka, Sach, Kumar, Satoshi, or Kim |
|---|---|
| **3.** A computer system according to claim 1, wherein said display screen is a flat screen unit. | <u>**Ioka**</u><br><br>*See, e.g.:*<br>**Fig. 1**<br><br><u>**Sach**</u><br>*See, e.g.:*<br>**2:39-49:** "The portable miniaturized tactical workstation 10 comprises a housing 11 that has a rotatable top cover 12 that houses a display 13, such as a liquid crystal display panel 13, a field emission display panel 13, or a plasma display panel 13, for example.  The cover 12 is lockable and rotatable and is rotated upward to expose a viewing screen 13a of the display panel 13.  A display panel 13 used in a reduced to practice embodiment of the present invention is a 13 inch 1280 by 1024 24 bit color liquid crystal display panel 13, although other sizes or types of display screens 13 may be employed."<br><br><u>**Kumar**</u><br>*See, e.g.:*<br>**Fig. 4**<br><br><u>**Satoshi**</u><br>*See, e.g.:*<br>**Fig. 1** |

200

| Limitation | Ioka, Sach, Kumar, Satoshi, or Kim |
|---|---|
| | **Kim**<br><br>*See, e.g.:*<br>**1:12-22:** "Notebook computers generally have a main body which houses the processor and associated electronic components, disk drives, cursor control and switches. A keyboard is carried by the upper surface of the main body, and a cover is suitably hinged to the body whereby in its closed position it covers and protects the keyboard. The cover includes a flat screen display such as an active matrix or LCD display. In the closed position the display overlies the keyboard. In the open position it generally faces the keyboard whereby the operator views the display as he performs various tasks commanded by the keyboard and cursor control."<br><br>**2:29-41:** "FIGS. 2 and 3 show notebook computer 10 with cover 12 in a raised position. On the bottom of cover 12 is a main display 21, for example a matrix or liquid crystal display. Display 21 is protected by cover 12 when in a lowered position. On top of body 11 is a keyboard 16, cursor control 17, and switches and controls 18. In the rear of body 11 are interface ports 19, such as serial and USB. Cover 12 overlies and protects keyboard 16, cursor control 17, and switches and controls 18, as well as protecting main display 21. In accordance with another feature of the present invention, the rear of cover 12 houses an auxiliary display 26, which lies against cover 12 when in the closed position, as shown in FIGS. 1 and 3."<br><br>**Fig. 2** |

### 5. Claim 6 is obvious over Ioka in combination with Sach, Kumar, or Satoshi.

> **6.** *A computer system according to claim 1, wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees.*

293. Claim 6 depends from claim 1 and adds: "wherein said mounting assembly permits

angular motion of said display screen relative to said keyboard base of at least one hundred

eighty degrees." As described above, Ioka in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (See supra Part VI.A.2.)

294. Ioka discloses that the display can rotate 180 degrees relative to the keyboard base. Specifically, Ioka states "since the connection part 30 prevents the severing of the wire between the main unit 10 and the display part 20, the angle of rotation is restricted in a range from +180° to -180° for the rotation of the perpendicular direction of the display part when the angle of the front surface of the display panel of the above-mentioned display part is set at 0°." (Ioka, ¶ [0007].) Additionally, Ioka states "the inside of the fixing part 100 has an impelling part that imparts frictional resistance to the vertical part 50 and with which the display part 20 in Figure 1 can be fixed to a suitable rotating position, and a vertical member support part 110 that has an angle restriction part that is composed of a projection that restricts the angle of rotation of the vertical part 50 to a range from +180° to -180°." (Ioka, ¶ [0007].) As stated, Ioka discloses that the display part 20 can rotate in a "range from +180° to -180°." Ioka also states that because of his invention "it is possible to show the display without rotating the main unit to a customer who is seated opposite the person showing the display." (Ioka, ¶ [0005].) It is my opinion that Ioka discloses the added limitation of claim 6 and that claim 6 is rendered obvious by Ioka in combination with Sach, Kumar, or Satoshi.



295.  The claim chart below provides exemplary disclosures from Ioka that disclose the elements of claim 6.

| Limitation | Ioka |
|---|---|
| **6.** A computer system according to claim 1, wherein said mounting assembly permits angular motion of said display screen relative to said keyboard base of at least one hundred eighty degrees. | **Ioka:**<br><br>*See, e.g.:*<br>**[0005]:** "According to the above-mentioned configuration, since the display part of the portable information processor is provided such that it can rotate around the vertical member, it is possible to show the display without rotating the main unit to a customer who is seated opposite the person showing the display."<br><br>**[0007]:**  "Moreover, since the connection part 30 prevents the severing of the wire between the main unit 10 and the display part 20, the angle of rotation is restricted in a range from +180° to -180° for the rotation of the perpendicular direction of the display part when the angle of the front surface of the display panel of the above-mentioned display part is set at 0°."<br><br>**[0007]:**  "Moreover, the inside of the fixing part 100 has an impelling part that imparts frictional resistance to the vertical part 50 and with which the display part 20 in Figure 1 can be fixed to a suitable rotating position, and a vertical member support part 110 that has an angle restriction part that is composed of a projection that restricts the angle of rotation of the vertical part 50 to a range from +180° to -180°." |

| Limitation | Ioka |
|---|---|
| | **Fig. 1, 5.** |

6.      <u>**Claim 8 is obvious over Ioka in combination with Sach, Kumar, or Satoshi.**</u>

> **8.** *A computer system according to claim 1, wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer.*

296.   Claim 8 depends from claim 1 and adds: "wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer." As described above, Ioka in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (See supra Part VI.A.2.)

297.   As described for claim 1 above (see supra ¶¶ 274274-277277), Sach and Kumar teach a plurality of input/output ports on the front wall or side wall of a laptop's base. (Sach at 3:4-7, 3:35-42; Kumar at 4:21-24, Fig. 4.) The input/output ports of Sach and Kumar suggest to a POSITA that ancillary devices could be connected to input/output ports. (Sach at 3:35-42; Kumar at 1:22-25.) For example, Kumar teaches that input/output devices, such as printers, light pens, image scanners, video scanners, etc., could be connected to the input/output ports of the laptop. (Kumar 1:22-25.) In addition to these example devices disclosed by Kumar, a POSITA would understand that many other types of input/output devices including ancillary computer systems could be connected to a laptop via appropriate input/output ports proximate the front wall of the base. These ancillary devices could include one of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket

computer.  Accordingly, it is my opinion that Ioka in view of Sach or Kumar renders claim 8 obvious.



Sach, Fig. 1                                    Kumar, Fig. 4

298.   It is also my opinion that claim 8 would have been obvious in view of Satoshi.  As described for claim 1, (*see supra* ¶¶ 278-279175), Satoshi discloses a tablet-integrated personal computer that uses a tablet as an input device that can be "removably stowed at predetermined position within the personal computer body."  (Satoshi, ¶ [0005], Fig. 1.)  The tablet allows for a user's handwritten graphics to be displayed on the display of the personal computer.  (Satoshi, ¶ [0007].)  The tablet inherently includes some processing ability to transform the strokes made by a user into data transmitted to the personal computer.  Thus, a POSITA would have considered the disclosed  tablet to be an example of a palm top computer, hand-held computer, electronic book, or pocket computer.  For these reasons, it is my opinion that the tablet in Satoshi could be characterized as one or more of the *ancillary computer systems* listed in claim 8.  Accordingly, it is my opinion that Ioka in view of Satoshi renders claim 8 obvious.



[FIG. 1]

299.   The claim chart below provides exemplary disclosures from Sach, Kumar, and/or Satoshi that discloses the elements of claim 8.

| Limitation | Sach, Kumar, or Satoshi |
|---|---|
| **8.** A computer system according to claim 1, wherein said ancillary computer system is selected from the group consisting of a desktop computer, a personal digital assistant, a palmtop computer, a hand-held computer, an electronic book, and a pocket computer. | **Sach**<br>*See, e.g.:*<br>**1:59-61:** "A two-slot VME processor box is disposed in the housing and is designed to receive two VME cards that are slid into the VME processor box from one side of the workstation."<br>**2:57-60:** "A two-slot VME processor box 16 is disposed in the housing 11 and is designed to receive two VME cards 17 (one of which is shown) which are slid into the VME processor box 16 from one side of the workstation 10."<br>**3:4-7:** "The [VME] processor card 17 has a plurality of input and output ports 19, including a local area network (LAN) port 19a, a small computer systems interface (SCSI) port 19b, a parallel port 19c, and a serial port 19d."<br>(Sach at 3:4-7; see FIG. 1).<br>**3:35-42:** "The VME processor card 17 has a LAN port 19a such as an AUI port 19a, a SCSI port 19b that is internally terminated by a terminator 28, a parallel port 19c for connection to a printer for example, an RS-232 port 19d for connection to a printer or modem, for example, a keyboard and trackball port 1ge for connection to the keyboard 24 and the trackball 25, and an RS-343 port 19/ for connection to the display panel 13." |

| Limitation | Sach, Kumar, or Satoshi |
|---|---|
| | **Fig. 1** |
| | **Kumar** |
| | *See, e.g.:* **1:15-25:** "Since the advent of the personal computer, manufacturers and industrial users have continually developed faster, smaller and more versatile machines, including portable computers that are dedicated to perform a specific function such as word processing, data collection or item identification. Alternatively, portable computers may be all purpose computing machines capable of running a variety of types of software programs. These portable personal computers may interact with a variety of portable and stationary peripheral input/output devices such as printers, light pens, image scanners, video scanners, etc." |
| | **4:21-24:** "Additionally, portable computer 2 is normally provided with a plurality of input/output ports such as port 20 extending through front wall 9, and port 21 extending through sidewall 8." |
| | **Fig. 4** |
| | **Satoshi** |
| | *See, e.g.:* **[0005]:** "To solve the above-described problem, the tablet-integrated personal computer of the present invention uses a tablet as the pointing device, and is provided with a stowing portion in which the tablet can be removably stowed at predetermined position within the personal computer body, and a tablet connection portion for connecting the tablet at a predetermined position on the personal computer body." |
| | **[0007]:** "As illustrated in FIG. 1, a tablet stowing portion 3 for stowing a tablet 2 may, for example, be provided on the side of the body. A tablet connection portion 4 is provided with a connector that opposes a connector of the tablet 2, at a position that allows a user to use the tablet 2 without removing their hands from the keyboard. The tablet 2, provided in place of the trackball, is a pointing device that allows pointing/movement of a cursor (not shown in the drawings) displayed on the display of the personal computer 1, and the input of handwritten information such as graphics |

207

| Limitation | Sach, Kumar, or Satoshi |
|---|---|
| | and text information. When the personal computer 1 is carried around, the tablet 2 is stowed in the tablet stowing portion 3. The tablet stowing portion 3 is provided with a lock mechanism not shown in the drawings to ensure that the tablet 2 is not jolted out by impacts that occur while the personal computer 1 is being carried. When used, the tablet 2 is taken out of the tablet stowing portion 3 and connected to the tablet connection portion 4." <br><br> **Fig. 1** |

7. **Claim 9 is obvious over Ioka in combination with Sach, Kumar, or Satoshi.**

> **9.** *A computer system according to claim 1, further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base.*

300. Claim 9 depends from claim 1 and adds: *"further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base."* As described above, Ioka in combination with Sach, Kumar, or Satoshi renders claims 1 obvious. (*See supra* Part VI.A.2.)

301. Ioka describes an angle restriction part (*stop*) for limiting rotational motion of the display part 20. Ioka states that "the inside of the fixing part 100 has . . . a vertical member support part 110 that has an angle restriction part that is composed of a projection that restricts the angle of rotation of the vertical part 50 to a range from +180° to -180°." (Ioka, ¶ [0007].) It is therefore my opinion that claim 9 is rendered obvious by Ioka in combination with Sach, Kumar, or Satoshi.

208



302.    The claim chart below provides exemplary disclosures from Ioka that disclose the elements of claim 9.

| Limitation | Ioka |
|---|---|
| **9.** A computer system according to claim 1, further comprising at least one stop for limiting rotational motion of said display screen relative to said keyboard base. | **Ioka:**<br><br>*See, e.g.:*<br>**[0007]:** "Moreover, the inside of the fixing part 100 has an impelling part that imparts frictional resistance to the vertical part 50 and with which the display part 20 in Figure 1 can be fixed to a suitable rotating position, and a vertical member support part 110 that has an angle restriction part that is composed of a projection that restricts the angle of rotation of the vertical part 50 to a range from +180° to -180°."<br><br>**Fig. 2.** |

### 8.    Claim 10 is obvious over Ioka in combination with Sach, Kumar, or Satoshi.

> **10.** *A computer system according to claim 1, wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base.*

303.    Claim 10 depends from claim 1 and adds: "wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base."  As described above, Ioka in combination with Sach, Kumar, or Satoshi renders claims 1 obvious.  (See supra Part VI.A.2.)

209

304.    As described in claim 1 above, Ioka discloses a connection part 30 where "a linking part 120 is connected to the vertical member 50, and vertical member 50 in the vertical direction and the horizontal member 60 in the horizontal member are fixed."    (Ioka, ¶ [0008], Fig. 2.)  Connection part 30 also includes "a fixing part 100 that has, on both sides, holes for fixing the connection part 30 with screws to the bottom surface and back surface of the main unit 10, and a column-shaped vertical member 50 that can rotate around the shaft that is disposed perpendicularly to the fixing part 100." (Ioka, ¶ [0007].)  "[T]he connection part 30 is fixed by a screw 200 at the surface to the rear of the main unit, and in addition it is also fixed by a screw to the reverse surface of the main unit." (Ioka, ¶ [0010], Fig. 3.)  Furthermore, Figure 3 shows Ioka's device when it's closed and shows that all the elements of connection part 30, except the horizontal member 60, are located within the main unit 10. (Ioka, Fig. 3.)  This means there must be an opening in main unit 10 (*keyboard base*) through which passes vertical member 50 (*turret that is rotatable*), which is part of the rotatable element of the connection part 30.  Figure 1 shows that the hinge mechanism is part of a circular opening in the base of the disclosed laptop computer system.    Therefore, it is my opinion that Claim 10 is obvious in view of the combination of Ioka with Sach, Kumar, or Satoshi.



305.    The claim chart below provides exemplary disclosures from Ioka that in my opinion discloses the elements of claim 10.

| Limitation | Ioka |
|---|---|
| **10.** A computer system according to claim 1, wherein said rotatable element of said mounting assembly defines a turret that is rotatable relative to a circular opening formed in said keyboard base. | **Ioka**:<br><br>*See, e.g.:*<br>**[0007]:** "The connection part 30 has a fixing part 100 that has, on both sides, holes for fixing the connection part 30 with screws to the bottom surface and back surface of the main unit 10, and a column-shaped vertical member 50 that can rotate around the shaft that is disposed perpendicularly to the fixing part 100."<br><br>**[0008]:** "A linking part 120 is connected to the vertical member 50, and vertical member 50 in the vertical direction and the horizontal member 60 in the horizontal member are fixed."<br><br>**[0010]:** "[T]he connection part 30 is fixed by a screw 200 at the surface to the rear of the main unit, and in addition it is also fixed by a screw to the reverse surface of the main unit."<br><br>**Fig. 1.** |

## VII.    SECONDARY CONSIDERATIONS

306.    I have been informed that certain secondary considerations may be examined to determine whether a certain invention would have been obvious to one of ordinary skill in the ordinary art.

307.    As I indicate above, I understand that secondary considerations may be addressed when relevant.  It is my understanding that Blackbird has not set forth an opinion on secondary considerations of non-obviousness.  At this time, I am not aware of any evidence of secondary considerations supporting the non-obviousness of the '931 patent.  To the extent that Blackbird provides through its expert an opinion regarding secondary considerations, I reserve the right to respond to such opinions.

211

## VIII.  SUMMARY OF CONCLUSIONS

308.    For the reasons presented above, it is my opinion that the asserted claims of the '931 patent are obvious.

309.    As detailed above, there is substantial art, which I understand was publicly known prior to the invention date and/or the priority date of the '931 patent, which disclose each and every element of the asserted claims.  The identification of such art and the relevant disclosures therein are detailed above.

## IX.  RESERVATIONS OF RIGHTS

310.    I plan to continue my investigation and study, which may include a review of documents and information which may yet be produced including without limitations copies of expert reports filed by Blackbird's expert(s).  Additionally, some of my opinions are based on my understanding of Blackbird's interpretation of terms as reflected in its infringement contentions. Accordingly, I reserve the right to expand upon or modify my opinions as my investigation and study continue, and to supplement my opinions in response to any additional information that becomes available to me, including any new interpretations and infringement theories asserted by Blackbird. As such, I expect that I will review, and reserve the right to respond to, the reports prepared by Blackbird's experts.

311.    I further intend to supplement this report, if necessary, should the Court render any additional rulings on claim construction. I reserve the right to provide a supplement to this report regarding any new material that I may be provided subsequent to the writing of this report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing Declaration is true and correct.

Dated: November 9, 2017

_____
T. Kim Parnell, PhD, PE

# EXHIBIT A

# T. Kim Parnell, PhD, PE

parnell-eng.com

1150 Kelsey Drive
Sunnyvale, CA  94087

(408) 203-9443 (Cell)
kim.parnell@stanfordalumni.org

## Expertise Highlights

- Medical device/biotechnology – Cardiovascular, Orthopedic, Orthodontic
- Patents & Intellectual Property
- Product Liability; Personal Injury
- Consumer Electronics; Consumer Products
- Plastics, Molding, & Manufacturing
- Composite Materials Design & Damage
- Materials & Metallurgy
- Failure Analysis & Reliability
- Fracture & Fatigue
- System Specifications & Test Procedures
- Telephone set design; keypads
- Finite Element Analysis of Structures and Fluid/Heat Transfer (FEA/CFD)
- User experience & system interaction
- User interface design
- Transducers, Accelerometers, MEMs
- Software design, development, QA
- Shock & Vibration Sensitivity
- Green energy: Wind energy, Electric Vehicles, Battery technology, Solar
- Structural Mechanics, Fluid Mechanics, Heat Transfer, & Thermodynamics
- Piezoelectric components
- Vehicle & Heavy-Truck Crashworthiness
- Group Manager & Project Leader; Strategic & Budgetary Planning responsibility

## Education

| Year | University | Degree Awarded |
|------|-----------|----------------|
| 1984 | Stanford University | Ph.D., Mechanical Engineering |
| 1979 | Stanford University | MSME, Mechanical Engineering |
| 1978 | Georgia Tech | BES, Engineering Science & Mechanics (Highest Honors) |
| 2004 | San Jose State University | Silicon Valley Executive Business Program (SVEBP) |

Ph.D. Thesis:  "Numerical Improvement of Asymptotic Solutions and Nonlinear Shell Analysis", June, 1984.

## Professional Associations and Achievements

- Registered Mechanical Engineer (PE, M025550) in the State of California
- ASME Fellow; American Society of Mechanical Engineers (ASME)
- IEEE Senior Member; Institute of Electrical and Electronics Engineers (IEEE)
- Member, Society of Automotive Engineers (SAE)
- ASM International Member; SMST (Shape Memory and Superelastic Technologies) Member; EDFAS (Electronic Device Failure Analysis Society) Member
- IEEE Santa Clara Valley (IEEE-SCV) Section; Chair-2011, Vice Chair-2010
- IEEE Consultants' Network of Silicon Valley (IEEE-CNSV), Board Member; Chair: 2008-2009
- NAFEMS – Composite Materials Working Group (CWG), Vice-Chair
- IEEE Vehicular Technology Society (IEEE-VTS); Vice-Chair, 2012-present.
- IEEE Consumer Electronics Society, IEEE Computer Society, IEEE Engineering in Medicine & Biology (IEEE-EMBS), IEEE Components, Packaging, and Manufacturing (IEEE-CPMT)
- Reviewer, *Journal of Composite Materials*
- Chinese American Semiconductor Professional Association (CASPA)
- NanoBio*Convergence* (NBC), Board of Directors
- CSIX Connect (CSIX), Board of Directors
- Medical Device Network (MDN), Stanford University
- The Bio2Device Group (B2DG)

## Employment History

| | |
|---|---|
| From: 2000<br>To: Present<br>Position: | **Parnell Engineering & Consulting (PEC)**<br>Sunnyvale, CA;                                        Web: parnell-eng.com<br>*Principal & Founder* |

Provides independent engineering consulting & expert witness services for high-technology applications including:

- Medical device/biotech product development & concept design
- Medical device cardiovascular applications across wide product range
- Medical device orthopedic, spinal, prosthetic devices
- VC technical due-diligence for prospective medical device investment
- Patent & intellectual property – research & due diligence
- Expert Witness & Litigation Support services
- Nitinol, shape-memory applications; biomaterials applications
- Portable devices, keypads:  robust design, reliability & durability
- Manufacturing technology; materials applications (metals, polymers)
- Reliability and failure analysis services; accelerated testing
- Research in application & damage of composite materials
- Teaching intensive workshops & training seminars on simulation, design, and reliability for practicing engineers
- Lecturer in Prof. Steve Tsai's *Stanford Composites Design Workshop*
- Composite materials design & applications;
- Wind Energy & Alternative Energy applications – technology
- Electric vehicles, battery systems: design & development
- Heavy-Truck Rollover and Vehicle Crashworthiness
- Software design, development, user experience, QA, testing
- Application of CAE, FEA, and High-Performance Computing (HPC)

| | |
|---|---|
| From: 2010<br>To: 2012<br>Position: | **Santa Clara University**<br>Santa Clara, CA<br>*Faculty, Mechanical Engineering Department* |

Taught courses covering a range of topics including Materials Science, Manufacturing Methods, Composite Materials, Finite Element Methods, Mechanism Dynamics, Computer Graphics, & Design. Advised students on Design, Safety, and Simulation for Student Projects including SAE Formula-Hybrid Vehicles. Research in Composite Materials and High-Performance Computing. Interaction with Industry Advisory Board (IAB) & ABET Certification. Teamed with other faculty for strategic initiatives and equipment/tool grants for research. Promote IEEE, ASME, cross-disciplinary initiatives & social media avenues for student networking, professional development & project support.

| | |
|---|---|
| From: 2006<br>To: 2010<br>Position: | **MSC Software Corporation**<br>Sunnyvale, CA<br>*Senior Manager, User Experience; Lead Application Engineer* |

Integrated feedback from customers into user interface design & specifications; Beta testing of prototypes with users; CAE software Product Management role for user interface and analysis tools including:

- Product quality, testing, and improvement; drove customer satisfaction
- Application of advanced analysis technology in design & manufacturing

**CV of T. Kim Parnell, PhD, PE**                                                                        Page 2

*Parnell_Kim_70s.docx*

- Led corporate Wind Energy initiative & revival of Fatigue product
- Composite materials – acknowledged corporate & customer expert
- Customer training courses, workshops, webinars; developed & taught
- Software design, development, QA, testing of commercial apps
- Mentoring and development of junior staff; interviewed & hired staff for India; developed and trained staff using distance learning

Applied finite element technology to applications including automotive, medical device, and electronics. Created customer satisfaction via:

- Customer support & analysis process development
- Material testing & data reduction for development of properties

| | |
|---|---|
| From: 1999<br>To: 2000<br>Position: | **Rubicor Medical, Inc.**<br>Redwood City, CA<br>*Director of R&D*<br>Led the R&D team for this start-up medical device company developing breast diagnostic and therapeutic devices.  Designed device considering interaction of Physician with Device and human factors. System included a mechanical subsystem and RF generator/control electronics. Developed initial prototypes and conceptual designs; researched IP and competing technologies. |
| From: 1986<br>To: 1999<br>Position: | **Exponent, Inc. and Failure Analysis Associates (FaAA)**<br>Menlo Park, CA<br>*Senior Managing Engineer*<br>Delivered consulting services for failure analysis, accident investigation, product liability, patent/IP, insurance-related litigation, medical device and biotechnology product development, FDA submission, and forensic/failure investigation. Performed analyses involving stress, thermal, & fluid applications; testing of material properties and use of laboratory techniques such as SEM & Optical Microscopy for inspection of material samples. Led the SAE Heavy Truck Crashworthiness, Phase II project with testing & simulation of heavy-truck cabs in rollovers.  Managed the Engineering Analysis Group and had profit/loss responsibility for the Engineering Computer Center.  Maintained high personal utilization/billable hours and had increasing personal/group profitability with consulting services revenue generation >$600K. |
| From: 1995<br>To: 1996<br>Position: | **Stanford University**<br>Stanford, CA<br>*Visiting Associate Professor, Mechanical Engineering Department*<br>Taught graduate courses in Theory of Plates and Theory of Shells in the Applied Mechanics Division (now Mechanics & Computation) of Mechanical Engineering.  Part-time appointment while full-time staff-member at Exponent. |
| From: 1984<br>To: 1986<br>Position: | **SST Systems, Inc.**<br>Sunnyvale, CA<br>*Principal Engineer in Pressure Vessels, Piping & Structures Division*<br>Managed software development, facilitated university collaboration, developed product specifications and enhancements based on customer feedback, supported and trained over 30 new customers, and created standardized product documentation.  Provided sales and technical marketing support to CEO during product launch; formulated go-to-market campaign. |

**CV of T. Kim Parnell, PhD, PE**
*Parnell_Kim_70s.docx*

| From: 1980 | **Stanford University** |
|---|---|
| To: 1984 | Stanford, CA |
| Position: | *Research Assistant, Mechanical Engineering Department* |

Established the theoretical basis and developed computational tools for nonlinear shell mechanics.  Emphasized computational mechanics and engineering applications, including linear & nonlinear finite element methods and other numerical analysis techniques.

| From: 1978 | **AT&T Bell Laboratories** |
|---|---|
| To: 1980 | Indianapolis, IN |
| Position: | *Member of Technical Staff (MTS), Physical Design Group* |

Design, development, and manufacturing of high-volume telecommunication components.  Researched and designed dials, keypads, electromechanical systems, and piezoelectric polymer applications. Employed range of materials including elastomers, metals, polymers, and piezoelectrics for keypad and transducer applications. Emphasis on cost, reliability, and manufacturing simplicity. Developed new technologies to ultimately drive field improvements. Applied finite element simulation to improve designs and reduce prototypes.

| From: 1976 | **General Motors Corporation** |
|---|---|
| To: 1977 | Atlanta, GA |
| Position: | *Engineering Assistant, Plant Engineering Department* |

Production line design and manufacturing applications for the GM Lakewood assembly plant.  Supervised demolition and production line installation during changeover.  Installed automated spotweld robot for sheet metal panels.  Studied automotive manufacturing & assembly operations from start to finish.

## Selected Grants & Research Programs

### SA Photonics, Inc.
- 2013 – Phase I Navy SBIR – Post-IED Hull Inspection Tool, Topic N123-156

### Stanford University
- 2012 – Phase II Army SBIR – Development and Implementation of Micro-Mechanics of Failure (MMF) Model for Composites in Commercial Finite Element Codes

### Santa Clara University
- 2012 – Kuehler Summer Undergraduate Research Grant – student support for composite materials testing & characterization
- 2011 – Technology Innovation Grant – Acquisition of advanced DSC/TGA System for improved lab capability
- 2011 – Technology Innovation Grant – Acquisition of High-Performance Workstation for advanced simulation of large dynamic and nonlinear systems
- 2011 – Technology Innovation Grant – Materials Laboratory equipment upgrades and reorganization

## Selected Presentations

"SMA Seismic Damping Devices: Fabrication, Testing, Analysis, and Projections", SMST-2014, Monterey, CA, May, 2014.

"Mechanical Design for Reliability:  What does it Mean?", ASME Santa Clara Valley Section, Sunnyvale, CA, Mar, 2014.

"Prosthetic Feet using Carbon Fiber Composites:  Design, Simulation, & Testing", ASME Santa Clara Valley Section, Jun, 2013.

**CV of T. Kim Parnell, PhD, PE**                                    Page 4

*Parnell_Kim_70s.docx*

"Mechanical Design for Reliability:  Beating the Tough Problems", IEEE-SCV Reliability Society, Santa Clara, CA, Jun, 2013.

"Prosthetic Feet using Carbon Fiber Composites:  Design, Simulation, & Testing", MSC Software 50th User Conference, Irvine, CA, May, 2013.

 "Composite Materials: Improved Understanding of Composite Failure Mechanisms with DIC Testing & Analysis", Trilion User Conference, Philadelphia, PA, Sep, 2012.

"Medical Device Failures – 'Not so Good, Very Bad, and Truly Ugly'!!", ASM (Materials Information Society) Santa Clara Valley Chapter, May, 2012.

"C-Ply Bi-Angle NCF Tape Seam Assessment & Design Considerations for Automated Tape Laying", Composites Design Forum, JEC Composites Conference, Paris, Mar, 2012.

"Failure of Structures Designed with Composite Material – Delamination", *'Meet the Experts' Forum on Composite Materials*, Joint with Prof. Steve Tsai, SMP Tech, Feb 28, 2012.

 "Shape Memory Alloy Fundamentals & Advanced Simulation Techniques for Medical Products", *'Meet the Experts' Forum on Nitinol Properties and Unique Behavior for Medical Product Design*, SMP Tech, Sep 14, 2011.

"Stiffness and Strength of Laminates Fabricated with Bi-Directional Tape", ICCM-18 (International Conference on Composite Materials, Korea, Aug, 2011, (with Daniel D. Melo & Christine Tower))

"Composite Materials – Damage & Delamination", Santa Clara University, Mechanical Engineering Seminar, Feb, 2011

"Composites Damage, Delamination, Failure & Curing" and "Workshop on Mic-Mac/FEA" with Prof. Steve Tsai, Stanford Composites Design Workshop, 2010-2012

"Composite Damage, Delamination, and Failure" and "Workshop on Mic-Mac/FEA" with Steve Tsai, Stanford Composites Design Workshop, Jan, 2010

"Composite Failure Methods – Application Comparisons", Composites Durability Workshop-14 (CDW-14), UCLA, Jul, 2009

"Composites Damage, Delamination, and Failure Analysis", Stanford Composites Workshop, May 2009

"Finite Element Analysis using a Thermomechanical Shape Memory Alloy Model", SMST-2006, Monterey, CA, 2006.

"Medical Device Issues & Trends", in "Biomedical Wave: Opportunities for Non-Biologists**,** MedTech Bridge Seminar Series, 2005.

"Medical Device Development and Entrepreneurship", IEEE Consultants' Network of Silicon Valley (IEEE-CNSV), www.CaliforniaConsultants.org , 2004.

"CFD Fundamentals and Applications in Biotechnology", ASME Professional Development Seminar, 2003 & 2004.

"Medical Device Business Opportunities in China", multiple presentations to key government and industry representatives, CASPA Delegation, Oct, 2003.

"Using Simulation with Testing for Maximum Benefit", WESCON 2003, Low Cost Tools: Alternatives for Problem Solving in Development, Design and Application, San Francisco, CA, Aug, 2003.

"Fracture Mechanics: Overview and Applications", Aeronautics & Astronautics Department, Stanford University, May, 1999.

"Integrated Fluid/Thermal/Structural Analysis of a Turbine Blade", American Society of Mechanical Engineers Bay Area Technical Conference, May, 1995.

"Failure Analysis Projects", Mechanical Engineering Department, Stanford University, May. 1992.

**CV of T. Kim Parnell, PhD, PE**                                                                                      Page 5

*Parnell_Kim_70s.docx*

"Finite Element Applications in Failure Analysis", Mechanical Engineering Department, Stanford University, Mar, 1991.

"Soil-Pipeline Interaction Associated with a Process-Plant Explosion", Seminar in Solid Mechanics, Stanford University, Nov, 1989.

"*Typical* Failures: Causes and Consequences", Construction Engineering and Management Program, Civil Engineering Department, Stanford University, 1989.

"Shell Analysis Using Personal Computers", Solid Mechanics Seminar, Stanford University, 1985.

## Selected Publications

"Numerical Simulation of Seismic Response Control of Frame Structure Using High-Temperature Shape Memory Alloy Wire"; In proceedings of: International Conference on Earthquake Engineering (SE-50EEE), At MAEE, Skopje, Macedonia, May 2013, (with Md. Golam Rashed and Raquib Ahsan).

"Equivalent Properties for Finite Element Analysis in Composite Design", JEC Composites Magazine, No.68 (Bi-Angle NCF Special Issue), Oct, 2011, (with Stephen W. Tsai)

"Stiffness and Strength of Laminates Fabricated with Bi-Directional Tape", ICCM-18, Aug, 2011, (with Daniel D. Melo & Christine Tower)

*"How Reliable Is Your Product: 50 Ways to Improve Product Reliability",* Mike Silverman, 2011 (2-Book Chapters contributed by T.Kim Parnell).

"Heavy Truck Roll Cage Effectiveness", IMECE2009-12423, Proceedings of IMECE: ASME-Mechanical Engineering Congress and Exposition, Nov, 2009, (with Stephen Batzer, Bruce Enz, Grant Herndon, Chandrashekar Thorbole, Robert Hooker, and Mariusz Ziejewski).

"Composite Failure Methods – Application Comparisons", Proceedings of Composites Durability Workshop-14 (CDW-14), UCLA, Jul, 2009

"Thermoelastic Shape Memory Modeling of Medical Devices with FEA", SMST-2006, The International Conference on Shape Memory and Superelastic Technologies, ASM International, May, 2006, (with Sanjay Choudhry and Jesse Lim).

"Finite Element and Fatigue Analysis of CardioVasc Stent Graft", CardioVasc, Inc., 2004.

"Analysis of Rail Cracking and Development of a Rail Screening Guideline Based on Fracture Mechanics Principles", Fatigue & Durability Assessment of Materials, Components & Structures, Proceedings of the Fifth International Conference of the Engineering Integrity Society, Queen's College, Cambridge, UK, Apr 7-9, 2003.

"Finite Element and Fatigue Analysis of CP Stent Expansion", NuMed, Inc., 2003.

"Evaluation of a Failure in a Chlorine Production Facility", Proceedings of IMECE 2001, ASME International Mechanical Engineering Congress and Exposition, Nov, 2001, New York, NY (with S. Andrew, R. Caligiuri, and L. Eiselstein).

"Physical Testing for Good Analysis: Experimental Validation for Quality Finite Element Analysis of Medical Devices", feature article for *ANSYS Solutions*, Fall 2000 (Machine Design Custom Media, Penton Media, Inc.).

"Finite Element Simulation of 180° Rollover for Heavy Truck Vehicles", ASCE Engineering Mechanics Conference, Baltimore, MD, Jun, 1999 (with Christopher V. White and Shari E. Day).

"Finite Element Analysis of the S670 Cardiovascular Stent", Arterial Vascular Engineering, Inc., 1999.

"Finite Element Analysis of the S660 Cardiovascular Stent", Arterial Vascular Engineering, Inc., 1999.

"Finite Element Analysis of the Six Crown Extra Support Renal Stent – Minimum Dimensions", Arterial Vascular Engineering, Inc., 1998.

"Finite Element Analysis of the SVG Stent", Arterial Vascular Engineering, Inc., 1998.

"Finite Element Analysis of the GFX-II Cardiovascular Stent", Arterial Vascular Engineering, Inc., 1998.

"Analysis of Drill Pipe Joint Failures and Recommendations For Service", Failure Analysis Associates, Inc. Report, Nov, 1997 (with R.D. Caligiuri, L.E. Eiselstein, M. Wu, R. Huet).

"Finite Element Analysis of the GFX Cardiovascular Stent", Arterial Vascular Engineering, Inc., 1997.

"Stress Analysis: AVE MicroStent-II Cardiovascular Stent", Arterial Vascular Engineering, Inc., 1997.

"SAE Report CRP-12 Heavy Truck Crashworthiness – Phase II (180° Dynamic Rollover, Static Roof Crush Simulation)", SAE Headquarters, 1997.

"Heavy Truck 180º Dynamic Rollover and Static Roof Crush Simulation", Failure Analysis Associates, Inc. Report, Apr, 1996 (with C. White, S. Day, T. Khatua, and L. Cheng).

"Fracture Toughness by Small Punch Testing", *Journal of Testing and Evaluation*, Vol. 23(1), pp. 3-10, Jan, 1995 (with J. R. Foulds, P. J. Woytowitz and C. W. Jewett).

"Safety Analysis of Custom Designed Manufacturing Equipment", Proceedings, American Society of Mechanical Engineers Winter Annual Meeting, Safety Engineering and Risk Analysis, New Orleans, Louisiana, Nov, 1993, Vol. 1, pp. 111 (with G. L. Rao and R. D. Caligiuri).

"American Azide Corporation Reactor and Dryer Safety Studies", Failure Analysis Associates, Inc. Report, Jan, 1993 (with G. L. Rao, V. B. Rao, and R. D. Caligiuri).

"Combustion Tests on and Chemical Analysis of Therminol 66 Heat Transfer Fluid Used at American Azide", Failure Analysis Associates, Inc. Report, 1993 (with A. Reza and R. D. Caligiuri).

"Gas Release from Leaky Natural Gas Pipeline: The PEPCON Explosion in Henderson, Nevada", Failure Analysis Associates, Inc. Report, 1992 (with A. Reza, M. El-Fadel and R. D. Caligiuri).

"Computational Modeling of Dynamic Failure in Armor/Anti-Armor Materials", Failure Analysis Associates, Inc. Final Report to U.S. Army Research Office, Contract DAA-L03-88-C-0029, May, 1992.

"Analysis of Cracking in the Windsor Recovery Boiler Superheater", Failure Analysis Associates, Inc. Report to Domtar, Inc., Apr, 1992 (with R. D. Caligiuri, C. H. Lange and S. P. Andrew).

"Analysis of the Dynamic Response of a Buried Pipeline due to a Surface Explosion", *Computational Aspects of Impact and Penetration*, L.E. Schwer and R.F. Kulak, eds., Elme Press International, 1991 (with R. D. Caligiuri).

"Failure Analysis of Aerzen Screw Compressor Male Thrust Bearings", Failure Analysis Associates, Inc. Report to AECI Chlor-Alkali & Plastics, Ltd., Sep, 1991 (with C. C. Schoof).

"Gas Flow and Heat Transfer in a Pipe Tee Joint", Failure Analysis Associates, Inc. Report to Chevron Corporation, Nov, 1990 (with R. D. Caligiuri and A. Reza).

"Development of Dynamic Failure Criteria for Ceramic Armor Materials", Failure Criteria and Analysis in Dynamic Response Symposium, ASME Winter Annual Meeting, Nov, 1990, H.E. Lindberg, ed.

"DYNA3D Analysis of the Dynamic Response of a Buried Pipeline due to a Surface Explosion", DYNA3D User Group Conference, Bournemouth, Dorset, United Kingdom, Sep, 1990.

"Con Edison Hellgate Facilities Gas Main Rupture", Failure Analysis Associates, Inc. Report to Consolidated Edison Company of New York, Inc., Feb, 1990.

"Stress and Fracture Mechanics Analysis of Weld Cracking in a Rotary Ball Mill", American Society of Mechanical Engineers Winter Annual Meeting, Paper 89-WA/DE-17, San Francisco, California, Dec, 1989 (with C. A. Rau, Jr., H. F. Wachob and E. L. Kennedy).

"Analysis of the Plunger-to-Plunger Rod Joint in an Automotive Fuel Injector", Failure Analysis Associates, Inc. Report to Hitachi, Ltd., Oct, 1988 (with P. R. Johnston and B. Ross).

"Analysis of the Circumferential Seam Weld Cracking of Raw Grinding Mills", Failure Analysis Associates Report to Kaiser Cement Corporation, Nov, 1986 (with C.A. Rau, Jr., H.F. Wachob).

"Local Flexibility and Stresses in Cylindrical and Spherical Shells Due to External Loadings on Nozzles and Lug Attachments", A.F.I.A.P. Conference, Paris, France, Oct, 1986.

"Analysis of Piping Systems with Local Nozzle Flexibility Using Personal Computers", American Society of Mechanical Engineers Pressure Vessel and Piping Conference, New Orleans, LA, 1985.

"Numerical Improvement of Asymptotic Solutions and Nonlinear Shell Analysis", Ph.D. dissertation, Stanford University, Jun, 1984.

"Numerical Improvement of Asymptotic Solutions for Shells of Revolution with Application to Toroidal Shell Segments", *Computers & Structures*, Vol. 16, No. 1-4, 1982.

## Consulting Projects - Selected

Client:     Silver Spring Networks, Inc.; Ops A La Carte LLC
Project:    Mechanical Accelerated Life Testing and Reliability Assessment of Commercial IoT Network-Connected Natural Gas Metering Equipment; Failure Analysis support

Client:     F-Prime Capital Partners (former Fidelity Biosciences)
Project:    Technical Due-Diligence review of prospective stealth-mode medical device investment

Client:     SI-Bone, Inc.
Project:    Design review of iFuse sacroiliac (SI) joint fixation devices; Competitive comparison

Client:     Promed Medical Inc.
Project:    Evaluation of deployment failure associated with Nitinol scaffold and bioabsorable PLGA cover material.  Test protocols; assessment of data and development of strategy to increase device reliability.

Client:     Topera Inc.
Project:    Evaluation of Nitinol device failure in test and clinical setting used for 3D mapping associated with treatment of arrhythmia. Comparison of current design with proposed redesign.

Client:     LC Therapeutics
Project:    Assessment of Nitinol coronary device.

Client:     CrossRoads Extremity Systems
Project:    Design evaluation of Nitinol orthopedic devices for bone fixation with focus on foot & ankle devices including staples and plates; Report for 510K submission to FDA

Client:     Bridgelux, Inc
Project:    Design evaluation of LED Outdoor Lighting Module (OLM) for assembly and service conditions; assessment of polymeric, injection-molded components including FRP (fiber-reinforced plastic)

Client:     Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Project:    MEMs Patent Portfolio review and assessment

Client:     Design Standards Corporation (DSC)
Project:    Design analysis & report for injection-molded surgical ligation clip;

Client:     Sirius Engineering LLC
Project:    Nitinol Vena-Cava Filter; Implantable cardiovascular medical device

Client:     Nitinol Technology, Inc.
Project:    Design and assessment of large-scale nitinol components for seismic damping in civil structures (buildings, bridges, roadways); analysis & testing collaboration

Client:     Varian Medical, Inc.
Project:    Medical radiation oncology capital equipment; shipping hazard assessment

Client:     Atsina Surgical LLC
Project:    Injection molded surgical ligation clip; material testing; product design, development, and optimization

Client:     Home Dialysis Plus
Project:    Development of reliability & accelerated testing protocols for innovative dialysis system including mechanical, electronic, & software components

Client:     Freedom Innovations, LLC
Project:    Carbon Fiber Prosthetic Foot – failure analysis, simulation

Client:     Ops A La Carte LLC
Project:    Mechanical Design for Reliability classes; failure analysis; simulation of mechanical & thermal performance; accelerated testing and root-cause analysis

Client:     OLT Solar
Project:    Product improvement under high-temperature exposure

Client:     VX Aerospace
Project:    Composite material product design and validation

Client:     Fidelity Biosciences
Project:    Medical device due-diligence and technology evaluation pre-investment

Client:     DJS Associates
Project:    Automated food packaging equipment - failure analysis and assessment of root cause issues

Client:     Tribal Engineering, LLC
Project:    Various simulation and customer training projects

Client:     Gerson Lehrman Group
Project:    MEMs Sensors; Various other projects

**CV of T. Kim Parnell, PhD, PE**                                                Page 9
*Parnell_Kim_70s.docx*

Client:     Ops A La Carte LLC
Project:    Various Reliability Consulting projects; Mechanical Design for Reliability Training

Client:     Revascular Therapeutics, Inc (acquired by Boston Scientific)
Project:    Implantable medical device for treatment of calcified lesions

Client:     City and County of San Francisco
Project:    Glass failure; Trial prep

Client:     Sagalio LLC
Project:    Retractable screen for portable cellular devices

Client:     New Energy Technologies, Inc
Project:    Alternative Energy concept assessment & review

Client:     Square One Medical
Project:    Implantable medical device design, development, simulation

Client:     Kyphon
Project:    Device improvement for spinal interventional device

Client:     ProMed, Inc
Project:    Implantable medical device for spinal application

Client:     Nuvation
Project:    Instrumentation assessment

Client:     Ovalis, Inc
Project:    Nitinol PFO Closure Device development and design improvements

Client:     Gateway Medical
Project:    Vascular Closure Device

Client:     Ensure Medical
Project:    Vascular Closure Device

Client:     Abbott Laboratories
Project:    Continued development and cost reduction aspects for StarClose device.

Client:     Integrated Vascular Solutions (IVS) (acquired by Abbot Labs)
Project:    Design & development of StarClose nitinol closure device for arterial closure
            following interventional procedures. 2005 MDM Excellence Award

Client:     Prolifix Medical
Project:    Nitinol device to excise plaque buildup from arteries

Client:     Coapt Systems
Project:    Bioabsorbable devices for surgical and cosmetic procedures

**CV of T. Kim Parnell, PhD, PE**                                               Page 10
*Parnell_Kim_70s.docx*

**Litigation Support Experience**
**Litigation Cases; Depositions & Expert Reports as Shown:**

| 2017 to Present | Client: | Rimon Law |
|---|---|---|
| | Case: | *Imogene D. Johns v. Invacare Corporation,* Tulare County Superior Court Case No. 270201 |
| | Project: | Alleged medical equipment product defect |
| | Status: | Ongoing |

| 2017 to Present | Client: | The Scranton Law Firm |
|---|---|---|
| | Case: | *Cesar Lopez & Moses Sepulveda v. DOES-1* |
| | Project: | Alleged design defect in ATV Rollover Protection System (RoPS); Design and Failure Analysis |
| | Status: | Ongoing |

| 2017 to Present | Client: | Vinson & Elkins |
|---|---|---|
| | Case: | *Blackbird Tech LLC d/b/a Blackbird Technologie v. Lenovo (United States) Inc.;,* C.A. No. 16-cv-140-RGA, United States District Court for the District of Delaware |
| | Project: | Patent infringement allegations around laptop computer screen display technology |
| | Status: | Invalidity Report Sep 2017;  Ongoing |

| 2017 to Present | Client: | White & Case LLP |
|---|---|---|
| | Case: | *Maquet Cardiovascular LLC v. Abiomed Europe GmbH and Abiomed R&D, Inc*.;  C.A. No. 1:16-CV-10914, United States District Court for the District of Massachusetts |
| | Project: | Multiple Patent & Technology dispute associated with Implantable Circulatory Support System Pumps |
| | Status: | Ongoing |

| 2017 to Present | Client: | Baker & Hostetler, LLP |
|---|---|---|
| | Case: | *SCA Hygiene Products AB et.al., SCA Tissue North America, LLC v. Tarzana Enterprises, LLC;* United States District Court, Western District of Wisconsin, No. 3:16-cv-00728 |
| | Project: | Patent infringement claims associated with paper goods manufacturing, stacking, folding, and packaging methods and equipment |
| | Status: | Ongoing |

| 2017 to Present | Client: | Vinson & Elkins |
|---|---|---|
| | Case: | *Inter Partes* Review of U.S. Patent No. 7,129,931; *Lenovo (United States) Inc. v. Blackbird Tech LLC d/b/a Blackbird Technologies, IPR2017-yyyy* |
| | Project: | Patent IPR involving laptop computer display apparatus |
| | Status: | IPR Declaration May 2017; Ongoing; |

**CV of T. Kim Parnell, PhD, PE**                                                                     Page 11
*Parnell_Kim_70s.docx*

| 2017 to Present | Client: | The Joe C. Savage Law Firm |
| | Case: | *Bauer v. Parks, Hyundai Motors America, and Deskins Motor Company and other related cases;* |
| | Project: | Vehicle Accident Investigation, Design, Crashworthiness, Fire |
| | Status: | Ongoing |

| 2017 to Present | Client: | Hill, Kertscher & Wharton, LLP |
| | Case: | *Trans Technologies Company v. Hendrickson USA LLC, et.al.*, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:16-cv-01778--AT |
| | Project: | Patent litigation involving heavy-truck tire inflation/deflation technology |
| | Status: | IPR Declaration Aug 2017; Ongoing; |

| 2017 to Present | Client: | Morgan, Lewis & Bockius LLP |
| | Case: | *Advanced Circulatory Systems, Inc. v. AutoMedx, Inc.,* and *AutoMedx, Inc v. ZOLL Medical Corp., Advanced Circulatory Systems, Inc.;* CPR Institute for Dispute Resolution, CPR File No. G-16-07 |
| | Project: | Medical Ventilator Technology Development; Medical equipment |
| | Status: | Ongoing |

| 2017 to Present | Client: | Dorsey & Whitney LLP |
| | Case: | *Hovik Nazaryan v. FemtoMetrix Inc.*, Superior Court of the State of California for the County of Orange Case No. 34-30- -2015- 00795246-CU-BC-CJC |
| | Project: | Semiconductor lithography equipment technology development |
| | Status: | Settled |

| 2016 to Present | Client: | Casper, Meadows, Schwartz & Cook |
| | Case: | *Rovner v. Medtronic, Inc. et.al.* Contra Costa Superior Court, Case No. C16-01768 |
| | Project: | Medical Device defect of NSC spinal lumboperitoneal (LP) Shunt/Valve for hydrocephalus shunting of excess cerebrospinal fluid (CSF); associated personal injury |
| | Status: | Ongoing |

| 2016 to Present | Client: | Rimon Law |
| | Case: | *Heather Ciechanowski v. Invacare Corporation, Folsom Care Center, Bluff Enterprises, Inc. and Calvin Callaway*, Sacramento County Superior Court Case No. 34-2016-00188724 |
| | Project: | Alleged medical equipment product defect |
| | Status: | Ongoing |

| 2016 to Present | Client: | Rucka, O'Boyle, Lombardo & McKenna |
| | Case: | *Concepcion Hernandez v. Helen of Troy, Inc;* |
| | Project: | Medical equipment personal injury |
| | Status: | Ongoing |

**CV of T. Kim Parnell, PhD, PE**                                                    Page 12
*Parnell_Kim_70s.docx*

| 2016 to Present | Client: | Quinn Emanuel Urquhart & Sullivan, LLP |
|---|---|---|
| | Case: | *TriReme Medical LLC v. AngioScore, Inc.*, Northern District of California; Case No. 14-cv-2946 |
| | Project: | Patent litigation involving cardiovascular medical device |
| | Status: | Deposition, Dec.2016; Expert Reports, Nov.2016 & Dec.2016; |

| 2016 to Present | Client: | Baker Manock & Jensen, PC |
|---|---|---|
| | Case: | *California Fire-Roasted LLC v. General Mills Operations, LLC;* Sacramento County Superior Court Case No. 34-2014-00170784-CU-BC-GDS |
| | Project: | Patent licensing and royalty case for food-processing equipment |
| | Status: | Ongoing |

| 2016 to Present | Client: | DLA Piper, LLP |
|---|---|---|
| | Case: | *Inter Partes* Review of U.S. Patent No. 6,099,882; *Olam West Coast, Inc. v. California Fire-Roasted LLC* |
| | Project: | Patent IPR involving food-processing equipment |
| | Status: | IPR Declarations Filed Oct.2016;  Ongoing |

| 2016 to Present | Client: | Plews Shadley Racher & Braun, LLP |
|---|---|---|
| | Case: | *Rick C. Sasso, M.D., and See LLC v. Warsaw Orthopedic, Inc., Medtronic Inc., Medtronic Sofamor Danek, Inc*, Indiana State Court, Case No. 43C01-1308-PL-44. |
| | Project: | Patent litigation involving spinal medical device |
| | Status: | Ongoing |

| 2016 to Present | Client: | Christensen Fonder, P.A. |
|---|---|---|
| | Case: | *Willis Electric Co., Ltd v. Polygroup Limited (Macao Commercial Offshore), Polygroup Macau Limited (BVI), Polytree (H.K.) Co. Ltd.,* 15-cv-3443, 3:15-cv-00552, United States District Court for the District of Minnesota. |
| | Project: | Patent litigation involving modular mechanical and electrical connectors |
| | Status: | Ongoing |

| 2016 to Present | Client: | Locke Lord LLP |
|---|---|---|
| | Case | *Denneroll Holdings Pty Limited and Denneroll Industries International Pty Limited v. ChiroDesign Group, LLC and Marie L. Webster, Individually and D/B/A ChiroDesign Group;* Civil Action No. 4:15-cv-740; United States District Court for the Southern District of Texas, Houston Division. |
| | Project: | Patent litigation involving chiropractic pillows |
| | Status: | Settled; Infringement Expert Report, May 2016; Validity Expert Report, June 2016 |

| 2016 to Present | Client: | Mass Montes LLP |
| | Case: | *Logan W. Hensley vs. Michael J. Skyhar, MD.; Cayenne Medical, Inc., and DOES 1 thru 40, inclusive;* Case no. 37-2015-00005140-CU-MM-NC,  Superior Court for the State of California for the County of San Diego, North County Division. |
| | Project: | Personal injury involving failed medical device and medical practice |
| | Status: | Ongoing |

| 2016 to Present | Client: | Hamrick & Evans, LLP |
| | Case: | *Laurence Johnson vs. Raytheon Company, Systems XT, Inc. Brownco Construction Company, Inc., Power Edge Solutions, Inc. (aka PES Controls), et.al.*  United States District Court for the Central District of California; Case No. 2:15-cv-00132-MWF-E. |
| | Project: | Personal Injury; Product Performance & Product Liability |
| | Status: | Ongoing; |

| 2015 to Present | Client: | Nixon Peabody LLP |
| | Case: | *Johnstech International Corp v. JF Microtechnology SDN BHD* United States District Court for the Northern District of California; Case No. 3:14-cv-02864-JD |
| | Project: | Patent litigation involving semiconductor test technology |
| | Status: | Invalidity Expert Report, Non-Infringement Expert Report – Dec 2015; **Patent Trial Testimony – Sep 2016**. |

| 2015 | Client: | Susman Godfrey LLP |
| | Case: | *Bonutti Skeletal Innovations, LLC v. Medical, Inc* |
| | Project: | Patent litigation involving spinal medical devices |
| | Status: | Ongoing |

| 2015 | Client: | Richardson, Patrick, Westbrook, & Brickman, LLC |
| | Case: | *Smart v. PACCAR* |
| | Project: | Heavy-Truck Rollover & Crashworthiness |
| | Status: | Settled |

| 2014 to Present | Client: | Harris and Graves, P.A. |
| | Case: | *Dineen v. Sprint and Apple* |
| | Project: | Investigation of alleged cellular telephone defect and Lithium-Ion battery breach; Personal injury (victim sustained burns) due to ignition & combustion of cell phone; Non-Destructive & Destructive Inspections |
| | Status: | Ongoing Expert Report, July 2015, July 2017; Deposition Oct 2017; |

| 2014 to Present | Client: | Law Offices of David McQuade Leibowitz, P.C. |
| | Case: | *Ricardo Garza v. Daimler Truck of North America (DTNA), Freightliner LLC;* Texas Circuit Court, Bexar County, Texas |
| | Project: | Heavy Truck Crashworthiness |
| | Status: | Ongoing |

| | | |
|---|---|---|
| 2014 | Client: | Kolisch Hartwell, P.C. |
| | Case: | *TMI Products, Inc. v. Rosen Entertainment Systems, L.P*<br>United States District Court for the Central District of California;<br>Case No. EDCV12-02263 RGK (SPx) |
| | Project: | Patent case involving consumer electronics & vehicle entertainment applications |
| | Status: | Settled |
| | | Declaration & Report March 2014;<br>Declaration & Rebuttal Report March 2014;<br>Deposition March 2014 |
| | | |
| 2014 to Present | Client: | Corsiglia, McMahon, & Allard |
| | Case: | *Avalos v. Balt, Stanford Hospital & Clinics, et.al.* |
| | Project: | Personal Injury during Medical Procedure & Medical Device Product Liability; Failure analysis of micro-catheter for neurovascular treatment; embolization of a cerebral AVM during procedure at Stanford Hospital |
| | Status: | Ongoing |
| | | |
| 2014 to 2015 | Client: | The Previant Law Firm, S.C. |
| | Case: | *Kaminski v. DongGuan, et.al.* |
| | Project: | Personal injury (eye damage) due to failure of consumer product (elastomeric strap tie-down); Failure analysis, material testing, and evaluation of elastomeric material components |
| | Status: | Settled |
| | | Expert Report, July 2014 |
| | | |
| 2013 to 2015 | Client: | Guajardo & Marks, LLP |
| | Case: | *Bertha A. Flores Individually and as Representative of the Estate of Jose Flores, et.al. v Daimler Trucks North America, LLC.*<br>United States District Court for the Southern District of Texas, Corpus Christi Division, and is Civil Action No. 2:13-cv-87 |
| | Project: | Heavy-Truck Rollover & Crashworthiness |
| | Status: | Settled, Mar 2015<br>Report, Oct 2014<br>Deposition, Feb 2015 |
| | | |
| 2012 to 2014 | Client: | Edwards Life Sciences; Kilpatrick, Townsend & Stockton, LLP |
| | Case: | *Medtronic v. Edwards*<br>Case No. 11-CV-1650-JNE/JSM (D. Minn.) |
| | Project: | Medical device patent claims, infringement & invalidity |
| | Status: | Settled<br>Invalidity Report Aug 2013;<br>Non-Infringement Report Oct 2013; Deposition Oct 2013<br>Report, Deposition Oct 2012 |

**CV of T. Kim Parnell, PhD, PE**

*Parnell_Kim_70s.docx*

Page 15

| 2013 to Present | Client: | US Securities and Exchange Commission |
| | Case: | *Securities and Exchange Commission (SEC) v. Inteligentry, Ltd., Plasmerg, Inc., PTP Licensing, Ltd., and John P. Rohner in Civil No. 2:13-CV-00344-GMN-NJK* |
| | Project: | Securities associated with "Plasmic Transition Process Engine" technology; Technology assessment |
| | Status: | Resolved |

| 2013 to Present | Client: | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
| | Case: | *Walker v. PACCAR, Inc;* Alabama Circuit Court, Barbour County; 06-CV-2013-900032.00 |
| | Project: | Heavy-Truck Rollover & Crashworthiness |
| | Status: | Ongoing |

| 2013 | Client: | Retained in a metal component manufacturing technology patent litigation case. |
| | Case: | *Confidential* |
| | Project: | Metal manufacturing process patent for smart-phone and consumer electronics applications |

| 2013 to 2015 | Client: | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
| | Case: | *Lacy v. Freightliner* |
| | Project: | Heavy-Truck Rollover & Crashworthiness |
| | Status: | Settled Mar 2015 |

| 2013 to Present | Client: | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
| | Case: | *Jones vs. Daimler Truck North America (DTNA)* Alabama Circuit Court |
| | Project: | Heavy Truck Rollover & Crashworthiness |
| | Status: | Settled Nov 2015; Deposition Jan 2014 |

| 2012 | Client: | Smart-phone technology patent litigation case involving embedded electro-mechanical components |
| | Case: | *Confidential* |
| | Project: | Patent issues associated with specific user-feedback technologies |
| | Status: | |

| 2010 to Present | Client: | Warren & Associates, LLC |
| | Case: | *Jones vs. MSE Hauling* |
| | Project: | Heavy Truck Rollover |
| | Status: | Settled Nov 2015; Deposition Jan 2014 |

| 2009 to 2014 | Client: | Schwarz & Mongeluzzi; Nelson, Levine, DeLuca & Horst |
| | Case: | *Carrera v. Navistar* |
| | Project: | Heavy-Truck Rollover & Crashworthiness |
| | Status: | Settled 2014; Deposition Feb 2013 |

| 2010 | Client: | Sico, White, Hoelscher & Braugh L.L.P. |
|---|---|---|
| | Case: | *Ramirez v. Sterling Truck* |
| | Project: | Heavy-Truck Rollover & Crashworthiness |
| | Status: | Settled; Expert Report; Deposition May 2010 |

| 2008 to 2010 | Client: | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
|---|---|---|
| | Case: | *Thibadeaux vs. PACCAR* |
| | Project: | Heavy-Truck Rollover Accidents |
| | Status: | Settled; 2010. |

| 2008 to 2010 | Client: | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
|---|---|---|
| | Case: | *Price vs. Navistar* |
| | Project: | Heavy-Truck Rollover Accidents |
| | Status: | Settled; 2010. |

| 2008 to 2009 | Client: | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
|---|---|---|
| | Case: | *Martin vs. Kenworth* |
| | Project: | Heavy-Truck Rollover Accidents |
| | Status: | Settled; 2009. |

| 2007 | Client: | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
|---|---|---|
| | Case: | *Strode v. Freightliner, LLC;* Civil Action No. 02-132 Circuit Court of Greene County Alabama |
| | Project: | Heavy-Truck Rollover Accident |
| | Status: | Settled; 2007. Testified at trial. |

| 2006 | Client: | Gibson, Dunn, & Crutcher |
|---|---|---|
| | Case: | *Jang v. Boston Scientific Corp., et.al.* United States District Court, Central District of California; Eastern Division – Riverside; Case No: EDCV 05-00426 VAP (SGLx) |
| | Project: | Patent case for matters involving design features of Cardiovascular Stents. |
| | Status: | |

| 2005 | Client: | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
|---|---|---|
| | Case: | *Mongan vs. MACK Truck* |
| | Project: | Retained as fact witness in heavy truck rollover accident. |
| | Status: | Settled, 2005 |

| 2005 | Client: | Lucas Wash Petway Tucker & Stephens, P.C. |
|---|---|---|
| | Case: | *Gable v. International Truck & Engine Corporation* United States District Court, Middle District of Pennsylvania; Civil Action No: 3:03-CV-01353 |
| | Project: | Heavy-Truck Rollover Accident |
| | Status: | Closed; Deposition June 2005. |

| | | |
|---|---|---|
| 2004 | Client: | Kenyon & Kenyon Intellectual Property Law Firm |
| | Case: | *Medtronic Vascular, Inc. vs. Boston Scientific Corp., et al.* C.A. No. 98-478-SLR (D-Del) |
| | Project: | Patent case involving Cardiovascular Stent design |
| | Status: | Closed; Expert Report filed; No Deposition. |

| | | |
|---|---|---|
| 1997 | Client: | Grimaldi, Pearson,and Weyand, P.C. |
| | Case: | *Herbolsheimer v. Warner-Swasey* Case No. 9357487NP |
| | Project: | Product defect of CNC machine equipment |
| | Status: | Closed; Deposition. |

| | | |
|---|---|---|
| 1994 | Client: | Jones, Jones, Close & Brown |
| | Case: | *Pioneer Chlor-Alkali Co., Inc. v. National Union Fire Insurance Co.*, United States District Court, District of Nevada, Case No. CV-S-93-276-HDM (RLH) |
| | Project: | Accident investigation, insurance claim. |
| | Status: | Closed; Deposition. |

| | | |
|---|---|---|
| 1994 | Client: | Clapp, Moroney, Bellagamba, Davis and Vucinich |
| | Case: | *Thomas Fujisaka and Sandra Fujisaka v. Livermore Valley Unified School District*, Superior Court of the State of California In and For the County of Alameda, Case No. 700921-1 |
| | Project: | Accident Investigation, Personal Injury |
| | Status: | Closed; Deposition. |

| | | |
|---|---|---|
| 1994 | Client: | GEA In-House Counsel |
| | Case | *GEA Power Cooling Systems, Inc. v. Hyspan Precision Products*, Superior Court of the State of California for the County of San Diego, Case No. 669769 |
| | Project: | Product Liability; Failure analysis root cause. |
| | Status: | Closed; Deposition. |

| | | |
|---|---|---|
| 1993 | Case | *Bobbye J. Phaneuf v. Edith D. Roman*, Superior Court of the State of California County of Alameda, Case No. H - 154330-4 |
| | Project: | Product Design. |
| | Status: | Closed; Deposition, Trial. |

| | | |
|---|---|---|
| 1993 | Case: | *Patricia C. Barbera v. H. B. Instrument Company*, Superior Court of the State of California In and For the County of Marin, Case No. 138929 |
| | Project: | Product Design. |
| | Status: | Closed; Deposition, Trial. |

| | | |
|---|---|---|
| 1990 | Client: | Chevron In-House Counsel |
| | Case: | *Secretary of Labor v. Chevron U.S.A, et al.*, Occupational Safety and Health Review Commission, Region 9, OSHRC Docket No. 89-3125 |
| | Project: | Accident investigation; Failure analysis root cause. |
| | Status: | Closed; Deposition. |

**CV of T. Kim Parnell, PhD, PE**

*Parnell_Kim_70s.docx*

Page 18

## Trials & IPRs:

2017    Case:        *Trans Technologies Company v. Hendrickson USA LLC, et.al.*,
                     United States District Court for the Northern District of Georgia,
                     Atlanta Division, Civil Action No. 1:16-cv-01778--AT
        Status:      IPR Declaration Aug 2017; Ongoing;

2017    Case:        *Lenovo (United States) Inc. v. Blackbird Tech d/b/a Blackbird
                     Technologies*, Review of U.S. Patent No. 7,129,931;
        Status:      IPR Declaration May 2017; Ongoing

2016    Case:        *Olam West Coast, Inc. v. California Fire-Roasted LLC; Inter
                     Partes* Review of U.S. Patent No. 6,099,882
        Status:      IPR Declarations, Oct.2016; Open

2016    Case:        *Johnstech International Corp. v. JF Microtechnology SDN BHD;*
                     Action 14-cv-02864-JD, US Federal Court, District of Northern
                     California
        Status:      Testified in Patent trial, Sep. 2016

2007    Case:        *Strode v. Freightliner, LLC;* Civil Action No. 02-132
                     Circuit Court of Greene County Alabama
        Status       Testified in Product Liability/Personal Injury case; Closed

1995    Case:        *Bobbye J. Phaneuf v. Edith D. Roman*; Superior Court of the State
                     of California County of Alameda, Case No. H-154330-4
        Status:      Testified in Product Liability/Personal Injury case; Closed

1994    Case:        *Patricia C. Barbera v. H. B. Instrument Company*; Superior Court
                     of the State of California In and For the County of Marin,
                     Case No. 138929
        Status:      Testified in Product Liability case; Closed

## EXHIBIT B
## MATERIALS CONSIDERED

| PATENTS AND FILE HISTORIES |
| --- |
| U.S. Patent No. 7,129,931 |
| Prosecution History of U.S. Patent No. 7,129,931 |
| Japaneese Published Patent Application No. H8-191,420 ("Masaru") |
| U.S. Patent No. 5,016,849 ("Wu") |
| U.S. Patent No. 6,498,721 ("Kim") |
| Japanese Published Patent Application No. H11-161,367 ("Ioka") |
| U.S. Patent No. 5,335,142 ("Anderson") |
| U.S. Patent No. 5,632,373 ("Kumar") |
| U.S. Patent No. 5,774,331 ("Sach") |
| Japanese Published Patent Application No. H7-261,905 ("Satoshi") |
| U.S. Patent No. 6,275,376 ("Moon") |
| U.S. Patent No. 5,206,790 ("Thomas") |
| U.S. Patent No. 6,670,950 ("Chin") |
| Japanese Published Patent Application No. H5-242,040 ("Nobuhiko") |
| **DEPOSITIONS** |
| 2017-06-16 Nicholas Pappas Deposition Transcript |
| 2017-06-16 Exhibits 1-14 to Nicholas Pappas Deposition |
| **DISCOVERY** |
| Lenovo's Initial Invalidity Contentions (dated November 21, 2016) |
| Lenovo's Final Invalidity Contentions (dated August 21, 2017) |
| Blackbird's Supplemental Objections and Responses to Lenovo's First Set of Interrogatories |
| Blackbird's Objections and Responses to Lenovo's Second Set of Interrogatories |
| Blackbird's Initial Infringement Contentions (dated October 20, 2016) |
| Blackbird's Final Infringement Contentions (dated July 24, 2017) |

1

| FILINGS |
| --- |
| Blackbird's Complaint and attached Exhibits |
| Joint Claim Construction Brief and Appendix (dated April 6, 2017) |
| Order on Claim Construction (dated June 19, 2017) |
| Claim Construction Order (dated June 22, 2017) |
| **DOCUMENTS & THINGS** |
| PC Magazine Ad for the Zeos Freestyle from May 1994 |
| ABA Journal Ad for the Zeos Freestyle from September 1992 |
| BYTE Magazine Ad for the Zeos Freestlye from September 1992 |
| PC Magazine Ad for Zeos Freestlye from August 1992 |
| InfoWorld Ad for Zeos Freestyle from July 1992 |